## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| REBECCA LOVE, D.D.S., SHARON MURPHY, WILLIAM A. GAYLE DAVIS, AND BRANDI CARL, INDIVIDUALLY AND ON BEHALF OF A PROPOSED CLASS,<br><br>   Plaintiffs,<br><br>   v.<br><br>LLT MANAGEMENT LLC F/K/A LTL MANAGEMENT, LLC; JOHNSON & JOHNSON; JOHNSON & JOHNSON HOLDCO (NA) INC; JANSSEN PHARMACEUTICALS, INC.; KENVUE INC.; J&J SERVICES, INC.; ROBERT WUESTHOFF; RICHARD DICKINSON; MICHELLE GOODRIDGE; JOAQUIN DUATO; THIBAUT MONGON; JOSEPH WOLK; LAURA MCFALLS; DUANE VAN ARSDALE; AND JOHN DOES 1-100,<br><br>   Defendants. | **JURY TRIAL DEMANDED**<br><br>**Case No. _____** |

## CLASS ACTION COMPLAINT

Plaintiffs Rebecca Love, D.D.S, Sharon Murphy, William A. Henry, Alishia Gayle Davis, and Brandi Carl, individually and on behalf of a proposed class (the "Plaintiffs"), submit this complaint (the "Complaint") against Defendants LLT Management LLC f/k/a/ LTL Management, LLC ("LTL"), Johnson & Johnson ("J&J"), Johnson & Johnson Holdco (NA) Inc. ("New JJCI"), Janssen Pharmaceuticals, Inc. ("Janssen"), Kenvue Inc. ("Kenvue"), Johnson & Johnson Services, Inc. (collectively with LTL, J&J, New JJCI, Janssen, and Kenvue, the "Corporate Defendants"), Robert Wuesthoff, Richard Dickinson, Michelle Goodridge, Joaquin Duato, Thibaut Mongon, Joseph Wolk, Laura McFalls, Duane Van Arsdale, and John Does 1-100 (collectively, the "Individual Defendants"), and allege as follows:

## PRELIMINARY STATEMENT

1.     This action is brought for the fair and equitable treatment and benefit of the creditors of LLT Management LLC (f/k/a, LTL Management LLC).

2.     For decades, J&J, one of the richest corporations in the world, knowingly sold asbestos-laden talc in its Johnson's Baby Powder and Shower to Shower products that led to tens of thousands of women developing ovarian cancer and thousands developing mesothelioma. J&J has since compounded its malfeasance by pursuing a strategy of repeat fraudulent transfers and serial bad faith bankruptcy filings to hinder, delay, and defraud these women and prevent them from ever having their day in court before a jury of their peers, much less recovering from J&J.

3.     The law of fraudulent transfers, however, affords remedies to creditors when debtors transfer away assets or incur liabilities for the purpose of hindering, delaying, or defrauding creditors' ability to collect on a claim. Critically, fraudulent transfer law affords remedies not only to those creditors with matured claims, but also to creditors with contingent, disputed, unliquidated, or unmatured claims, such as tort victims. Plaintiffs seek these fraudulent transfer remedies on behalf of themselves and the Class.

4.     Specifically, this lawsuit seeks a declaration that certain transactions as further detailed herein engaged in by Johnson & Johnson, and certain of its former and present named subsidiaries, and its aiders and abettors were fraudulent and implemented through corporate machinations and bad faith bankruptcy filings to hinder and delay tort victims. It also seeks to have those fraudulent transfers avoided and judgment for the value of said transfers entered against J&J and certain present named subsidiaries for whose benefit the transfers were undertaken.

5.     This suit also seeks other appropriate remedies, including compensatory and punitive damages to address the Defendants' malicious abuse and malicious use of process.

6.    All the Corporate Defendants in this case, besides J&J, are J&J's current or former subsidiaries. Many acts described below were taken by the named current and former subsidiaries, but always at the direction and for the benefit of J&J itself.

7.    All references to J&J in this Complaint refer to J&J, directly, as well as to the current and former subsidiaries named in this Complaint. References to JJCI are to Johnson & Johnson Consumer, Inc., ("JJCI") a wholly owned subsidiary of J&J, which as the first step in J&J's fraudulent scheme split into two companies through a "divisive merger," one of which ultimately reclaimed the JJCI name. For clarity, this Complaint refers to JJCI prior to the divisive merger as Old JJCI ("Old JJCI") and to the new entity formed after the divisive merger as New JJCI ("New JJCI").

8.    The individual named defendants are all officers or directors of J&J or of individual named current or former subsidiaries that executed the fraud, or persons assigned to execute specific aspects of the fraud. All had actual individual involvement in one or more actions necessary to the execution of the fraudulent schemes articulated herein.

9.    In committing its frauds and fraudulent schemes, J&J and its current and former subsidiaries, were aided and abetted by a host of professionals, including various law firms, accounting firms, and third-party financial professionals.

10.    J&J's frauds and fraudulent schemes can be characterized as three distinct, but connected fraudulent transfers, all directed toward the same goal; namely, hindering and delaying tort victims from recovery against J&J and its operating subsidiaries:

a.    **Fraudulent Transfer #1** — The use of the Texas divisive merger statute to split Old JJCI into two successor entities: (1) a GoodCo (*i.e.,* New JJCI) that was allocated almost all of Old JJCI's assets, including valuable brands like Tylenol and

Band-Aid, and (2) a BadCo (*i.e.*, LTL Management LLC or "LTL") that was allocated all of Old JJCI's talc liabilities, only to file for bankruptcy two days later (the "Texas Two-Step" or the "**Divisive Merger Fraud**");

b. **Fraudulent Transfer #2** — During the pendency of the first LTL bankruptcy, the transfer out of New JJCI of its valuable multi-billion-dollar consumer health business assets to its immediate corporate parent Janssen, with the ultimate destination of those assets being a newly-created J&J entity, named Kenvue (the "**Asset Stripping Fraud**"); and,

c. **Fraudulent Transfer #3** — The purported cancellation of a $61.5 billion funding agreement provided by both J&J and New JJCI to LTL, which left LTL with no access to J&J's wealth. The cancelled funding agreement was replaced with a new, but substantially reduced $29.9 billion funding agreement solely from New JJCI (the "**Bait-and-Switch Fraud**").

11.    J&J has recently announced its intent to pursue further corporate transfers as part of an as-yet unfulfilled scheme which may also constitute additional fraudulent transfers. According to J&J, it intends to undertake corporate transactions in the near future that will (1) void the new, diminished $29.9 billion funding agreement, (2) replace it with an even more limited one, and (3) culminate in yet a third bad-faith bankruptcy filing, this time by a newly contrived subsidiary. Like the first three fraudulent transfers, the voiding of the $29.9 billion funding agreement (if carried out in the manner announced by J&J) would be undertaken with the actual intent to hinder, delay, or defraud the Plaintiffs. As an initial step in this scheme, LTL has already been converted to a Texas entity and renamed LLT Management LLC.

12.     J&J's past fraudulent transfers should be declared frauds and avoided, so as to ensure that talc victims have access to the same assets to satisfy their claims that they had prior to the Divisive Merger Fraud. J&J should also be enjoined from engaging in further fraudulent transfers, including its intended termination of the $29.9 billion funding agreement.

**A.     <u>Background</u>**

13.     For the past half-century J&J's conduct has remained remarkably consistent: it knowingly sold dangerous personal hygiene products to consumers and sought to avoid taking responsibility for the harms it has caused.

14.     For decades, J&J sold talc products, such as Johnson's Baby Powder and Shower to Shower, that contained asbestos, fibrous talc, and other ingredients that, individually or in combination, are dangerous carcinogens. J&J did so despite being aware of scientific studies, conducted by researchers at different institutions, in different countries, using different study designs that almost uniformly demonstrate between a 30% and 60% increased risk of ovarian cancer. J&J did so despite incontrovertible scientific knowledge that asbestos causes mesothelioma.

15.     Despite this knowledge, J&J advertised its talcum powder to parents for use on their newborn babies; it advertised its talcum powder for women to use on their perineal or genital region; and it advertised its talcum powder for general everyday use by men and women. J&J warned consumers of none of the relevant facts. J&J misled the public about the asbestos contamination in its products. J&J failed to warn women of the potential risk of ovarian cancer when talcum powder was applied to the genital area. J&J failed to warn anyone of the risk of mesothelioma by breathing air that contained talcum powder contaminated with asbestos. J&J did this knowing that it had a safe alternative to talc—cornstarch.

16.     The human toll of J&J's choice is staggering. Over the decades, tens of thousands of women have developed ovarian cancer caused by the migration of the talcum powder and its constituents from the exterior of their bodies to their ovaries, where talc accumulated and remained in the same way asbestos and other contaminants accumulate in the lungs and other parts of the body. Thousands of men and women have developed mesothelioma from inhaling the asbestos in Johnson's Baby Powder. Both cancers are often incurable and lethal.

17.     As a result, the families of victims face the prospect of their loved ones suffering and dying prematurely, and the cancer victims die knowing their families may have been ruined financially because of the high costs of their fight to survive the cancer that J&J inflicted upon them and the loss of their earnings for their families. Moreover, victims have suffered emotional pain and distress as they deal with their cancer and live through the pain and disruption their loved ones experience.

18.     For decades, J&J has concealed and covered up the presence of asbestos and other carcinogens in its talcum powder. It has suppressed scientific research into the link between talcum powder use and ovarian cancer and mesothelioma. For years, victims who believed talc was a likely cause of their cancer and sued were unable to obtain relevant documents or prove the scientific link between J&J's talc products and their cancer. Often, if they did not drop their lawsuits or accept a nuisance value settlement amount, they were threatened with sanctions and damages by J&J through its army of lawyers. However, in the past decade, this wall of deceit has crumbled.

19.     Victims have been able to uncover and obtain internal documents that underscore the true magnitude of J&J's misconduct. Among other things, these documents establish that J&J knew that its talcum powder contained asbestos and other carcinogens and caused a risk of ovarian

cancer and mesothelioma; that J&J knew this information for decades but failed to disclose it to the public; that women and men suffered or died from incurable and fatal cancer as a result of J&J's actions and omissions; and, that J&J concealed and otherwise spoliated evidence, altered or suppressed scientific studies, and misrepresented facts on the existence of asbestos in its talc ore (which it mined or purchased) and its talc products, including Johnson's Baby Powder.

20. When J&J first detected the asbestos contamination in its products and learned of the link to ovarian cancer and mesothelioma, rather than remove the products from the market or replace them with a safer alternative (cornstarch), J&J engaged in a "deny strategy" straight out of the tobacco industry and mined-asbestos products playbook. J&J publicly and persistently denied that its products ever contained asbestos.

21. Despite these proclamations, behind closed doors, J&J lobbied the FDA to allow a purportedly "safe" level of asbestos in its talcum powder products — a request which the FDA, of course, refused, explicitly telling J&J that no mother would powder her infant with a "safe" level of asbestos (as there is no such safe level). Nonetheless, for years, J&J was successful in convincing the FDA not to regulate talcum powder at all by stepping in with purported "self-regulation" to falsely reassure the public that its products contained no asbestos.

22. However, the testing methods J&J selected and promoted were flawed, such that they could not detect lower levels of asbestos contamination—in effect, giving J&J the permitted level of asbestos contamination in talc that it sought. Further, J&J's chosen testing method was incapable of detecting chrysotile asbestos—the very form of asbestos the FDA found in Johnson's Baby Powder in 2019.

23. As a result of these developments, juries throughout the country over the past ten years have been holding J&J accountable. J&J has been found liable by juries for causing ovarian

cancer and mesothelioma in victims, and due to J&J's "reprehensible" conduct (as confirmed by a Missouri appeals court) in hiding the asbestos and other carcinogens in its product, significant punitive damages have been awarded against J&J and its subsidiaries to punish and deter their indefensible actions. *See Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (2020), *cert. denied*, No. 20-1223 (June 1, 2021).

24. Courts, including the federal court overseeing the federal talcum powder litigation, a federal court in South Dakota, and state courts in New Jersey, Missouri, Illinois, Pennsylvania, California, and Georgia have found that there is reliable scientific evidence linking talcum powder to ovarian cancer. Recently, a California appellate court not only affirmed the trial court's adverse inference instruction against J&J for spoliation of key evidence, but unequivocally determined that, notwithstanding any destruction of evidence, there was still "abundant evidence" that J&J's talc "contained asbestos." *See Bader v. Johnson & Johnson*, 303 Cal. Rptr. 3d 162, 194-95 (Cal. Ct. App. 2022). Moreover, courts have repeatedly held J&J liable for mesothelioma caused by the asbestos in its talcum powder.

25. Even in the face of these findings, J&J remains defiant. It repeats its claims— rejected by juries and judges—that there is no scientific basis for the linkage between its asbestos-contaminated talcum powder and both ovarian cancer and mesothelioma. It has continued to repeat its claims—belied by testing of the FDA, and decades of internal J&J tests and documents—that its talcum powder does not contain asbestos. It continues to assert that the numerous scientific authorities that have demonstrated a strong link between talcum powder use and ovarian cancer are all mistaken or fabricated.

26. Like many guilty parties facing lawsuits, J&J has resorted to destruction of evidence (*see, e.g.*, *Bader*, 303 Cal. Rptr. 3d at 194-95) and distraction from the merits. In fact,

upon being confronted with the mounting evidence of its wrongdoing, J&J shifted to its now-standard spectacle of misdirection through attacks on the plaintiffs, their lawyers, and their lawyers' experts. Following several plaintiffs' verdicts, J&J's lawyers proudly boasted that J&J had shifted its tactics to pushing a theory of the talc lawsuits as a "sham" or fraud perpetrated by plaintiffs' lawyers. J&J's attacks on the plaintiffs' bar rather than addressing the merits of the talc lawsuits left one New Jersey judge "horrified." *See Barden v. Brenntag North America, Inc., et al.*, No. MID-L-1809-17, Tr. at 44 (July 11, 2019).

      **B.**    **Fraudulent Transfer #1: <u>The Divisive Merger Fraud</u>**

27.    With juries and judges no longer accepting J&J's meritless litigation arguments and the tide of the talc litigation turning against J&J, numerous state court trial dates were set and a Multidistrict Litigation ("<u>MDL</u>") bellwether trial was scheduled to begin in April 2022. In light of those developments, J&J and its lawyers devised a "Texas Two-Step" stratagem to delay all talc cases in the United States for years, avoid jury trials, and attempt to force a lowball global settlement on talc victims. That maneuver began in October 2021, with a divisive merger under Texas law.

28.    A "divisive merger" is a transaction permitted under Texas corporate law that allows a corporation to split into two or more entities and allocate its assets and liabilities among them. *See, e.g.*, Texas Bus. Org. Code § 1.002(55)(a) (defining "merger" to mean "the division of a domestic entity into two or more new domestic entities or other organizations or into a surviving domestic entity and one or more new domestic or foreign entities or non-code organizations."), *id.* § 10.008(a)(3) (noting that "[w]hen a merger takes effect … all liabilities and obligations of each organization that is a party to the merger are allocated to one or more of the surviving or new organizations in the manner provided by the plan of merger.").

29.     More specifically, J&J, through the Individual and Corporate Defendants named in this Complaint as involved in the Divisive Merger Fraud, instructed Old JJCI (a subsidiary that manufactured, marketed, and distributed Johnson's Baby Powder and was worth over $61 billion according to J&J's own calculations) to effectuate a series of transactions that involved its re-domestication from New Jersey to Texas in order to take advantage of the Texas divisive merger statute (Texas Bus. Org. Code §§ 10.001 *et seq.*). The divisive merger transaction resulted in the termination of Old JJCI's corporate existence and the ultimate formation of two new successor entities, a "BadCo" and a "GoodCo," LTL and New JJCI respectively. *See* Decl. of John K. Kim in Support of First Day Pleadings*, In re LTL Mgmt. LLC* (Bankr. W.D.N.C.) No. 21-30589 ("Kim Decl.") [D.I. 5 ¶¶ 16, 22-23].

30.     As part of the divisive merger, the talc liabilities were dumped into LTL, the BadCo, while all other liabilities and valuable assets were assigned to New JJCI, the GoodCo. LTL, the BadCo, was a passive, non-operating entity with no employees that existed solely as a vehicle for a bankruptcy filing. *See* Transfer Agreement, at 2, 9. Specifically, LTL was assigned all of Old JJCI's talc-related liabilities, but only certain limited non-operating assets, as well as rights under a 2021 Funding Agreement. *See* Kim Decl., ¶ 24.

31.     LTL thus incurred the talc-related liability obligations as part of the divisive merger. Meanwhile, New JJCI, the GoodCo, was allocated all of Old JJCI's other assets, including those related to a broad range of well-known consumer health products such as Tylenol and Band-Aid, and the non-talc liabilities. *Id*. ¶¶ 16, 19, 23-24. The result was that the talc liabilities were parked in a non-operating company (LTL) whose major asset was a funding agreement with J&J. The funding agreement provided LTL with access to liquidity to pay talc claims, but only if J&J— which controlled LTL—approved of LTL's draw on the funding. All of Old JJCI's other liabilities

were allocated to New JJCI, a well-capitalized operating company. Through these actions, the Defendants committed the Divisive Merger Fraud, the first part of the so-called "Texas Two-Step" stratagem.

32.     Less than two days after the divisive merger, LTL re-domesticated to North Carolina to take advantage of what its lawyers perceived to be a more lenient good faith standard for bankruptcy filings, and New JJCI re-domesticated to New Jersey, where its parent J&J is incorporated. *Id.* ¶ 10, 16, 22-23.

33.     LTL's principal asset was a funding agreement with New JJCI and J&J (the "2021 Funding Agreement"). The 2021 Funding Agreement allowed LTL to access the full value of Old JJCI—estimated to be more than $61 billion—and was guaranteed by J&J. The 2021 Funding Agreement provided that the funding would be available to LTL both in and out of bankruptcy.

34.     As the United States Court of Appeals for the Third Circuit recognized in its decision directing that LTL's first bankruptcy case be dismissed for cause, the 2021 Funding Agreement functioned as an ATM—providing LTL with access to cash sufficient to satisfy talc claims as they became due in the ordinary course of business.

35.     The 2021 Funding Agreement was not an eleemosynary act by J&J. If J&J provided LTL with anything less than full access to the same value that formerly was available to Old JJCI to satisfy talc claims prior to the divisive merger—and the same ability to satisfy those claims—then it would mean the divisive merger was an *ipso facto* fraudulent transfer.

36.     Fraudulent transfer law offers remedies to creditors in circumstances involving two types of transactions: constructive fraudulent transfers and actual fraudulent transfers. The divisive merger was an *actual* fraudulent transfer in that it was undertaken with actual intent to hinder, delay, or defraud the talc claimant creditors of J&J and Old JJCI. *See* Uniform Fraudulent Transfer

Act § 4(a)(1) (avoidability of actual fraudulent transfers). The 2021 Funding Agreement provided no defense to the divisive merger as an actual fraudulent transfer. Indeed, the 2021 Funding Agreement was entered into as part of an integrated transaction with the divisive merger, and it too was entered into with the actual intent to hinder, delay, or defraud the Plaintiffs. Thus, it was part of J&J's scheme and artifice to defraud the Plaintiffs and all present and future talc victims.

37.     Once the divisive merger transaction was complete and the 2021 Funding Agreement reflecting J&J's so-called commitment to fund at least $61 billion to pay talc liabilities was in place, J&J and New JJCI caused LTL to be placed into bankruptcy, triggering the bankruptcy automatic stay against any efforts to collect from LTL outside of the bankruptcy court. 11 U.S.C. § 362(a). This was the second step of the "Texas Two-Step."

38.     The individual defendants involved in the Divisive Merger Fraud, as will be discussed below, all played important roles in the scheme by approving and executing the divisive merger and putting LTL into bankruptcy with the intentional goal of hindering, delaying, and defrauding the Plaintiff creditors.

39.     Indeed, after steering LTL straight into bankruptcy, J&J declared that the automatic stay in LTL's bankruptcy case halted "all" talcum powder litigation across the country, even while assuring the capital markets that it was only LTL, and not the rest of the J&J enterprise, that had filed for bankruptcy relief.[1]

40.     J&J's goal with the Texas Two-Step was to halt litigation by separating the talc liabilities from its assets and then use the automatic stay provisions of the Bankruptcy Code to freeze all talc litigation. Even though bankruptcy relief is intended for the honest but unfortunate

---

[1] *See* Johnson & Johnson Press Release (Oct. 14, 2021), https://www.jnj.com/media-center/press-releases/johnson-johnson-takes-steps-to-equitably-resolve-all-current-and-future-talc-claims.

debtor that files for bankruptcy in good faith due to its financial distress, J&J invoked bankruptcy relief for itself without subjecting itself to court and creditor scrutiny. Of course, LTL was not in financial distress, as the Third Circuit subsequently held in *In re LTL Mgmt. LLC*, 64 F.4th 84, 106-110 (3d Cir. 2023) (as amended), and the divisive merger and subsequent bad faith bankruptcy filing were undertaken to hinder, delay, and defraud the Plaintiffs and current and future talc victims.

41.     The fraudulent transfers in the Divisive Merger Fraud included both the incurrence of the talc obligations by LTL and the transfer of the valuable assets to New JJCI. These transfers were not the entirety of the Divisive Merger Fraud, however, as the divisive merger was part of an integrated set of transactions with the 2021 Funding Agreement and the bankruptcy filing. This set of integrated transactions had as its goal hindering, delaying, and defrauding the Plaintiffs and the talc victims.

42.     As detailed below, each of the Individual Defendants named in this action took or authorized corporate actions allowing and implementing the Divisive Merger Fraud.  Each of them knew or should have known that the Divisive Merger Fraud was designed to hinder, delay, or defraud the talc creditors of Old JJCI and J&J.

     C.     **Fraudulent Transfer #2: <u>The Asset Stripping Fraud</u>**

43.     On September 19, 2022, the talc victim creditors made their oral arguments to the Court of Appeals for the Third Circuit requesting the dismissal of LTL's bad faith bankruptcy filing. Before the Court announced its decision, the Defendants executed their "Asset Stripping Fraud," another step in J&J's efforts to remove valuable assets from the reach of talc creditors.

44.     The Third Circuit ultimately held that LTL's bankruptcy was filed in bad faith and warranted dismissal. Specifically, the Third Circuit—*relying on a record that reflected the state*

- 13 -

*of the world prior to the Asset Stripping Fraud*—found that LTL had full access to at least $61 billion of value, and thus LTL was not in immediate financial distress. Further, the Court held that LTL had no business to reorganize in bankruptcy, and its professed claims to want a "fair and equitable" settlement for talc claimants did not overcome its bad faith in filing for bankruptcy. What's more, the Third Circuit's decision made clear that it was not blind to the possibility of J&J's potential next move—to fraudulently transfer away LTL's assets to artificially create financial distress—and the Court specifically warned against it. Finally, the Third Circuit noted that it could not see any legitimate way that LTL would qualify for bankruptcy through legitimate, immediate financial distress and mandated that LTL be ejected from bankruptcy.

45.     J&J was not deterred. Even with the Third Circuit's decision looming, J&J proceeded with a second fraudulent transfer transaction.

46.     Despite (or because of) the fact that the measure of J&J's liability under the 2021 Funding Agreement was the value of New JJCI at the time of bankruptcy (or the then-existing value, whichever is greater), J&J took steps to transfer its immensely valuable consumer health business (worth well more than $40 billion dollars) out of New JJCI[2] and into another J&J subsidiary called Janssen. On information and belief, New JJCI received no consideration in exchange for the transfer of the consumer health business assets.

47.     Janssen was New JJCI's immediate corporate parent. By transferring the consumer health business assets from New JJCI to New JJCI's immediate parent (*i.e.*, Janssen), J&J attempted to remove the consumer health business from the reach of New JJCI's creditors, with the knowledge that creditors of a subsidiary ordinarily do not have any claim on the assets of a

---

[2] New JJCI had been renamed Johnson & Johnson Holdco (NA) Inc. but is referred to in this Complaint as "New JJCI".

parent. The transfer of the consumer health business from New JJCI to Janssen was an actual fraudulent transfer as it was undertaken with actual intent to hinder, delay, or defraud the Plaintiffs and talc victims.

48.     From Janssen, the valuable consumer health business found its way to another newly formed J&J subsidiary called Kenvue Inc. ("Kenvue").[3, 4]

49.     In perpetrating the Asset-Stripping Fraud, J&J sought to shield its incredibly valuable consumer health business—and all future profits generated thereby—from the talc claimants who are Plaintiffs in this case and all present and future talc claimants.

50.     The Individual and Corporate Defendants involved in the Asset Stripping Fraud are further identified below.

**D.     Fraudulent Transfer #3: The Bait-and-Switch Fraud**

51.     After the Third Circuit issued its opinion ordering dismissal of the bankruptcy for lack of good faith, but before the bankruptcy court entered the order actually dismissing the case, J&J moved forward with the next part of its scheme. LTL's general counsel John Kim claimed that, as early as the day the Third Circuit decision was announced, he "concluded" there was a material risk that the 2021 Funding Agreement had been rendered "void or voidable"—a conclusion for which neither LTL nor J&J has provided any support or basis.[5] In fact, if the Funding Agreement was "void or voidable" as LTL claimed, then the divisive merger was a fraudulent transfer of gigantic proportions, as was the subsequent transfer of the consumer health

---

[3] Kenvue was subsequently spun off to become a public company, meaning that its shares were dividended to J&J's shareholders so they would hold Kenvue directly, rather than indirectly as shareholders of J&J when Kenvue was a subsidiary of J&J. The spinoff means that J&J is not in a position itself to direct Kenvue to return the consumer health business assets to New JJCI.

[4] Recently, on May 13, 2024, J&J announced that it would sell its remaining shares of Kenvue.

[5] *In re: LTL Management LLC,* No. 23-12825, Dkt. No. 4 at p. 26 (First Day Declaration of John Kim).

business out of New JJCI to Janssen and then Kenvue, because the transfer to LTL of all the talc liabilities would have been without adequate offsetting assets.

52.    The 2021 Funding Agreement had a floor of $61.5 billion, could only increase in value, and was guaranteed by J&J itself. As the Third Circuit held, the 2021 Funding Agreement was "not unlike an ATM disguised as a contract" and provided LTL with sufficient funding to pay its talc liabilities inside and outside of bankruptcy. *In re LTL Mgmt. LLC*, 64 F.4th 84, 109 (3d Cir. 2023) (as amended).

53.    LTL acknowledged (including to the Bankruptcy Court and the Third Circuit) that the 2021 Funding Agreement applied outside of bankruptcy, something LTL would be hard pressed to deny as the very terms of the Funding Agreement so specify. *See In re: LTL Mgmt. LLC*, 64 F.4th 84, 106 (3d Cir. 2023) ("To recap, under it LTL had the right, outside of bankruptcy, to cause J&J and New Consumer, jointly and severally, to pay it cash up to the value of New Consumer as of the petition date (estimated at $61.5 billion) to satisfy any talc-related costs and normal course expenses."). LTL also admitted that dismissal was a "reasonably foreseeable" event and it understood that its case might be dismissed.

54.    Each of these admissions is by itself fatal to any claim that the Third Circuit's ruling suddenly made the 2021 Funding Agreement "void or voidable" under all legal precedent, making LTL's alleged concerns facially absurd and factually and legally unsupportable.

55.    The Third Circuit's decision posed a conundrum for J&J because under the 2021 Funding Agreement, LTL had the ability to access the $61.5 billion both in and out of bankruptcy. With its bankruptcy about to be dismissed and the automatic stay lifted, LTL knew it could be sued; and if LTL was sued, its creditors could force it to tap the "ATM" of the 2021 Funding Agreement. In other words, because the 2021 Funding Agreement was still valid and enforceable

outside of bankruptcy, the dismissal of the case had the effect of undermining the divisive merger. The 2021 Funding Agreement caused J&J and New JJCI to remain liable for all the talc liabilities dumped into LTL. In particular, the 2021 Funding Agreement meant that J&J, the parent company, had effectively indemnified LTL for all *LTL's* liabilities. Therefore, J&J needed to find a way out of the obligations it imposed on itself through the 2021 Funding Agreement.

56.     The solution was to have LTL pretend that the dismissal somehow put the 2021 Funding Agreement's enforceability in doubt. Accordingly, LTL purported to "settle" the fake concern that the 2021 Funding Agreement was "void or voidable," despite having made no effort to litigate the issue or defend the validity of the Agreement. Instead, "by consensus" LTL gave up the 2021 Funding Agreement.

57.     LTL's abandonment of the 2021 Funding Agreement was an actual fraudulent transfer, as it transferred away its most valuable $61.5 billion asset and released J&J and New JJCI from their obligation to satisfy all claims against LTL.

58.     LTL admits that the intent of terminating the 2021 Funding Agreement was not to achieve any value for LTL or its creditors. LTL destroyed its most valuable asset in an attempt to hinder, delay, and defraud the talc claimants. And LTL did so at the direction and under the control of J&J.

59.     All that LTL had after the transfer of its most valuable asset were rights under a new funding agreement which obligated only New JJCI to cover LTL's liabilities (the "2023 Funding Agreement"). The 2023 Funding Agreement is, by LTL's admission, of far lesser value than the 2021 Funding Agreement. The **2023** Funding Agreement provides up to $29.9 billion in funding, less than half the amount provided in the **2021** Funding Agreement. Moreover, the 2023 Funding Agreement is backed only by New JJCI, whereas the 2021 Funding Agreement was

backed by both New JJCI and J&J. The 2023 Funding Agreement was only available in bankruptcy. *See* Kim Decl., ¶ 82.

60.     Not only did the substitution of the 2023 Funding Agreement for the 2021 Funding Agreement purportedly get J&J off the hook for its indemnification of LTL, but by reducing the value of the funding available to LTL, J&J sought to create the financial distress needed to stave off the dismissal of a second LTL bankruptcy filing for lack of good faith.

61.     The final piece of the Bait-and-Switch Fraud was for LTL to re-file for bankruptcy a mere **131 minutes** after the entry of the order dismissing its first bankruptcy. LTL was confident that it had created "financial distress" through swapping of the funding agreements, but as with the first bankruptcy, the second was also dismissed as filed without good faith. *See In re: LTL Mgmt. LLC*, No. 23-12825, Dkt. No. 1211 (Aug. 11, 2023).

62.     The Individual and Corporate Defendants involved in the Bait-and-Switch Fraud are further identified below.

63.     By surrendering over $30 billion dollars in value through the swap of the funding agreements, LTL, J&J, and their aider and abettor co-conspirators knowingly and intentionally conducted what may be the largest fraudulent transfer in U.S. history.

**E.     Summary**

64.     The Divisive Merger Fraud, the Asset Stripping Fraud, and the Bait-and-Switch Fraud cannot stand. J&J and its aiders and abettors must be held to account.

65.     The Divisive Merger Fraud and the Asset Stripping Fraud establish J&J's fraudulent intent. These transactions are the very paradigm of actual fraudulent transfers: a debtor faced with immense liability transfers assets to an affiliated non-debtor to put the assets beyond the reach of its creditors.

66.    Likewise, the termination of the 2021 Funding Agreement in the Bait-and-Switch Fraud is a textbook fraudulent transfer of value from LTL to J&J, conceived and largely executed when LTL was debtor in possession with fiduciary duties to its bankruptcy estate (the major part of which was comprised of the talc claimant creditors). But LTL did not exercise those fiduciary duties. Instead, it bowed to the demands of its ultimate equity owner, J&J, and moved right along to a second bad faith bankruptcy filing. The second bankruptcy filing was part of yet another scheme to wrongfully deny talc victims their day in court where a jury of their peers would adjudicate their claims. Jury trials are what J&J fears. J&J has undertaken the entire scheme and artifice to defraud described herein to hinder, delay, and defraud women who are ill and dying from use of J&J's talc products.

67.    J&J has been able to hinder, delay, or defraud its creditors by doing whatever it chooses without being held accountable for its actions, no matter how egregious. This must end. J&J's multitude of frauds and fraudulent schemes must be abrogated, and equitable relief and damages must be awarded to the thousands of talc victims J&J and its affiliates have harmed.

## JURISDICTION AND VENUE

68.    The Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) (diversity jurisdiction). This action satisfies, among other things, the requirements for diversity under 28 U.S.C. § 1332(d)(2), a provision of the Class Action Fairness Act of 2005.

69.    The matter in controversy exceeds $5 million, exclusive of interest and costs. Specifically, this action alleges fraudulent transfers of billions of dollars and seeks those damages.

70.    Further, at least one class member is a citizen of a state different from any Defendant.

71.    The Corporate Defendants are subject to this Court's personal jurisdiction because Defendants have purposefully availed themselves of the privilege of conducting business within

New Jersey, and are domiciled here, have their principal place of business here, are registered to do business here, and carry on continuous and systematic business here.

72.     The Individual Defendants are subject to this Court's personal jurisdiction because many of the acts described in this complaint occurred in New Jersey. All the individual Defendants have travelled to New Jersey in the course of their work for J&J. Many of them reside in New Jersey. Much of the communication in this case occurred in New Jersey and most of the misuse of the bankruptcy system from 2021 through 2023 – which would have been impossible but for the actions of the individual Defendants – occurred in New Jersey.

73.     Venue is proper in this District and Division under 28 U.S.C. § 1391(b)-(d) because Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction when the action is commenced, and the Defendants' contacts with this District are sufficient to subject them to personal jurisdiction.

74.     Plaintiffs demand a jury trial on all issues so triable.

## PARTIES

### A.     Plaintiffs

75.     Plaintiff, Dr. Rebecca Love, D.D.S., is a citizen and resident of Park City, Summit County, Utah. Plaintiff Love brings this action individually and on behalf of a proposed class of similarly situated Plaintiffs, as described in greater detail below in the sections entitled "Class Representative Plaintiffs" and "Class Action Allegations."

76.     Plaintiff, Sharon Murphy, is a citizen and resident of Wylie, Collin County, Texas. Plaintiff Murphy brings this action individually and on behalf of a proposed class of similarly situated Plaintiffs, as described in greater detail below in the sections entitled "Class Representative Plaintiffs" and "Class Action Allegations."

77.     Plaintiff, William A. Henry, is a citizen and resident of Orange Park, Clay County, Florida. Plaintiff Henry brings this action individually and for the Estate of Debra Sue Henry, and on behalf of a proposed class of similarly situated Plaintiffs, as described in greater detail below in the sections entitled "Class Representative Plaintiffs" and "Class Action Allegations."

78.     Plaintiff, Alishia Gayle Davis, is a citizen and resident of Inman, Spartanburg County, South Carolina. Plaintiff Davis brings this action individually and on behalf of a proposed class of similarly situated Plaintiffs, as described in greater detail below in the sections entitled "Class Representative Plaintiffs" and "Class Action Allegations."

79.     Plaintiff, Brandi Carl, is a citizen and resident of Norristown, Montgomery County, Pennsylvania. Plaintiff Carl brings this action individually and on behalf of a proposed class of similarly situated Plaintiffs, as described in greater detail below in the sections entitled "Class Representative Plaintiffs" and "Class Action Allegations."

**B.      Corporate Defendants**

80.     Defendant LLT is a Texas limited liability company which at all relevant times alleged in this Complaint operated as LTL, a North Carolina limited liability company with an address at 501 George Street, New Brunswick, New Jersey 08933. For convenience and consistency with pleadings in other matters referred to herein, as noted above, LLT is generally referred to as LTL.

81.     Defendant Johnson & Johnson, a New Jersey corporation, is a holding company with various subsidiaries. J&J is LTL's ultimate parent company. J&J's principal place of business is in New Brunswick, New Jersey, where its corporate offices are located.

82.     Defendant Johnson & Johnson Holdco (NA) Inc., a New Jersey corporation (alternatively, "New JJCI"), is a subsidiary of J&J. Old JJCI's consumer health business, including

its assets and operations, was transferred through a series of transactions to New JJCI, which thereafter continued to operate the business without interruption until a subsequent restructuring.

83.     Defendant Janssen Pharmaceuticals, Inc., a New Jersey corporation, is a subsidiary of J&J. New JJCI's consumer health business, including assets and operations, was transferred through a series of transactions to Janssen Pharmaceuticals and then to Kenvue, Inc., which thereafter continued to operate the business without interruption.

84.     Defendant Kenvue, Inc., a New Jersey corporation, was a subsidiary of J&J and has its headquarters in New Jersey. New JJCI's consumer health business, including assets and operations, was transferred through a series of transactions to Kenvue, which thereafter was spun-off from J&J and continues to operate the business without interruption. Kenvue is a separate publicly traded corporation. At this time, J&J continues to own shares in Kenvue.

85.     Defendant J&J Services, Inc. ("J&J Services"), a subsidiary of J&J, is headquartered in New Jersey, and employs LTL's officers—Mr. Kim, Mr. Wuesthoff, and Mr. Dickinson (each defined below)—each of whom is seconded to LTL by J&J Services.[6]

**C.     The Aider and Abettor Defendants[7]**

86.     Numerous individuals associated with and/or employed by the Corporate Defendants aided and abetted the frauds described herein. To the extent they may have merely signed documents effectuating the frauds and were not officers or directors of key entities, they have not yet been named as defendants, although their names may be listed in the factual allegations below. Several individuals, however, did more and were instrumental in the

---

[6] February 14, 2021, H'rg. Tr., at 97:7 – 97:9.

[7] The following individuals named as Aider and Abettor Defendants either currently reside in New Jersey or, upon information and belief, worked in New Jersey at times relevant to this Complaint: Robert Wuesthoff, Richard Dickinson, Joaquin Duato, Thibault Mongon, Joseph Wolk, Michelle Goodridge, Laura McFalls, and Duane Van Arsdale, in addition to John Does 1-100.

perpetuations of the various frauds committed by the Corporate Defendants. Some of them are not yet named and others are named in the paragraphs below as follows:

87.     Defendant Robert Wuesthoff ("Mr. Wuesthoff") is the President of LTL and a member of the board of managers of LTL. Mr. Wuesthoff is an employee of J&J Services. Mr. Wuesthoff signed documents effectuating the Divisive Merger Fraud and the Bait-and-Switch Fraud, including the Termination and Substitution Agreement that effectuated the Bait-and-Switch of the two funding agreements, the 2023 Funding Agreement, and the J&J Support Agreement, all agreements crucial to the frauds perpetrated in this case. Mr. Wuesthoff specifically authorized both the first and second bankruptcy filings. The second filing was part of the Bait-and-Switch Fraud.

88.     Defendant Richard Dickinson ("Mr. Dickinson") is the Chief Financial Officer of LTL and a member of its board of managers. Mr. Dickinson is an employee of J&J Services. Mr. Dickinson signed documents effectuating the Divisive Merger Fraud. Mr. Dickinson specifically authorized both the first and second bankruptcy filings. The second filing was part of the Bait-and-Switch Fraud.

89.     Joaquin Duato ("Mr. Duato") is the Chief Executive Officer of J&J and the leader of J&J's executive committee. He approved all three named fraudulent transfers in this case, each moving billions of dollars away from talc creditors and imposing substantial delays. None of the actions taken by J&J or its named subsidiaries in this case would have been possible without his implicit or explicit approval.

90.     Defendant Thibaut Mongon ("Mr. Mongon") was formerly Executive Vice President, Worldwide Chairman, Consumer Health at J&J, and a member of J&J's executive committee. Mr. Mongon was the recipient of an approval request memorandum regarding the

- 23 -

Divisive Merger Fraud and approved the Divisive Merger Fraud. All three named fraudulent transfers in this case would have been impossible without his implicit or explicit approval. He was deeply involved in the Asset Stripping Fraud, and now serves as CEO of Kenvue.

91.     Defendant Joseph Wolk ("Mr. Wolk") is the Executive Vice President and Chief Financial Officer of J&J and a member of J&J's executive committee. All three named fraudulent transfers in this case would have been impossible without his implicit or explicit approval. He was deeply involved in the conception and approval of the Asset Stripping Fraud.

92.     Defendant Michelle Goodridge ("Ms. Goodridge") was formerly the President of New JJCI (now Holdco) and was the President of Old JJCI. Ms. Goodridge signed documents effectuating the Divisive Merger Fraud, the Asset Stripping Fraud, and the Bait-and-Switch Fraud. Ms. Goodridge is currently the U.S. President of Brand Growth at Kenvue.

93.     Defendant Laura McFalls ("Ms. McFalls") was formerly the President of Holdco. Ms. McFalls signed documents effectuating the Bait-and-Switch Fraud, including the Termination and Substitution Agreement, abandoning the 2021 Funding Agreement, the 2023 Funding Agreement, and the J&J Support Agreement. Ms. McFalls is Assistant Corporate Secretary at Johnson & Johnson.

94.     Defendant Duane Van Arsdale ("Mr. Van Arsdale") is the Treasurer of J&J. Mr. Arsdale signed documents effectuating the Bait-and-Switch Fraud, including the Termination and Substitution Agreement abandoning the 2021 Funding Agreement and the J&J Support Agreement.

**D.     Known but yet Unnamed Contributors to the Allegedly Fraudulent Transfers and Fraudulent Activities**

95.     Numerous individuals and attorneys employed by and/or associated with the Corporate Defendants contributed to or otherwise aided and abetted the frauds described herein.

- 24 -

Although these attorneys are not named at this time as Individual Defendants, the assistance and support they provided the named Individual and Corporate Defendants will be described in the factual allegations below. Accordingly, their names and roles are identified in the paragraphs below as follows:

96.     John K. Kim ("Mr. Kim") is the Chief Legal Officer of LTL and an employee of J&J Services. A former attorney in J&J's legal department, Mr. Kim managed the talcum powder litigation brought against J&J. Mr. Kim, among other actions, helped execute the Divisive Merger Fraud and the abandonment of the 2021 Funding Agreement in the Bait-and-Switch Fraud, moving billions of dollars away from LTL's talc creditors. He worked diligently to effect and maintain the bad faith bankruptcy filings at issue in this case. As such, the crime-fraud exception to attorney-client privilege applies to Mr. Kim's work in these matters, so the privilege should not serve as a basis for him to avoid discovery (including testimony) in this action. Although Mr. Kim is not named herein as an individual defendant, he is a material witness to the facts alleged in this Complaint.

97.     Erik Haas ("Mr. Haas") is Worldwide Vice President, Litigation at J&J and was instrumental to the design and orchestration of the Divisive Merger Fraud, the Asset Stripping Fraud, and the Bait-and-Switch Fraud. Mr. Haas also worked diligently to effect and maintain the bad faith bankruptcy filings at issue in this case. As such, the crime-fraud exception to attorney-client privilege applies to Mr. Haas's work in these matters, so the privilege should not serve as a basis for him to avoid discovery (including testimony) in this action. Although Mr. Haas is not named herein as an individual defendant, he is a material witness to the facts alleged in this Complaint.

98. Russell Deyo ("Mr. Deyo") is a member of the board of managers of LTL and a former General Counsel of J&J. Mr. Deyo signed documents effectuating the Divisive Merger Fraud. Mr. Deyo specifically authorized both the first and second bankruptcy filings. The second filing was part of the Bait-and-Switch Fraud. As such, the crime-fraud exception to attorney-client privilege applies to Mr. Deyo's work in these matters, so the privilege should not serve as a basis for him to avoid discovery (including testimony) in this action. Although Mr. Deyo is not named herein as an individual defendant, he is a material witness to the facts alleged in this Complaint.

99. Michael Ullmann ("Mr. Ullmann") served as the General Counsel of J&J and was a member of J&J's executive committee until his retirement in approximately 2022. Mr. Ullman was a prime architect of the Divisive Merger Fraud; all three named fraudulent transfers in this case would have been impossible without his implicit or explicit approval. As such, the crime-fraud exception to attorney-client privilege applies to Mr. Ullmann's work in these matters, so the privilege should not serve as a basis for him to avoid discovery (including testimony) in this action. Although Mr. Ullmann is not named herein as an individual defendant, he is a material witness to the facts alleged in this Complaint.

100. Chris Andrew ("Mr. Andrew") is an Assistant General Counsel at J&J. Mr. Andrew signed documents effectuating the Divisive Merger Fraud and was the recipient of an approval request memorandum regarding the Divisive Merger Fraud. He worked diligently to effect and maintain the bad faith bankruptcy filings at issue in this case in the Divisive Merger Fraud and the Bait-and-Switch Fraud. As such, the crime-fraud exception to attorney-client privilege applies to Mr. Andrew's work in these matters, so the privilege should not serve as a basis for him to avoid discovery (including testimony) in this action. Although Mr. Andrew is not named herein as an individual defendant, he is a material witness to the facts alleged in this Complaint.

### E. **The John Doe Defendants**

101.     Defendants John Does 1-100 are persons or legal entities who may be subject to certain avoidance actions set forth herein and/or aided and abetted certain fraudulent transfers and/or committed certain breaches of fiduciary duties. Plaintiffs reserve the right to name these persons or legal entities as additional information is learned through discovery and otherwise.

## PROCEDURAL BACKGROUND

102.     On October 14, 2021, the Debtor filed a voluntary petition for relief under Chapter 11 (the "First LTL Bankruptcy" or "LTL 1.0") of title 11 of the Bankruptcy Code in the Western District of North Carolina (the "North Carolina Bankruptcy Court").

103.     On November 16, 2021, the North Carolina Bankruptcy Court entered an order transferring venue of the case to the District of New Jersey. *In re: LTL Management, LLC* (Bankr. D.N.J.) No. 21-30589 [D.I. 416].

104.     On January 30, 2023, a unanimous panel of the United States Court of Appeals for the Third Circuit found that LTL's bankruptcy was not filed in good faith (the "Third Circuit Opinion"). On March 22, 2023, with no reported dissents, the Third Circuit rejected a petition for *en banc* review, and on March 31, 2023, the Third Circuit issued an order that fully incorporated the Third Circuit Opinion and certified the opinion as the mandate to the Bankruptcy Court.

105.     On April 4, 2023, in compliance with the Third Circuit Opinion (as mandated), the Bankruptcy Court dismissed the First LTL Bankruptcy.

106.     Within 131 minutes of the dismissal of the First LTL Bankruptcy, LTL filed a second voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the District of New Jersey (the "Second LTL Bankruptcy" or "LTL 2.0").

107.     Subsequently, on July 28, 2023, the Bankruptcy Court in the District of New Jersey issued its opinion in which it determined LTL 2.0 was filed in bad faith and indicating it intended to dismiss the LTL 2.0 case. *See In re: LTL Mgmt. LLC,* No. 23-12825, Dkt. No. 1127, at 39.

108.     On August 11, 2023, the Bankruptcy Court entered its Order dismissing LTL 2.0 as having been filed in bad faith. *See In re: LTL Mgmt. LLC,* No. 23-12825, Dkt. No. 1211.

109.     Notwithstanding two dismissals of bankruptcies approved by J&J as the ultimate parent of LTL, J&J has once again initiated a process by which it hopes to gain access to bankruptcy yet a third time. J&J has announced its intent in public fora and has approved what it hopes will be a prepackaged plan. *See Form 8-K*, Johnson & Johnson, at 2, Ex. 99.2 (May 1, 2024). That is, J&J has approved LLT's proposing a disclosure statement for an as-yet unformed entity, Red River LLC ("Red River"), with what purports to be a plan that Red River will propose – assuming, of course, that Red River is ever formed and ever initiates its own disclosure statement and plan process in or out of bankruptcy.

110.     Faced once again with the extreme efforts J&J undertakes to deprive talc claimants of fair compensation for the harm J&J has caused them, this action has been brought.

## FACTUAL ALLEGATIONS

111.     J&J has known, since at least the 1950s, that it was selling asbestos-contaminated talcum powder. It has denied this asbestos contamination despite numerous independent scientists detecting asbestos in its talc products. It has sought to suppress the knowledge of this contamination by implementing flawed testing methods in a supposed "self-regulation" regime to ensure the FDA would not regulate its talcum powder after the FDA refused to agree to an acceptable "safe" level of asbestos contamination.

112.    The source of the revelation of this decades-long "reprehensible conduct" (as found by an appeals court, and numerous juries) has been discovery obtained by victims' counsel, over J&J and JJCI's fierce opposition, in courts throughout the country. The result has been that juries have awarded damages against JJCI for its acts and products and have held J&J directly liable for its independent negligence and intentional conduct—and awarded separate punitive damages against each.

113.    Once J&J's conduct was made public and juries began awarding damages against the company and its subsidiaries, J&J — together with many accomplices, the Individual Defendants in this case — executed a scheme through a series of corporate transactions. This scheme was intended to prevent J&J's victims from getting their day in court and obtaining their rightful compensation.

## I.    <u>J&J Corporate History with Talc</u>

114.    J&J has been in the talcum powder business for over a century. Its baby powder was one of the world's most recognizable products, producing profits to J&J and helping to establish J&J's brand as the "family company" for the purpose of selling its other products.[8]

### A.    **J&J Gets into the Talc Business**

115.    J&J was incorporated in 1886, founded by Robert Wood Johnson and his younger brothers. For over a century, Johnson & Johnson marketed their talcum powder products as "safe," "natural" and "pure." *See* JNJ000313878; JNJ000058794 JNJ000313867 (J&J advertisements).

116.    When some early J&J products (specifically, a line of medicated plasters) caused skin irritation, the Johnson brothers sent affected customers packets of talcum powder. Upon

---

[8] In May 2020, Johnson & Johnson stopped distributing Johnson's Baby Powder with talc in the United States and Canada. In August of 2022, Johnson & Johnson announced they would stop selling talc-based Johnson's Baby Power globally, transitioning solely to Johnson's Baby Powder with cornstarch.

discovering that parents had begun soothing children's diaper rash with the packets of talcum powder, J&J determined to market the product. In 1894, J&J added a fragrance to the talcum powder and began distributing it to midwives to give to new mothers. The following year, J&J began selling Johnson's Baby Powder at retail, and the scent became ubiquitous and associated in the public mind with babies themselves.

117.    Johnson's Baby Powder became a huge part of J&J's business in the century following the creation of Johnson's Baby Powder. Talcum powder became a significant, vertically integrated product line at J&J, where J&J bought and operated talc mines, crushed the talc into powder and separated it by grade (*e.g.*, industrial, cosmetic, or pharmaceutical), processed it and sold it. Although sales had declined from its peak, as late as 2018, Johnson's Baby Powder still grossed over $400 million in annual sales in the United States alone.

118.    Even after sales declined from its peak, Johnson's Baby Powder remained a critical part of the company's marketing: establishing J&J as a safe and trusted company to new parents in the first years of their child's life. This strategy was very effective for J&J as the company then markets its other products such as baby shampoo, sunscreen, and a host of other consumer products to those parents.

### B.    J&J Realizes Talc Is a Liability

119.    J&J has been aware for decades that its talcum powder contained asbestos, fibrous talc, and other carcinogens harmful to human health.

120.    The health hazards of asbestos come largely from its fiber-like shape. "Asbestos is the generic commercial designation for a group of naturally occurring mineral silicate fibres of the serpentine and amphibole series. These include the serpentine mineral chrysotile (also known as 'white asbestos'), and the five amphibole minerals – actinolite, amosite (also known as 'brown asbestos'), anthophyllite, crocidolite (also known as 'blue asbestos'), and tremolite (IARC, 1973;

USGS, 2001)." IARC, Monograph 100c, p. 219 (2012). The five amphibole asbestos minerals —
Crocidolite, Amosite, Anthophyllite, Tremolite, Actinolite — occur as straight, jagged fibers. The
sixth mineral, Chrysotile or serpentine asbestos occurs as curved fibers.

121.    Today, it is understood that asbestos is a carcinogen because the physical shape of
the fibers damages cells and inhibits ordinary cell processes in ways that can cause cancer and
other diseases. The size and shape of the fibers are both dangerous and durable.

122.    Widespread public awareness of the dangers of asbestos, and proof that the asbestos
industry had hidden those dangers and exposed countless millions of Americans to asbestos,
caused a wave of bankruptcies as injured victims of the asbestos industry demanded justice in the
tort system and defendants sought ways to acknowledge responsibility and manage their liability.
However, asbestos was never banned in the United States and remained in use far beyond what
was reasonable in supposedly "safe" contexts. Even now, decades after the public became fully
aware of the health dangers of asbestos, victims of asbestos exposure continue to develop
mesothelioma and other cancers, suffer, and die painful deaths.

**C.    J&J's Discovery of Asbestos Contamination in Its Talc**

123.    In the 1950s, J&J decided to test its talc for the presence of asbestos and fibrous
talc or talc fibers. J&J was not doing this to determine the safety of its talc: instead, it was
concerned that the contaminants in its talc — "acicular and granular" particles—were giving the
talc it obtained from its Italian mines a 'gritty' feel rather than the smooth feel from "platy" talc
that J&J preferred. The results of this testing were memorialized in reports from 1957 and 1958
that showed significant asbestos contamination of J&J talc and the presence of large amounts of
fibrous talc, which is also carcinogenic. Despite these reports, J&J hid the test results for decades
and continued to market an unsafe product.

124. In technical language, the 1957-1958 Reports described "acicular and fibrous" "amphiboles" that were "presumed" to be "tremolite or enstatite[,]" and confirmed this presumption by determining that "[t]he amphibole component has been established to be the variety tremolite[.]" To simplify, amphiboles are a family or supergroup of minerals that form in a crystalline shape—and, notably, the talc mineral itself is not amphibole. It does, however, include tremolite, which in its fibrous or acicular form, is one of the six kinds of materials described above that are commonly referred to as asbestos. As a result, these findings meant that J&J had found fibrous contaminants from the amphibole group and determined that those amphibole contaminants were tremolite asbestos. The samples tested were taken directly off Johnson's Baby Powder production lines at weekly intervals. There was no doubt about where the samples originated and into which product this talc was directed.

125. The risks of asbestos were first identified in medical literature in 1924 and by the 1950s scientists had determined that there was likely a strong link between asbestos and lung cancer. As a result, for decades, J&J has known and understood the dangers posed by asbestos exposure and that asbestos was a known contaminant of talc used in cosmetic and industrial products.

126. J&J purchased talc mines in Vermont in 1964. J&J testing conducted in 1967 showed that these mines, too, produced talc that contained tremolite asbestiform fibers.

127. By 1969, J&J was acutely aware of the health risks of asbestos in its talc. In 1969, a memo from the executive in charge of J&J's talc supply to a doctor raised questions regarding the health risks of tremolite. The executive noted that he "gather[ed] there has been a lot of attention given to the hazards" of inhaling asbestos and asbestos-like materials, and asked "How bad is Tremolite medically, and how much of it can safely be in a talc base we might develop?"

128.     The response was clear: J&J should "limit any possible content of Tremolite in our powder formulations to an absolute minimum."

129.     In 1973, the Environment Subcommittee of the United States Senate Committee on Commerce held public hearings in connection with the Toxic Substances Control Act of 1973. Among other things, witnesses who testified proposed that talc be forbidden in consumer products "including vaginal deodorant sprays." This recommendation was made both for the possibility of a risk of asbestos induced mesothelioma and the possibility that talc products were being found in ovarian tumors. Regarding Johnson's Baby Powder specifically, the witnesses at this 1973 hearing made clear that a safer alternative existed even in the 1800's—cornstarch—and recommended a return to that safer substitute.

### D.     J&J Adopts a "Deny Strategy"

130.     Rather than take the medical risks of talcum powder seriously, J&J instead hid those risks from the public and engaged in a strategic campaign to pervert scientific investigation into talcum powder and J&J's products.

### i.     J&J Blocks FDA Regulation of the Asbestos in Its Talc

131.     In 1971, New York City's environmental protection chief announced that asbestos contamination had been found in unidentified brands of talcum powder. In response, J&J claimed that "fifty years" of research showed "there is no asbestos contained in the powder manufactured by J&J." As detailed above, that was false. J&J showed it knew this statement was false when it spoke to the FDA. In its statements to the FDA, it instead said that J&J's talc contained "less than 1%" asbestos particles, not zero, but asked that the FDA not make the data or information that J&J submitted public.

132.     This is not to say that J&J was honest with the FDA. For example, Arthur Langer, a professor at the Mt. Sinai School of Medicine, had alerted J&J in 1971 that he had found

chrysotile asbestos in a sample sent by J&J. J&J responded by placing Mr. Langer on an internal enemies list of "antagonistic personalities" in 1972. J&J also had an internal memo dated July 29, 1971, that stated that its talc ore from Vermont contained "trace amounts" of tremolite and actinolite fibrous materials—asbestos. Finally, J&J was also aware that University of Minnesota professor Thomas E. Hutchinson had identified in J&J talcum powder products [9] what he described as "incontrovertible asbestos" in 1972.

133.    Each of these examples was known to J&J and hidden from the FDA.

134.    Rather than reformulate its cosmetic talc products in the 1970's to address the potential risk of mesothelioma and ovarian cancer or to disclose relevant research, J&J took to lobbying the FDA for less stringent safety testing methods.

135.    In lobbying the FDA in the 1970s, J&J sought a de facto standard that its talcum powder could contain asbestos, as long as it constituted less than 1% of the talcum powder. J&J did so by pushing the FDA to use an x-ray scanning technique that was, as the company knew, fundamentally incapable of detecting 1% or less asbestos contamination. To justify this testing methodology, J&J claimed in writing to the FDA, "methods of determining less than 1% asbestos in talc are not necessary to assure the safety of cosmetic talc."

136.    There is no known "safe" level of exposure to asbestos in consumer products.

137.    Parents using talcum powder on their children (or women using it in their genital area) would disagree with the idea that there is any "safe" level of asbestos that they would tolerate in baby powder. That was why when speaking to the public, J&J claimed that fifty years of research showed **no** amount of asbestos in its talc, rather than a purportedly "safe" amount of asbestos.

---

[9]    "Shower to Shower" was a talcum powder product J&J marketed to adults beginning in 1966.

138.    The FDA was similarly aware that the public had zero tolerance for asbestos in talcum powder and told J&J so. According to an internal J&J memo of a meeting with the FDA, J&J was told that J&J's position was "foolish" and that "no mother was going to powder her baby with 1% of a known carcinogen[.]"

139.    J&J eventually chose to pressure the FDA to back off its proposed testing regimen. J&J falsely claimed in a letter dated March 15, 1976, that its extensive testing had shown **no** (emphasis in original) asbestos in its products.

140.    J&J knew that several tests by outside consultants at various prestigious universities had found asbestos in its products (including the Colorado School of Mines and the University of Minnesota professor discussed above). J&J also knew that a report, dated November 5, 1975, and directed to Windsor Minerals (J&J's Vermont talc mining subsidiary), showed that tests had detected "fibers of asbestos" in 9 samples tested, and described some as "rather high" amounts of asbestos fibers. That same report noted which methods were effective at detecting the asbestos and which were not.

141.    J&J's strategy worked. Although the FDA was unwilling to endorse J&J's proposal for an "acceptable" level of asbestos in products used for infants, the FDA agreed to permit "self-regulation" of asbestos contamination in baby powder—*i.e.*, J&J was given free rein to pretend to implement whatever standards it wished to impose on itself. As expected, J&J wished to impose standards on itself that would not detect the asbestos that J&J knew contaminated Johnson's Baby Powder and other talcum powder products.

142.    Free to choose its own standard, J&J selected a form of "testing" for asbestos in its baby powder that, like its proposals to the FDA, would not actually detect the asbestos in its talcum powder. J&J's selected testing technique was unsuited to detect chrysotile asbestos even though it

had already been detected in Johnson's Baby Powder. Mr. William Ashton, a high-ranking J&J executive in charge of Johnson's Baby Powder explained the need to avoid better testing methodologies when he wrote that if accurate testing methodologies were used, "there are many talcs on all markets which will be hard pressed in supporting purity claims[.]" Mr. Ashton found an FDA testing methodology "disturbing" as a result—because it would, in fact, detect the asbestos contamination in J&J's products.

143.    However, J&J wanted to give the impression that someone was checking its work. It made misleading public statements that give the impression that J&J's products are regulated and tested to ensure they are safe by a legitimate third party using legitimate, accurate methods. Of course, neither was true, and by using this flawed methodology, J&J continued to claim its talc was asbestos-free for decades.

144.    At all times relevant hereto J&J understood the dangers posed by asbestos exposure and that asbestos was a known contaminant of talc used in cosmetic and industrial products.

145.    J&J hired testing laboratories, such as the Battelle Memorial Institute, McCrone Associates, the Colorado School of Mines Research Institute, and others to test for asbestos contamination (or co-mineralization) in the source talc ore used to manufacture Johnson's Baby Powder, Shower to Shower, and J&J cosmetic products. Every one of these testing laboratories found asbestos minerals both in the source talc ore and J&J's cosmetic talc products.

146.    Tests performed by J&J and its consultants in the 1960s, 1970s, 1980s, and 1990s demonstrated that there was asbestos and fibrous talc in the talc mined from J&J's Vermont mines.

147.    In 2018, a New Jersey court relied on J&J's history of seeking to mislead the FDA in rejecting an effort by J&J to throw out a verdict rendered by a jury of American citizens. The

court wrote that "[p]roviding the FDA favorable results showing no asbestos and withholding or failing to provide unfavorable results, which show asbestos, is a form of a misrepresentation…."[10]

148.    On November 14, 2018, Drs. William Longo and Mark Rigler published a report detailing results from tests they performed on samples dating from the 1960s to the early 2000s provided by J&J of Johnson's Baby Powder and Shower to Shower. The results were that 68% of the samples tested contained amphibole asbestos. The authors further found that 98% of the samples contained fibrous talc, a known carcinogen.

149.    In 2019, the FDA contracted AMA Analytical Services, Inc. to test samples of talc-containing cosmetics, including Johnson's Baby Powder. AMA identified chrysotile asbestos and talc fibers in a sample of Johnson's Baby Powder. As a result, J&J issued a recall of all bottles (approximately 33,000) from the sampled lot.

150.    Similarly, in December 2022, a California appeals court not only affirmed the trial court's adverse inference instruction against J&J for spoliation of key evidence regarding the presence of asbestos in talc, but unequivocally determined that, notwithstanding any destruction of evidence, there was still "abundant evidence" that J&J's talc "contained asbestos."[11]

**ii.    Mesothelioma Cancer**

151.    As a result of the asbestos contamination of Johnson's Baby Powder, numerous people whose only exposure to asbestos was through Johnson's Baby Powder have developed the "signature cancer" of mesothelioma. Hundreds of such cases are (or were) currently pending against J&J and JJCI, although LTL's bankruptcies caused them to be stayed while its two

---

[10]  Transcript of Decision, *Lanzo v. Cyprus Amex Minerals Co., Inc.*, No. L-7385-16AS (N.J. Super. Ct. Law Div.) June 29, 2018, *available at* https://www.documentcloud.org/documents/5027646-2018-ruling-by-Middlesex-County-NJ-Superior.html#document/p18/a464477.

[11]   *Bader v. Johnson & Johnson*, 303 Cal. Rptr.3d 162, 195 (Cal. Ct. App. 2022).

bankruptcy cases were pending. With the millions of people who used Johnson's Baby Powder, the potential exists for many more victims to develop mesothelioma, a disease which has a very long latency period and nearly always results in death.

152.    Mesothelioma is an aggressive and deadly form of cancer that occurs in the thin layer of tissue that covers the majority of the body's internal organs, most notably, the lung. Mesothelioma is caused by asbestos fibers that have been inhaled and settle in the chest and/or abdomen. These fibers remain permanently, a ticking time bomb that may explode into mesothelioma decades after exposure.

153.    It is undisputed that asbestos causes mesothelioma. If a person develops mesothelioma, it is then necessary to determine where, and how, they were exposed to asbestos to obtain redress. In non-litigation contexts, J&J scientists admit that mesothelioma is caused nearly always by asbestos, though, of course, in litigation J&J sometimes disputes its own scientists' opinion.

154.    Exposure to asbestos is hazardous to human health and there is no "safe" level of exposure. As J&J experts have admitted, asbestos exposure in childhood is disproportionately significant to development of asbestos-related diseases. Yet J&J produced and marketed its unsafe baby powder and talc products, advertising them for use on infants.

155.    Mesothelioma has a long latency period measured in decades; exposure to asbestos does not cause cancer immediately but decades later. As a result, the asbestos in Johnson's Baby Powder does not cause cancer in infants as soon as they are exposed to it. Rather, mesothelioma develops in them decades later, when they are adults. J&J also marketed talcum powder to adults, both its Baby Powder and Shower-to-Shower. J&J knowingly exposed adult caregivers to asbestos.

156.     A recent peer-reviewed article considered dozens of mesothelioma patients whose repeated exposures to cosmetic talcum powders was the only known source of their exposure to asbestos. The study concluded that cosmetic talcum powder exposure caused the victims' mesothelioma.[12]

### iii.     Ovarian Cancer

157.     Ovarian cancer is a very dangerous type of cancer because it is difficult to detect, is rarely caught early and has a high mortality rate.

158.     Studies as far back as the 1960s showed that frequent use of talcum powder in the genital area posed a serious risk of ovarian cancer. Talc particles were identified deep in ovarian tissue in 1971, and by the early 1970s doctors were raising awareness regarding environmental toxins like talc as a factor in ovarian cancer. In 2010, IARC, a universally accepted international authority on determining the classification of substances as carcinogenic, concluded that studies from around the world consistently found an increased risk of ovarian cancer in women who used talc in the perineal area. In 2012, IARC concluded that exposure to asbestos and talc fibers can cause ovarian cancer.

159.     It has been known since as early as 1961 that particles like talc can translocate from the exterior genital area to the ovaries in women: in other words, the contaminated talc that J&J marketed to women would be absorbed into their ovaries over time. Asbestos contamination introduced in this way does not break down in the body and accumulates in the ovaries in a way similar to how asbestos accumulates in the lungs; once there, it remains permanently. As early as 1964, a J&J internal document noted that talc could not be safely absorbed by the vagina, but

---

[12] Emory, Theresa S., M.D., Maddox, John, C., M.D., Kradin, Richard L., M.D., *Malignant Mesothelioma Following Repeated Exposures to Cosmetic Talc: A Case Series of 75 Patients,* Am. J. Ind. Med., 63:484-89 (2020).

cornstarch could be. Nonetheless, for the next 50 years, J&J marketed its talcum powder to mothers to powder their infants' diapers, and to women to powder their genital areas.

160.    As discussed above, the danger of asbestos is physical—the shape and permanence of the fibers puncture or disrupt cells and persist for long periods of time. The shape and ability of asbestos fibers to disrupt cellular function applies across cell types, including that of the ovaries. As noted, in 2012, IARC published a monograph in which it concluded that exposure to asbestos and talc fibers can cause ovarian cancer and listed them as "Group 1" human carcinogens. Then in May 2022, the EPA also recognized that asbestos causes ovarian cancer. The National Cancer Institute also has concluded that exposure to asbestos can cause ovarian cancer.

161.    Worse, asbestos is not the only fibrous material present in talcum powder. Talc itself takes fibrous forms, similar in shape to that of asbestos fibers. Significant amounts of fibrous talc have been found in cosmetic talcum powder. Twenty-two products were tested and found to have an average fiber content of 19%, according to a study conducted in 1968. Fibrous talc itself, uncontaminated with asbestos, is also a known cause of ovarian cancer. Talc fibers behave in the human body similarly to asbestos fibers.

162.    Finally, there are other known carcinogenic mineral contaminants in talcum powder that render it unsuitable for use as a cosmetic. These include nickel and chromium which are known to cause cancer in humans.

163.    There is substantial medical evidence that talcum powder causes ovarian cancer even without the presence of asbestos. Environmental factors that cause cancer generally act in a cumulative fashion. Each of the carcinogenic compounds in talc increases the risk of developing cancer. In some cases, those compounds act in a synergistic manner, increasing the risk of developing cancer beyond the individual risk factors.

164.    For decades, scientific studies have consistently linked talcum powder itself, regardless of its asbestos content, to ovarian cancer. That is, talcum powder itself is now known to cause cancer. Since the early 1980s, there have been 40 epidemiological studies evaluating the link between talcum powder use and the risk of developing ovarian cancer; 38 of the 40 studies demonstrated an increased risk of ovarian cancer. The studies, which yielded consistent results, were conducted by diverse researchers around the world over the course of forty years, evaluating many distinct patient populations, providing further evidence of the reliability of the results.

165.    In December 2018, Health Canada published a draft screening assessment on the safety of talc. The comprehensive scientific assessment included a Bradford Hill causation analysis of relevant epidemiological and animal studies. Health Canada found that there is a "statistically significant positive association between perineal exposure to talc and ovarian cancer" and "available data are indicative of a causal effect." *See Health Canada* Screening Assessment at p.iii (April 2021). Following a years-long review process that included the review of J&J expert reports and argument against its preliminary conclusions, Health Canada issued a final report in 2021 reiterating its original findings on a final basis.

166.    Recently, on May 15, 2024, Katie O'Brien, Ph.D., and other researchers published updated results from the *Sister Study*. Katie M. O'Brien, et al., *"Intimate Care Products and Incidence of Hormone–Related Cancers: A Quantitative Bias Analysis,"* J. Clin. Oncol. 00:1-15; 2024.The *Sister Study* is a cohort study that J&J has featured in its defense of Johnson's Baby Powder. The study validates Plaintiffs' experts' opinions and undercuts J&J's defense. Further, the study demonstrates a consistent, strong positive link between the genital use of talc and ovarian cancer.

167.    In sum, the body of scientific knowledge shows a consistent, strong association between genital talcum powder use, and a 30%-60% increase in the chances of developing ovarian cancer.

### iv.        Other Industries Cease Talc Use, But J&J Refuses to Do So

168.    The dangers of talcum powder have been recognized in numerous industries that have (voluntarily, or under pressure) ceased the use of talcum powder in their products. For example, around 1996, at the request of the FDA, the condom industry stopped dusting condoms with talcum powder due to growing health concerns regarding talc. Further, on December 19, 2016, the FDA issued a ban on the use of talcum powder on surgical gloves, stating that "the risk of illness or injury posted by powdered gloves is unreasonable and substantial."

169.    For decades, J&J has faced internal and external pressure to follow suit: to replace the talcum powder in its products with cornstarch. Cornstarch is an easy and safe substitute for talc, as demonstrated by Bausch Health's reformulation of Shower to Shower after it purchased that product from J&J to use cornstarch instead of talc.

170.    In 1994, the Cancer Prevention Coalition asked J&J to withdraw its talcum powder products, in favor of cornstarch powder products, because of the decades of scientific studies showing that talcum powder caused a serious health risk of ovarian cancer. In 2000, J&J prepared draft public relations statements while they waffled on whether to switch to cornstarch.

171.    Nonetheless, until litigation forced its hand in 2020, J&J remained steadfast in using talcum powder in its products. However, in light of this litigation risk, J&J began considering ways to separate assets from this potential talc liability while continuing its efforts to cover up the underlying facts, including its distribution of a toxic product marketed for use on newborns.

172.    The beginning of these structural efforts was the spinoff of the "Baby Division" to the predecessor to JJCI—J&J Baby Products Company, in 1979. In this transaction J&J transferred all assets related to the Baby Division (including the Baby Powder business), and "liabilities which are now allocated to the BABY division on the books or records of J&J[.]"

173.    As a part of the spinoff agreement, J&J caused Old JJCI to "indemnify and save harmless J&J against all the indebtedness, liabilities and obligations aforesaid hereby assumed and agreed to be paid[.]" However, Old JJCI was not required to indemnify J&J for liabilities not assumed, or for future liabilities J&J incurred (including tort liabilities for its own independent conduct). In 1989, J&J realized it had not fully transferred all of its talcum powder business to Old JJCI and transferred Shower to Shower—a talcum powder marketed to adults. No new indemnities are known to have been executed in connection with this transfer as J&J has never produced documents containing such indemnity.

174.    Moreover, J&J controlled production of talc ore through its talc mines. At no point did J&J transfer control of its talc mines (operated through J&J's subsidiary, Windsor Minerals) to JJCI nor did JJCI ever accept any liability related to those mines. They remained wholly owned by J&J and outside the JJCI corporate entity until their eventual sale. J&J sold its talc mines subsidiary, Windsor Minerals, in 1989. In connection with that sale, J&J (not JJCI) executed certain indemnity agreements for talc sold prior to the sale of Windsor Minerals.

## II.    Talc Litigation History

175.    It was long suspected that talc caused mesothelioma and ovarian cancer. Lawsuits began as early as 1997, alleging that J&J talcum powder caused cancer. But the claimants had a basic problem: J&J had successfully suppressed public knowledge that its talc contained asbestos and, by removing this information from the public sphere, had suppressed scientific inquiry into the dangerous nature of its products. In this respect, J&J victims faced the same challenges

encountered by victims of the tobacco industry and the opioid industry whose playbook J&J eagerly copied. Consequently, much like early tobacco and opioid litigation, early cases seeking to hold J&J accountable for its talcum powder causing cancer were unsuccessful.

176.    In one of the first cases alleging that J&J's talcum powder had caused cancer, claimants were unable to obtain the documents discussed above that show—in great detail—J&J's awareness of asbestos in its talcum powder. As a result, they ultimately were unable to prevail on their efforts to hold J&J accountable. However, as time went on, J&J's "deny strategy" became less and less tenable.

177.    The first crack in the dam was a case in South Dakota federal court, *Berg v. Johnson & Johnson*, 940 F. Supp. 2d 983 (D.S.D. 2013) ("*Berg*") where a federal jury reached the first verdict holding J&J and Old JJCI liable for causing ovarian cancer in 2013. *Berg* ultimately awarded the plaintiff no damages—her cancer was in remission at the time—but it was a watershed event. Through the extensive discovery in *Berg*, the public became aware of J&J's conduct and other victims began filing lawsuits.

178.    Public awareness of J&J's conduct and the contamination in its products led to a significant increase in the claims filed against J&J. Subsequent trials went to verdict, and juries continued to find J&J liable, and awarded damages.

179.    For example, in 2016, the estate of a deceased ovarian cancer victim Jacqueline Fox was awarded $72 million for her ovarian cancer that the jury found was caused by J&J's products. Ms. Fox's estate's verdict was ultimately overturned because of a jurisdictional issue caused by an intervening Supreme Court case which the Missouri appellate courts held had divested the Missouri trial court of personal jurisdiction over the dispute. This same jurisdictional issue led to numerous other plaintiff verdicts being overturned. J&J proudly touts its record of reversing these

cases on appeal; however, it generally leaves out that these jurisdictional reversals were not on the merits and do not discredit the juries' liability findings.

180.    In 2016, the Judicial Panel of Multidistrict Litigation (JPML) established *In re: J&J Talcum Powder Marketing, Sales Practices, and Products Litigation*, MDL 2738, and transferred all cases alleging that J&J's talcum powder products cause ovarian cancer to Chief Judge Freda Wolfson of the District of New Jersey for pretrial purposes. This was at the request of J&J as New Jersey was J&J's preferred venue. The Court granted J&J's request for bifurcation of the proceedings to resolve the threshold issue of general causation; specifically, whether there was reliable evidence that talc can cause ovarian cancer.

181.    Thereafter, in a process spanning several years, both parties provided evidence regarding whether there is reliable evidence that talc can cause ovarian cancer in hearings before Chief Judge Wolfson. On April 27, 2020, in a comprehensive 141-page opinion, Chief Judge Wolfson of the MDL Court deemed plaintiffs' evidence to be sufficiently reliable and denied the bulk of J&J's challenges to plaintiffs' causation evidence and scheduled the first bellwether trials for April 2022. *In re Johnson & Johnson*, 509 F. Supp. 3d 116 (D.N.J. 2020).

182.    This was a massive blow to J&J's litigation strategy and reflected that the plaintiffs' evidence, comprised of decades of epidemiological studies considering the association between the routine application of J&J's talcum powder products to the female genital area and ovarian cancer, was reliable and supported the existence of a causal relationship.

183.    Specifically, Chief Judge Wolfson concluded that plaintiffs' causation experts' methodology was reliable, satisfying the standard under *Daubert*, based primarily on the experts' application of the "*Bradford Hill*" factors, the foundational epidemiologic process for establishing

- 45 -

a causal relationship, and which is endorsed by the Federal Judicial Center's *Reference Manual on Scientific Evidence.*

184.    The MDL Court also addressed and dismissed J&J's primary argument, alleging that more than two dozen case-control studies showing a consistent association between talc use and ovarian cancer were unreliable. Chief Judge Wolfson accepted plaintiffs' experts' methodologies, ruling that "[plaintiffs'] decisions to rely on the case-control studies … is supported by good grounds" and "this is not a situation where the experts purposefully ignored the cohort studies entirely because they were inconsistent with their opinions."

185.    Approximately three months after Chief Judge Wolfson issued her *Daubert* Opinion in the federal MDL, the Appellate Division of the Superior Court of New Jersey weighed in on the identical issue of general causation in state court. In a unanimous 36-page opinion, the Appellate Division overruled a trial judge's finding that plaintiffs' causation evidence was unreliable, characterizing the trial court's analysis as "slanted away from objective science and towards advocacy."[13] The Appellate Division admonished the trial judge for committing a litany of errors, which collectively amounted to having "selected defendants' scientific methodologies over plaintiffs', a process well beyond the gatekeeping function," constituting an abuse of discretion necessitating reversal.[14] In reaching its conclusion, the New Jersey Appellate Court reviewed the available studies, evidence, and reports of agencies like the FDA and IARC. The appeals court held that there was sufficient reliable evidence that talcum powder products can cause ovarian cancer. Similar decisions have been rendered by other state courts around the country.

---

[13]    *Carl v. Johnson & Johnson,* 464 N.J. Super. 446, 452 (App. Div. 2020).

[14]    *Id.* at 504.

186.    In June of 2018, the *Ingham v. Johnson & Johnson* trial was submitted to the jury. This case sought compensatory (pain and suffering) damages for 22 plaintiffs suffering from ovarian cancer, or who had died from ovarian cancer. Following a six-week trial, the jury ultimately returned a verdict for the plaintiffs, finding each plaintiff entitled to approximately $25 million in compensatory damages for pain and suffering, and awarding $4.14 billion in punitive damages against J&J and JJCI for their reprehensible and intentional conduct, with the large majority (approximately 76%) of punitive damages allocated to J&J rather than JJCI.

187.    On June 23, 2020, the Missouri Court of Appeals reviewed the *Ingham* verdict and rejected J&J's efforts to overturn the jury's finding that talcum powder caused ovarian cancer. The decision found that certain plaintiffs suffered from a jurisdictional defect and the verdict could not be upheld as to those plaintiffs, but ultimately upheld all the compensatory **and** substantially all the punitive damages for the remaining plaintiffs, holding that defendants motivated by profits, disregarded the safety of consumers and knowingly sold products containing asbestos.[15] J&J was unsuccessful at convincing the Missouri Supreme Court to reverse the *Ingham* decision of the Missouri Court of Appeals, and ultimately filed for United States Supreme Court review on March 2, 2021. On June 1, 2021, the United States Supreme Court (with no recorded dissents) denied review of the *Ingham* decision.

188.    Similarly, as the asbestos contamination of Johnson's Baby Powder became clear, mesothelioma victims began winning their cases against J&J as well. In April 2018, a New Jersey jury awarded Stephen Lanzo and Kendra Lanzo a total of $117 million in compensation (70%

---

[15]    Certain plaintiffs had their claims against J&J (but not JJCI) dismissed. While this did not reduce the compensatory damages awarded in total, the Missouri Court of Appeals reduced the punitive damages awarded against J&J to maintain the same ratio of punitive damages to compensatory damages for J&J found by the jury.

allocated to J&J/JJCI, 30% to the talc miner) for the mesothelioma its products caused Stephen Lanzo—including $80 million in punitive damages.

189.    Although the *Lanzo* case was later overturned on appeal and remanded for a new trial, it began a string of courtroom losses by J&J with respect to mesothelioma victims. Indeed, juries in eleven straight cases have found J&J liable for mesothelioma caused by its products, many awarding substantial punitive damages for J&J and JJCI's reprehensible conduct. Mesothelioma plaintiffs have won thirteen jury verdicts against J&J and Old JJCI, for a total of over $200 million in compensatory damages and more than $320 million in punitive damages.

190.    Plaintiffs have prevailed in the past ten mesothelioma cases that went to trial against J&J and Old JJCI—**<u>every single case</u>** since the FDA announced it had detected asbestos in talc products. This string of courtroom defeats for J&J since the FDA confirmed asbestos contamination shows that early J&J victories were simply because it was able to convince a jury that its products do not contain asbestos. Once it could no longer do so, no jury has been willing to sanction J&J's conduct and deny recovery to a mesothelioma victim of J&J's talc products.

191.    These legal decisions did not occur in a vacuum. In December 2018, Health Canada, the public department of the Government of Canada, preliminarily concluded that there was a consistent and statistically significant link between talcum powder and ovarian cancer, and that the data indicated a causal relationship – *i.e.,* that the talcum powder caused the ovarian cancer. Despite fierce J&J lobbying, this conclusion was reaffirmed in 2021 and J&J's 255-page submission seeking to rebut it was specifically discussed and rejected.

192.    Further, in 2019, the FDA tested two bottles of Johnson's Baby Powder. One of the two bottles was found to be contaminated with both asbestos and talc fibers—just as plaintiffs' experts had contended for years.

193.    Like many parties facing lawsuits, J&J resorted to destruction of evidence and distraction from the merits. Recently, a California appellate court affirmed the trial court's adverse inference instruction against J&J for spoliation of key evidence. *Bader v. Johnson & Johnson,* 303 Cal. Rptr.3d 162 (Cal. Ct. App. 2022). Nonetheless, the court determined that, notwithstanding any destruction of evidence, there was still "abundant evidence" that J&J's talc "contained asbestos."

194.    Confronted with the mounting evidence of its wrongdoing, J&J repeatedly has shifted to its standard playbook of misdirection through attacks on the plaintiffs, their lawyers, or their lawyers' experts. J&J's lawyers proudly boasted, following several plaintiffs' verdicts, that J&J had shifted its tactics to pushing a theory of the talc lawsuits as a "sham" or fraud perpetrated by plaintiffs' lawyers.

195.    The decision by J&J and its lawyers to attack the plaintiffs' bar — rather than addressing the merits of the talc lawsuits—left one New Jersey judge "horrified." At trial, that same judge, Judge Ana Viscomi, struck that same J&J lawyer's entire closing for being "replete with conduct this court has already warned you about," most notably "attacking the profession" with bald accusations that the talc claims are "lawsuit fiction" engineered by plaintiffs' lawyers.[16]

196.    The tide had turned against J&J, which faced grim prospects in future litigation and bellwether trials scheduled to begin in April 2022. J&J was forced to admit its strategy of denial and obfuscation of the facts had reached the end of its useful life, and further litigation and jury trials would only degrade that strategy and drive the knowledge of the dangers of talcum powder— and J&J's role in hiding it—farther into the public awareness. It was time for a new plan.

---

[16] *See Barden v. Brenntag North America, Inc., et al.*, No. A-0047-20, 2023 WL 6430088 (Oct. 3, 2023) (reversed on other grounds).

### III.    Project Plato: J&J's Secret Plan for a Divisive Merger

197.    By 2021, J&J was tired of the tort system. It was tired of paying to defend itself against victims of its talcum powder products now that it was losing cases. It was tired of the questions from ratings agencies, about if J&J's sterling credit rating might need to be downgraded because of the potential liability. J&J was also tired of the press: exposure of its wrongdoing through jury trials was having a severe impact as people learned that J&J had, for decades, sold an asbestos-tainted product causing tens of thousands of cases of cancer in present victims (leaving aside future victims and victims who died with no idea what caused their cancer). It was tired of *Reuters* articles that laid out, in detail, what they knew and when they knew it—and linked directly to J&J internal documents that had been made public through the trials so that American citizens could review what had happened and view the source documents themselves.

198.    Attorneys with the Jones Day law firm offered a way out—to utilize its so-called "Texas Two-Step" scheme to strip talc victims of their access to court, to freeze all the cases, and to hinder, delay, and defraud them into accepting sub-par compensation many years in the future.

199.    Although the Constitution protects the right to a jury trial and protects the right of a victim to seek to take a case to trial rather than accept a coerced settlement, Jones Day advertised that a bankruptcy could effectively terminate both. J&J hoped that by ending jury trials, and by forcing claimants to proceed against a trust the public would forget about J&J's conduct and the tens of thousands (at a minimum) of cancer victims dying from its products would be "yesterday's news." Indeed, during the bad faith bankruptcy proceedings, J&J witnesses cited the need for protection of J&J's ***reputation*** as a key rationale for the bankruptcy proceeding, and the desire to avoid further uncomfortable publicity that further trials might cause.

200.    In April 2021, attorneys from Jones Day held a meeting with J&J executives that included John Kim, Erik Haas, Eric Jung, and Christopher Andrew. This meeting occurred after

the refusal of the Missouri Supreme Court to overturn the *Ingham* decision, but prior to when J&J's long-shot attempt at United States Supreme Court review was denied.

201.    The Jones Day attorneys proposed that J&J execute a "Texas Two-Step," a scheme that the law firm had begun using to shield its clients' assets from tort victims seeking recompense.

202.    Jones Day attorneys subsequently discussed the proposal with J&J employees, including Eric Haas, John Kim, Andrew White, Christopher Andrew, Troy Lewis, Thomas McCann, Amanda Manfre, Laura Giacino, Valerie Coulson, Donald McGraw, Alyson Lawrence, Duane Van Arsdale, Glen Murphy, Elizabeth Scott, Tina French, Mikelis Vasarais, Jennifer Boston, Paul Jeges, Jennifer Sheehy, Scott Borup, David McDonald, Jake Feldman, Myra McCormack, Jon Chiodo, Amanda Kessel, Brandon Greer, and Kim Januzzi.

203.    J&J leapt at this chance. The aforementioned Jones Day attorneys willingly aided and abetted the scheme dubbed "Project Plato;" a project that was meant to salvage J&J's reputation by putting a stop to jury trials and, through a bankruptcy, forcing claimants to proceed against an underfunded and capped trust ("Project Plato"). Project Plato was the blueprint for the Divisive Merger Fraud. The strategy was explicitly approved by Thibaut Mongon, Paul Ruh, Robert J. Decker, Jr., Michelle Ryan, Louise Weingrod, Matthew Orlando, Chris Andrew, Robert Deberardine, David McDonald, Erik Haas, Valeria Cnossen, Donny McGraw, Alyson Lawrence, Catherine Turk, Chuck Borst, Duane Van Arsdale, Luani Alvarado, Peter Kerrane, and Laura Giacino, all of whom received a document titled "Approval Request – Memorandum of Approval."

204.    J&J and the Aider and Abettor Defendants, except Laura McFalls, began plotting a complex series of transactions that became the Divisive Merger Fraud, namely utilizing an obscure Texas corporate law provision that allows a company to conduct a "divisive merger" to separate its assets and liabilities into two separate companies, as discussed further below, so long as the

actions taken comport with the requirements and intent of the Texas statute's provisions which is not the case here.

### i.   The Divisive Merger – General Overview

205.    The divisive merger used a provision of Texas corporate law to conduct a brazen fraudulent transfer in an attempt to transfer liabilities without the consent of the creditors in violation of common law principles older than the United States. Under Texas law, a company undergoing a divisive merger is not deemed to have dissolved – a process that would otherwise require, among other things, the payment of outstanding debts. Instead, under Texas law, the dividing company purportedly ceases to exist, with its assets and liabilities allocated to two or more successor entities.

206.    The general strategy of the divisive merger was simple. First, J&J would use the Texas divisive merger law to accomplish the full separation of Old JJCI assets from the talcum powder liabilities to attempt to limit the assets directly available to the victims. The divisive merger would accomplish this by splitting Old JJCI into a non-operating BadCo stuffed with the talc liabilities and an operating GoodCo with the valuable assets. J&J would then cause the newly created BadCo that housed the talc liabilities (and only the talc liabilities) to file for bankruptcy and utilize the automatic stay and a supplementary equitable stay to block further litigation not only against BadCo, but against all J&J affiliates. The stays would thus preserve the effects of its "deny strategy" from further erosion. Finally, J&J would have LTL "wait out the clock" in bankruptcy while purporting to negotiate, placing the talc claimants in an interminable limbo. Meanwhile, the newly created GoodCo subsidiary that held the real assets would continue to run its business, sheltered by the equitable stay and free from the scrutiny of a bankruptcy. Ultimately, the aim of the "deny" strategy, coupled with the delay caused by the stays imposed by the bad-

faith bankruptcy, was to force claimants to accept a cut-rate settlement to get out of limbo – thus enabling J&J to hinder, delay, and defraud them from obtaining their rightful compensation.

### ii.     Implementation of the Divisive Merger

207.    The divisive merger was a complex series of corporate transactions effectuated simply by signing documents created by counsel in the right order to implement various legal fictions, and then filing certain of those documents with applicable state authorities—largely over the course of a single day.

208.    *First*, on October 6, 2021, a company named Chenango Zero was formed under the laws of Texas, but its only place of business and control was New Jersey.

209.    *Second*, at 9:00 a.m. on October 12, Old JJCI—a company incorporated in New Jersey, the state where its offices are based—merged with and into Chenango Zero. It took with it both billions of dollars of assets and, according to the Debtor, all of the liability for claims related to talcum powder products.

210.    *Third,* exactly one hour later, at 10:00 a.m., Chenango Zero executed a divisional merger under Texas Law. That divisional merger created two companies: Chenango One and Chenango Two. Assets and liabilities were allocated between the companies according to the plan of merger. All assets (other than token assets needed to meet the requirements of the bankruptcy code) were transferred to the "GoodCo"—Chenango Two—along with all liabilities *other than* the talc liabilities J&J sought to impair. The token assets needed for a bankruptcy filing, and the liabilities sought to be impaired (the claims of talcum powder victims), were transferred to another new corporation, the "BadCo"—Chenango One.

211.    *Fourth*, in this "plan of merger" J&J also terminated the corporate existence of Chenango Zero (in truth, Old JJCI)—allegedly allowing J&J to circumvent Texas law that would otherwise keep Chenango Zero/Old JJCI secondarily liable for the tort liabilities in question.

212.    *Fifth*, like clockwork, and again exactly one hour later, Chenango Two merged into a New Jersey entity called Currahee Holding Co. The resulting entity (now referred to as New JJCI), to which Old JJCI had allocated almost all of its assets, was quickly reincorporated as a New Jersey corporation called—just as it had been before—J&J Consumer Inc. New JJCI stepped into the shoes of Old JJCI in practically every respect—except, of course, that it *announced* it was unencumbered by the talc liabilities transferred to Chenango One thanks to the corporate death of its parent (for one hour), Chenango Zero.

213.    *Sixth*, and simultaneously, Chenango One—the entity into which Old JJCI dumped all its talcum powder liabilities—converted into a North Carolina company called LTL Management LLC. LTL executed unilateral agreements pledging to "indemnify" New JJCI for the liabilities transferred to LTL. A "Funding Agreement"—the 2021 Funding Agreement—that required New JJCI and J&J to fund LTL's liabilities inside or outside of bankruptcy was also executed.

214.    In this process, the following individuals executed the following documents to effect the Divisive Merger Fraud.

- Agreement and Plan of Merger between J&J and Chenango Zero (dated 10/12/2021) was signed by: Michelle Ryan and Michelle Goodridge

- Funding Agreement (10/12/2021) between J&J, Currahee Holding and Chenango Zero, was signed by: Michelle Ryan and Michelle Goodridge

- Plan of Divisional Merger (10/12/2021) between Chenango Zero, was signed by Robert Wuesthoff and Michelle Goodridge

- Divisional Merger of Chenango Zero (10/21/2021) was signed by Michelle Goodridge

- Divisional Merger Support Agreement between Chenango One and Chenango Two, was signed by Robert Wuesthoff and Michelle Goodridge

- Secondment Agreement between J&J and Chenango One (10/12/2021) was signed by Leonardo DeCandia and Robert Wuesthoff

- Agreement and Plan of Merger between Currahee and Chenango Two (10/12/2021) was signed by Michelle Ryan and Michelle Goodridge

- Plan of Conversion of Chenango One to LTL Management (10/12/2021) was signed by Robert Wuesthoff

- Articles of Organization for LTL, was signed by Michelle Goodridge

- Amended Restated Funding Agreement, between JNJ, JJCI, and LTL (10/12/2021) was signed by Michelle Ryan, Michelle Goodridge and Robert Wuesthoff

- Amended Restated Divisional Merger Support Agreement (10/12/2021) was signed by Michelle Goodridge and Robert Wuesthoff

215.    *Seventh*, on October 14, LTL filed for Chapter 11 bankruptcy. The next day, New JJCI and J&J filed notices of LTL's bankruptcy in the myriad talc lawsuits pending against them, arguing that the automatic stay under 11 U.S.C. § 362 halted proceedings against not just the debtor (LTL), but also all of its non-debtor affiliate companies—in essence, the entire J&J corporate family.

216.    Upon the completion of the corporate machinations on October 12, 2021, that created LTL, the directors and officers of LTL now had a fiduciary duty to their corporation (LTL). They were duty-bound to maximize its assets—and LTL's principal asset was the 2021 Funding Agreement. Outside of bankruptcy, LTL had the ability to settle claims and have those immediately paid via the 2021 Funding Agreement, backstopped by both New JJCI and J&J up to the full value of at least New JJCI—which LTL has estimated at greater than $61 billion. LTL had the full ability to remain outside of bankruptcy and use the 2021 Funding Agreement to resolve its liabilities.

217.    However, while that would have been in LTL's interests, it would not have been in J&J's interests—and Project Plato was all about J&J's interests. Accordingly, LTL was staffed only with J&J employees, drawing their paychecks from J&J, and employed at the sufferance of J&J—and they knew what their job was. It was to place LTL immediately into bankruptcy, for the benefit of its non-debtor parent companies.

218.    LTL officers and directors Kim, Wuesthoff, Dickinson, and Deyo specifically effected the bad faith filing.

### iii.    Key Divisive Merger Documents

219.    There are three documents most relevant to understanding how the Divisive Merger Fraud was intended to further victimize talcum powder claimants: the "Plan of Merger," the "Merger Support Agreement", and the "2021 Funding Agreement."

220.    The Plan of Merger purported to split the assets and liabilities of "Old JJCI" as follows. To BadCo (Chenango One, currently known as LLT, but f/k/a LTL), the Plan of Merger allocated all talc-related liabilities of Old JJCI. It allocated the following assets: (a) a bank account and approximately $6 million in cash; (b) Old JJCI's rights and interests as payee under the 2021 Funding Agreement; (c) all contracts of Old JJCI related to its talc-related litigation, including settlement agreements, interests in qualified settlement trusts, indemnity rights, service contracts and engagement and retention contracts, if any; (d) all equity interests in Royalty A&M; (e) causes of action that relate to the assets and liabilities allocated to the Debtor (which must include the breach of fiduciary duty, fraud and alter ego claims assertable against the directors and officers of its affiliates and predecessors, pled herein); (f) privileges that relate to the assets and liabilities allocated to the Debtor; and (g) records that relate to the assets and liabilities allocated to the Debtor. GoodCo—now known as New JJCI, then known as Chenango Two—received everything

else. It received all favored liabilities (the non-talc liabilities), and received all assets not allocated to BadCo.

221.    Specifically, the Schedules to the Plan of Merger stated that Chenango One (LTL) received the following causes of action:

> "All Causes of Action of the Company against any Person **related in any way** to the other Chenango One Assets or the Chenango One Liabilities (including the Talc Related Liabilities) and all Proceedings related thereto (collectively, the "Chenango One Causes of Action"), including all such Causes of Action and Proceedings that seek to hold any Person responsible for the Talc Related Liabilities."

222.    The Merger Support Agreement was executed at the direction of J&J (and never negotiated by LTL) as part of the Divisive Merger Fraud, and had several key provisions that sought to create new indemnification obligations to protect J&J. Old JJCI was burdened by an indemnification provision in the 1979 spinoff, but this indemnification was limited to the liabilities allocated on the "books or records" of J&J as pertaining to the Baby Division (and did not extend to Shower to Shower, or J&J's liabilities associated with indemnities issued in connection with its talc mine spinoff). As a result, it was limited to explicitly listed liabilities. Under no reading could it have encompassed liabilities not in existence at that time and, thus, was definitively not "all liabilities associated with talc" as J&J has falsely represented. In other words, it might not cover any talcum powder litigation claims (as none were booked on J&J's records), but if it did, it likely only covered claims from J&J's actions in 1979 or before—and would not cover affirmative wrongdoing that J&J engaged in after 1979, or unrelated to the transfer in 1979.

223.    The 2021 Funding Agreement was drafted by Jones Day. The terms of the 2021 Funding Agreement that applied to transactions outside of bankruptcy were necessary to give LTL access to the same assets that Old JJCI had available to satisfy talcum powder claims. The 2021 Funding Agreement expressly contemplated an existence outside of bankruptcy (either before an LTL bankruptcy, or after its dismissal from bankruptcy). At this point (outside of bankruptcy), the

2021 Funding Agreement was as good as cash—as the Third Circuit later found, it strongly resembled an ATM that provided LTL with a right to at least $61.5 billion in cash with minimal conditions.

224.    The 2021 Funding Agreement was set up to insulate the Texas Two-Step from criticism that it facilitated a fraudulent transfer—at least whenever J&J wanted to defend against such criticism. The 2021 Funding Agreement made the entire value of JJCI—at least $61 billion— available to pay talc claimants on a free and clear basis.

225.    In fact, the resources available to LTL under the 2021 Funding Agreement are available regardless of whether a plan of reorganization is acceptable to J&J or New JJCI, and whether or not the plan of reorganization offers any payor protections under section 524(g) of the Bankruptcy Code. Under the 2021 Funding Agreement, J&J was obligated to pay at least $61.5 billion even if the tort claimants committee proposed the plan of reorganization. The 2021 Funding Agreement was drafted to apply both inside and outside of bankruptcy.

226.    That a plan was not required to protect or exculpate J&J was, again, included in a meritless attempt to avoid the divisive merger from being unwound as a fraudulent transfer. J&J itself has independent liability for the talc claims. Courts have found J&J to be jointly and severally liable with Old JJCI, and some courts, including in the *Ingham* case, have apportioned a greater share of punitive damages to J&J on account of its "reprehensible conduct." Regardless of any internal indemnifications or cost allocations between J&J and Old JJCI, described below, a creditor with a judgment against J&J could recover from J&J, up to the value of J&J. The Divisive Merger Fraud removed J&J and Old JJCI's assets out of the direct reach of these creditors, leaving only an unsecured promise to pay LTL up to the value of Old JJCI. These acts were undertaken with

actual intent to hinder, delay, and defraud tort claimants and thus constituted an actual fraudulent transfer.

### iv.        The Divisive Merger's Planned End Result: Delay to Underpay

227.    The Texas Two-Step has been done several times before by other debtors with mass tort liability, all counseled by the same bankruptcy law firm, Jones Day, and the Texas Two-Step scheme has followed the same basic pattern each time. The company that is established and set up for the sole purpose of bankruptcy publicly states that it wants a fair resolution of liabilities and to pay the full value of all such claims, present and future—but of course, it does not. Instead, it seeks to force tort victims to accept grossly inadequate settlement offers through the threat of interminable delay, knowing that sick and dying claimants and their families are often desperate for funds.

228.    Bankruptcy is the vehicle for achieving the intended delay. Under normal circumstances, when an operating company files for bankruptcy, it is strongly incentivized to find a fast exit both to maintain customer and vendor confidence and to free itself from the near-constant supervision of the bankruptcy court – as well as the related requirement of seeking the court's approval for all manner of transactions outside of the ordinary court of business.

229.    The Texas Two-Step maneuver, however, dumps all of the disfavored tort liabilities into a newly formed non-operating subsidiary, the "BadCo." The non-operating BadCo (*i.e.*, the debtor company) has no business reason to seek a prompt resolution of its bankruptcy. It has no customers or vendors to assuage, and court oversight imposes no particular burden on it because it is easier to manage **one** bankruptcy case than **thousands** of cases in trial courts around the nation. And given that BadCo does not even share a name with GoodCo, the bankruptcy spares GoodCo from reputational harm.

230.     Instead, every day that BadCo sits in bankruptcy is to its advantage: all litigation is stayed against it by the automatic stay and a supplementary equitable stay protects its GoodCo non-debtor operating company affiliates. BadCo has the exclusive right to propose a bankruptcy plan for up to 18 months and given that it alone possesses the information necessary for an acceptable disclosure statement, the exclusive right to set the agenda in the bankruptcy is effectively indefinite. This means that BadCo can simply remain in bankruptcy indefinitely, making lowball offers to tort victims until they finally settle out of exhaustion, while GoodCo can continue operating as normal, even paying out dividends to its shareholders.

231.     Whereas delay imposes no cost on BadCo, it imposes tremendous costs on tort victims. Their claims are stayed while the bankruptcy is pending. This cuts off their ability to develop discovery as well as to present their cases to juries of their peers. Meanwhile, their medical bills mount every day, their families grow deeper in debt, and the victims become more and more desperate—and eventually die, after a slow and agonizing decline.

232.     This dynamic places enormous pressure on victims to accept whatever lowball settlement is being offered by BadCo because the alternative is the prospect of never-ending delay.

233.     This dynamic is not theoretical. In the seven years since Jones Day filed the first Texas Two-Step bankruptcy case on behalf of Bestwall, a Georgia-Pacific subsidiary with asbestos liabilities, no court has ever confirmed a bankruptcy plan arising from a Texas divisive merger. Instead, every Texas Two-Step bankruptcy case filed remains pending (except LTL's), with no resolution in sight. This means that not one tort victim has received compensation in a litigation where the Texas Two-Step maneuver was employed. Meanwhile, the bankruptcy automatic stay prevents the victims from being able to pursue their claims outside the bankruptcy court. The Texas Two-Step—*i.e.,* the combination of a divisive merger to split a mass tort debtor into GoodCo and

BadCo and followed by the BadCo filing for bankruptcy—is fundamentally a litigation tactic designed to hinder, delay, and defraud tort creditors and abuse the bankruptcy process.

234.    J&J's machinations have followed this now well-worn, delay-to-underpay playbook. First, J&J used the threat of the delay as leverage to force a lowball settlement, as reported by *Reuters* on July 18, 2021. This fact demonstrated J&J's awareness that the Divisive Merger Fraud would hinder, delay, and defraud its creditors—and that those creditors could accept lower settlements to avoid this fraud. When those threats did not work, J&J then proceeded with its own Texas Two-Step bankruptcy.

235.    Following the Texas Two-Step playbook, Old JJCI split into New JJCI (the GoodCo operating company) and LTL (the BadCo non-operating company). LTL filed for bankruptcy, shielded from litigation by the automatic stay, while New JJCI continued to operate as normal, shielded from litigation by the supplemental equitable stay. LTL put a lowball settlement offer on the table….and waited. Free from court supervision, New JJCI and J&J have been able to distribute their largess—over $17 billion to date—to J&J shareholders, without a single penny being provided to ovarian cancer victims.

236.    The Divisive Merger Fraud—like every Texas Two-Step—is intended to create the most adverse possible negotiating position for tort victims. New JJCI and J&J have no incentive to negotiate in good faith. They control all the assets, earning handsome returns off them, and cannot be compelled to pay their victims anything because of the litigation stay. This ensures that New JJCI and J&J will have no incentive to agree to a fair resolution with talc victims.

237.    J&J purports that the 2021 Funding Agreement means that LTL's creditors were not defrauded because the 2021 Funding Agreement made over $61 billion in assets available to satisfy their claims. In practice, however, the tort victims would only have been able to access the

2021 Funding Agreement if they reached a deal with J&J, and the delay dynamics of the Texas Two-Step meant that J&J would only agree to a lowball settlement.

238.   All of J&J's corporate machinations were designed to hinder and delay the payment of claims presented by tort claimants indefinitely. Ultimately, J&J's goal was (and is) to force the victims to accept an inadequate payment of their claims against one of the most solvent corporations in the world – and do so under the threatening cloud of interminable bankruptcy delays.

### v.   Directors and Officers Breached Their Duties in Concert

239.   On October 14, 2021, LTL held its first board meeting (the "LTL Board Meeting") and approved the first bankruptcy filing. That meeting lasted approximately ninety minutes. Prior to the LTL Board Meeting, Mr. Wuesthoff and the LTL Board did not receive or review any written analysis related to whether LTL should file for bankruptcy. Mr. Kim was at that Board meeting— although he had been a J&J lawyer deeply involved in the Divisive Merger Fraud and was one of the core conspirators, Mr. Kim was seconded to LTL and serves as its Chief Legal Officer. Mr. Kim purportedly advised the board of key facts relevant to their decision—but those board members and officers were unable to recall a number of these facts in sworn testimony.

240.   Prior to the LTL Board Meeting, Mr. Wuesthoff and Mr. Dickinson did not receive, and did not review, any written material related to the talc liability. No one at LTL undertook any work to value the potential talc liabilities that had been assigned to LTL, nor did anyone at LTL undertake any assessment of JJCI's purported indemnification of J&J, or whether either LTL or JJCI could raise any potential challenges to this purported indemnification. The forecasted costs and expenses associated with talc litigation were not presented at the LTL Board Meeting, and neither was any discussion of what J&J had paid to settle cases in the past or any forecasts about

what LTL could expect to pay to settle the talc litigation. Prior to voting to place LTL into bankruptcy, neither Mr. Wuesthoff, nor Mr. Dickinson, nor the LTL Board had any information relating to the amount of LTL's talc liabilities. They operated for the benefit of J&J and effected the Divisive Merger Fraud.

241.    Additionally, neither Mr. Wuesthoff nor Mr. Dickinson, nor the LTL Board knew the value of LTL's assets. Even though Mr. Wuesthoff had signed the 2021 Funding Agreement on behalf of LTL, and even though he understood that the 2021 Funding Agreement was both the most important asset of LTL and that, after a bankruptcy filing, the value of the 2021 Funding Agreement would be tied to the value of JJCI, he did not know, and did not ask, what the value of JJCI was. The value of JJCI was not discussed at the LTL Board Meeting.

242.    While Mr. Wuesthoff and the LTL Board understood that it would be important for LTL to have legal counsel, neither Mr. Wuesthoff nor the LTL Board selected, or had any input, into who would represent LTL in its bankruptcy case. Rather, Jones Day, which had previously represented both J&J and JJCI in planning the Texas Two-Step, was assigned to represent LTL in its bankruptcy case, and neither Mr. Wuesthoff nor the LTL Board knew whether Jones Day was free of conflicts. Indeed, both Mr. Wuesthoff and Mr. Dickinson gained their understanding of the restructuring transaction—such as it was—from J&J lawyers including Mr. John Kim, Mr. Chris Andrew, and Mr. Andrew White.

243.    In short, not only was there no independent board at LTL, but there was not even a pretense of independence. The LTL Board consisted of puppets put in place by J&J to protect J&J's interest. Their assignment was to rubber stamp anything and everything that needed to be done on behalf of each entity involved to ultimately effectuate Divisive Merger Fraud by filing

LTL's bad faith bankruptcy. Inherent in this rubber-stamping exercise was a complete and utter disregard for any kind of diligence, review, analysis, or objective decision making.

244.    Their orders were simple: do not review, question, analyze, comment on, discuss, or otherwise consider the several transactions involved in the Texas Two-Step. Simply sign on the dotted line. If anyone asks, repeat the party line: "so that we could equitably and efficiently resolve the talc claims." Of course, what J&J meant by "equitable resolution" was that all talc claimants would be deprived of their right to a jury trial and forced to accept nuisance value settlements in amounts determined by J&J in its sole and absolute discretion.

245.    The Third Circuit revealed this charade. It found that LTL faced no imminent financial distress because—taking J&J and LTL at their word—the 2021 Funding Agreement could allegedly meet all of LTL's talc liabilities in the ordinary course.

## IV.    The Third Circuit Dismisses LTL 1.0 as Filed in Bad Faith

246.    LTL's initial bankruptcy was filed in bad faith. It was filed as part of a scheme to hinder, delay, and defraud talc claimants through the bankruptcy filing. However, the Third Circuit ultimately reached that very conclusion; finding that because the 2021 Funding Agreement provided LTL with access to at least $61.5 billion and permitted LTL to meet its obligations in the ordinary course, the bankruptcy was filed in bad faith. Thus, bankruptcy was unavailable to LTL.

247.    The only way for LTL's initial bankruptcy to appear, at least superficially, non-fraudulent was for LTL and J&J to hold the 2021 Funding Agreement out as absolute and something that provided LTL with access to funding outside of bankruptcy.

248.    John Kim, LTL's chief legal officer, in his first-day declaration setting out the purported purpose of LTL's first bankruptcy filing, represented to the Court that the 2021 Funding Agreement provided LTL with access to funding outside of bankruptcy. Mr. Kim testified:

Significantly, the [2021] Funding Agreement imposes no repayment obligation on the Debtor; it is not a loan. It obligates New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, to pay for costs and expenses of the Debtor incurred in the normal course of its business (a) at any time when there is no bankruptcy case and (b) during the pendency of any chapter 11 case, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses. In addition, the [2021] Funding Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (b) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.

Decl. of John K. Kim in Support of First Day Pleadings, *In re LTL Mgmt., LLC* (Bankr. W.D.N.C.)

No. 21-30589 [D.I. 5 at ¶ 27].

249.     LTL's counsel, Mr. Gregory Gordon of the Jones Day law firm, represented to the

Bankruptcy Court, in the presence of Mr. Haas—J&J's head of worldwide litigation—at a hearing

held on February 18, 2022 on a motion to dismiss LTL's bankruptcy as a bad faith filing, that the

2021 Funding Agreement meant that talc claimants were covered in bankruptcy or outside

bankruptcy, including in the event the bankruptcy case was dismissed. Mr. Gordon stated:

[T]here's literally no conditions or any material conditions on the permitted funding uses under this document. I'll come back to this. So I did want to focus on permitted funding use because the other side I think has fashioned a new argument that we hadn't heard before with respect to the funding agreement. So there's basically two different scenarios where funding is available. The first is funding in the tort system. And as you would expect, what that funding says is that the payors are obligated to pay the liabilities to the extent they're established by a judgement or a settlement in the tort system. That's what you would expect and that's what happens. You want funds available to pay settlements, to pay judgments in the tort system. So it makes very clear this is what we're talking about if there's no proceeding in bankruptcy. Whether there was no case filed or whether the case is filed or dismissed, the money's available for that purpose. And you can imagine, Your Honor, by the way, the hue and cry you would have heard if this provision weren't in there because they would have said that we've manipulated the whole system because you filed bankruptcy and now you're going to tell the Court you can't dismiss our case because there's no money available if we go back in the tort system. So this is there to protect the claimants. It's there to assure this isn't treated

or consider a fraudulent conveyance. The idea was and the intent was the claimants
are covered either way in bankruptcy or outside.

*In re LTL Mgmt., LLC* (Bankr. D.N.J.) No. 21-30589, Feb. 18, 2022, Trial Tr. 60:17-61:20.

250.    Indeed, the terms of the 2021 Funding Agreement expressly provide that it applies
outside of bankruptcy and enables "the payment of any and all costs and expenses of the Payee
[*i.e.*, LTL] incurred in the normal course of its business," such as talc judgments and settlements,
"at any time when there is no proceeding under the Bankruptcy Code pending with respect to the
Payee." 2021 Funding Agreement, pp. 5-6.

251.    The Bankruptcy Court relied on LTL's representations and held that the 2021
Funding Agreement obligated New JJCI and J&J "to pay for costs and expenses of the Debtor
incurred in the normal course of its business (a) at any time when there is no bankruptcy case" and
"requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to
satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case…." *In re
LTL Mgmt.*, 637 B.R. 396, 423 n.27 (Bankr. D.N.J. 2022).

252.    Neal Katyal, LTL's appellate counsel, also told the Third Circuit that the 2021
Funding Agreement applied outside of bankruptcy. "Mr. Katyal: Now you had asked before, Your
Honor, I just have to slightly correct something. I understand that the [2021] funding agreement
does have provisions for funding outside of bankruptcy. The Court: Yeah, that's what I thought."[17]

253.    Relying on the plain language of the 2021 Funding Agreement, as well as the
Bankruptcy Court's findings and LTL's representations, the Third Circuit held that LTL "had the
right, outside of bankruptcy, to [enforce the Funding Agreement]." *In re LTL Mgmt. LLC*, 64 F.4th
84, 106 (3d Cir. 2023). The Third Circuit pointed to the benefit to claimants of New JCCI's role

---

[17]    *In re LTL Mgmt. LLC*, Case No. 22-2003/22-2004 (3d Cir.) Sept. 19, 2022, Oral Arg. Tr. 83:21-25.

in the 2021 Funding Agreement: "The value of the payment right could not drop below a floor defined as the value of New Consumer measured as of the time of the divisional merger, estimated by LTL at $61.5 billion, and was subject to increase as the value of New Consumer increased after it." *Id.* at 97.

254.    Thus, the value of the 2021 Funding Agreement "would increase as the value of New Consumer's business and assets increased." *Id.* at 106. In addition, New JJCI "had access to Old Consumer's cash-flowing brands and products along with the profits they produced, which underpinned the $61.5 billion enterprise value of New Consumer as of LTL's filing. And the sales and adjusted income of the consumer health business showed steady growth in the last several years when talc costs were excluded." *Id.*

255.    The 2021 Funding Agreement was absolute, functioned like an ATM machine, and made over $61 billion available to LTL to pay talc claims outside of bankruptcy. The problem for LTL and J&J, though, was this meant that LTL was not eligible to be in bankruptcy.

256.    Much to J&J's disappointment, the Third Circuit held that LTL was not eligible for bankruptcy protection and the case had been filed in bad faith. For J&J's scheme to work, LTL had to stay in bankruptcy for as long as possible and maintain a litigation stay that protected J&J and its non-debtor affiliates. Dismissal meant that J&J would not get the "bang for the buck" that it was promised. If LTL's case was dismissed too soon, J&J would lose the benefits of the Bankruptcy Court's injunction keeping cancer victims from trying to hold J&J accountable for its conduct.

**V.      In Response, J&J Executes the Asset Stripping Fraud and the Bait-and-Switch Fraud**

257.    J&J had provided the 2021 Funding Agreement to enable it to assert it had not sought to defraud talc claimants because they would have access to the same assets as they had

before the Divisional Merger. However, the Third Circuit identified that as a result, LTL faced no imminent financial distress and thus could not satisfy the test that its bankruptcy had been filed in good faith. The Third Circuit specifically cautioned against LTL seeking to manufacture financial distress by parting with the 2021 Funding Agreement. *See In re LTL Mgmt. LLC*, 64 F.4th 84, at FN 18. However, having conducted one fraudulent transfer to access the bankruptcy system, J&J was not deterred from conducting another to re-file for bankruptcy.

258.    As soon as oral argument before the Third Circuit ended and J&J became concerned about a possible outcome that would boot LTL out of its bankruptcy, J&J began to orchestrate a scheme to keep LTL in bankruptcy, even if the Third Circuit dismissed LTL's first bankruptcy.

259.    The following documents are relevant to the Asset Stripping Fraud and the Bait-and-Switch Fraud discussed in detail below:

### LTL 2.0 — Operative Approval & Agreements

- The Bankruptcy Approval (4/2/2023), including the Board Presentation, the Board Minutes, and the Resolution

- The Termination and Substitution Agreement (4/4/2023) signed by: Robert Wuesthoff (President, LTL), Laura McFalls (President, Johnson & Johnson Holdco (NA), Inc.), and Duane Van Arsdale (Treasurer, Johnson & Johnson Holdco (NA), Inc.)

- The 2023 Funding Agreement (4/4/2023) signed by: Robert Wuesthoff (President, LTL) and Laura McFalls (President, Johnson & Johnson Holdco (NA), Inc.); and

- The J&J Support Agreement (4/4/2023) signed by: Robert Wuesthoff (President, LTL), Laura McFalls (President, Johnson & Johnson Holdco (NA), Inc.), and Duane Van Arsdale (Treasurer, Johnson & Johnson Holdco (NA), Inc.)

260.    First, in early January 2023, New JJCI, renamed Holdco, transferred its consumer health business through one or more transactions to Janssen and subsequently to Kenvue. As a result of these transactions, Kenvue now owns and operates the consumer health business and the

cash-flowing brands that were once owned by Old JJCI and subsequently by New JJCI/Holdco. As a result of the transfer of the consumer health business, Holdco's assets no longer include the consumer health business and the cash-flowing brands and products and profits that they produced. Instead, Holdco's assets are limited to ownership interests in various subsidiaries. Holdco's assets post-transfer are valued, according to J&J, at approximately $30 billion. This reduction in value was effectuated by the Asset Stripping Fraud.

261.    This was a fraudulent transfer and would not have been able to happen but for the actions of the Aider and Abettor Defendants identified above who participated in the Asset Stripping Fraud.

262.    Second, LTL was made to part with its rights under the 2021 Funding Agreement. This is the Bait-and-Switch Fraud. On the very day the Third Circuit decision issued its decision ordering that LTL's first bankruptcy be dismissed, Mr. Kim or Mr. Haas (or both together) purportedly came up with the idea that the 2021 Funding Agreement might be deemed "void or voidable" because of the Third Circuit's ruling. Fact witness testimony as to who came up with what, when, shifted as J&J formulated and finalized the arguments it was going to use to defend the actions it took and caused LTL to take in the second bankruptcy case. Mr. Kim apparently concluded that the Third Circuit's opinion frustrated the purpose of the 2021 Funding Agreement because it meant that LTL could not stay in bankruptcy for years and years and keep talc claimants from asserting their claims against J&J.

263.    Mr. Kim stated that he consulted with attorneys at Jones Day to see if anyone would support his novel and fraudulent legal theory that the Third Circuit's opinion somehow rendered the 2021 Funding Agreement "void or voidable."[18] Regardless of the advice he received, there is

---

[18] *See In re: LTL Management, LLC*, No. 23-12825, Dkt. No. 4, Decl. of John K. Kim, at 26 (April 4, 2023).

no evidence or legal support for the proposition that the Third Circuit's order to dismiss LTL's first bankruptcy was a frustration of purpose such that J&J could escape its obligations under the 2021 Funding Agreement. *See Brenner v. Little Red School House, Ltd*., 274 S.E.2d 206 (N.C. 1981). Mr. Kim's suggestion that the Third Circuit's ruling meant that the 2021 Funding Agreement was "void or voidable" was contradicted ***by the express language of the contract***; it was contrary to LTL's counsel's admission to the Third Circuit that the Funding Agreement was in effect in or out of bankruptcy; ***and*** it was wholly adverse to LTL's own interests.

264.    Tellingly, LTL also never raised with the creditors, the U.S. Trustee's Office, or the Bankruptcy Court its alleged concern that the 2021 Funding Agreement might be "void or voidable" because of the Third Circuit's opinion. In late March 2023, LTL filed a monthly operating report, signed by LTL's CFO Dickinson and its counsel, which indicated the 2021 Funding Agreement remained in place. J&J never refused to make a payment under the 2021 Funding Agreement. In fact, nothing prevented J&J from honoring its obligations under the 2021 Funding Agreement to LTL even if a theoretical risk of frustration of purpose—normally an affirmative defense—existed, especially considering LTL's repeated assurances to the Bankruptcy Court and the Third Circuit that the 2021 Funding Agreement applied outside of bankruptcy.

265.    Notwithstanding Kim's testimony that it was the Third Circuit's decision that led him to his erroneous conclusion that the 2021 Funding Agreement was void or voidable —and, indeed, prior to the dismissal of LTL's first bankruptcy—LTL began its preparations to terminate the 2021 Funding Agreement and replace it with new financing agreements (the 2023 Funding Agreement and J&J Support Agreement) in order to manufacture (purported) financial distress.[19] Under the new agreements, J&J's balance sheet is only available to the Debtor in bankruptcy to

---

[19] *See In re: LTL Management, LLC*, No. 23-12825, Dkt. No. 4, Decl. of John K. Kim, at 26 (April 4, 2023).

fund a court-approved plan. Also, under the new agreements, Holdco's (formerly New JJCI's) assets no longer include the consumer health business (because they were transferred to Kenvue). The LTL Board, comprised of Wuesthoff, Deyo and Dickinson and aided by Kim, approved this transaction during the pendency of LTL's first bankruptcy, while LTL's directors, officers and counsel owed fiduciary duties to the talc victims and claimants. This is part of the Bait-and-Switch Fraud.

266. On April 4, 2023, during the 131 minutes that LTL was outside of bankruptcy, LTL terminated the 2021 Funding Agreement and entered into the 2023 Funding Agreement and the J&J Support Agreement (the "2023 Transaction"). LTL, J&J, and New JJCI (renamed Johnson & Johnson Holdco (NA) Inc.) entered into a termination and substitution agreement by which the 2021 Funding Agreement was terminated, and the 2023 Funding Agreement and the J&J Support Agreement were executed.

267. Laura McFalls, President of New JJCI, and Duane Van Arsdale, Treasurer of J&J, signed the termination and substitution agreement and the J&J Support Agreement on behalf of New JJCI and J&J, respectively. Ms. McFalls also signed the 2023 Funding Agreement on behalf of New JJCI. This is part of the Bait-and-Switch Fraud.

268. Once LTL had parted with its rights under the 2021 Funding Agreement, it re-filed for bankruptcy. LTL sought to use the Bait-and-Switch Fraud to manufacture the appearance of financial distress in an effort to justify a second bankruptcy filing that would impose a litigation stay and thereby keep claimants from pursuing recovery from J&J. Under the 2023 Funding Agreement, LTL can only look to New JJCI for funding – not to J&J. Moreover, because of the Asset Stripping Fraud, New JJCI had a more limited asset base, having transferred its valuable consumer health business to Janssen. Thus, LTL did not (and does not) have the same access to

assets and liquidity to pay talc claims as Old JJCI did prior to the divisive merger or termination of the 2021 Funding Agreement. All LTL's directors and officers named as Defendants participated in and approved this second bad faith bankruptcy filing for the specific purpose of hindering, delaying, and defrauding LTL's creditors.

269.    The result of LTL's strategy to evade the Third Circuit's ruling was that LTL replaced the 2021 Funding Agreement—guaranteed by New JJCI as well as J&J—with the 2023 Funding Agreement guaranteed *only* by the remains of New JJCI. Because J&J had caused New JJCI to spin off its consumer health division, New JJCI does not have access to the same level of assets and liquidity to meet its obligations as when the 2021 Funding Agreement was implemented (as LTL proudly announces)—because at least $30 billion was transferred away from New JJCI to J&J and its shareholders. Further, by stripping operating businesses from New JJCI, J&J sought to deny LTL access to liquid cash that could be used to pay talc claims in the ordinary course. Under the 2023 Funding Agreement, only New JJCI (Holdco) was obligated to provide funding both inside and outside bankruptcy.  J&J was relieved of its 2021 obligation to fund LTL inside and "outside of bankruptcy."  Under the new Support Agreement, J&J was obligated to provide funding only pursuant to a confirmed reorganization plan in bankruptcy.

270.    A legitimate company with a valuable contractual asset (even if that asset is worth a fraction of $61.5 billion) that might have legal vulnerability would normally retain new, independent counsel to evaluate those claims—counsel who was not involved in drafting the contract. It would do exhaustive research on those claims. It would determine every viable basis to retain those contractual rights. It would not advise its counterparty of those potential challenges. If its counterparty asserted those claims, it would inform the party challenging those contractual rights that the challenge was baseless, and would fight any challenge to its contractual rights, tooth

and nail. Further, the company would seek assistance from its allies (here, the company's creditors, the office of the U.S. Trustee, and the Bankruptcy Court). It would not "settle" on the advice of conflicted counsel for a fraction of the value of those rights. Finally, if the company was actually concerned that the contract indeed had defects, it would demand to know who had made mistakes and demand compensation for those mistakes.

271.     Compare that instead to what LTL did. LTL sought advice from Jones Day, the very same law firm that previously represented both J&J and Old JJCI in drafting the 2021 Funding Agreement. Individuals acting on behalf of LTL (all of whom are actually J&J employees seconded to LTL) then discussed with J&J the defenses J&J had to payment to LTL—even though these defenses necessarily failed as a matter of applicable state law due to the express terms of the 2021 Funding Agreement, or, alternatively, meant that LTL could no longer house any talc liability. LTL then "by consensus" and without negotiation prepared and agreed to a *new* agreement, that would swap the 2021 Funding Agreement for new agreements worth at least tens of billions less in value. LTL asserted "common interest" privilege over these negotiations—which should have been *highly adversarial* considering they went to tens of billions of dollars of value. LTL then retained Jones Day *again* for a new bankruptcy and filed its petition a mere 131 minutes after it had been expelled from its first bankruptcy.

272.     Each of these actions was taken to hinder, delay, and defraud creditors. All the Aider and Abettor Defendants (including J&J and New JJCI) participated in this scheme. So did the law firms, accounting firms, and financial firms involved.

273.     This was an intentional fraud because LTL transferred away assets or incurred liabilities that hindered, delayed, or defrauded the abilities of creditors, including Plaintiffs and members of the Class, to collect on their claims.

## CLASS REPRESENTATIVE PLAINTIFFS

274.     Plaintiff Sharon Murphy is a Texas resident who was diagnosed with Stage III-B ovarian cancer in June 1995 (at the age of 21) and experienced a reoccurrence of her cancer in 2013. Plaintiff Murphy used Johnson's talcum powder products as part of her infant and feminine hygiene routine for approximately 26 years, applying the powder to her genital area on a regular basis. Plaintiff Murphy has undergone a hysterectomy, depriving her of the ability to have children. Additionally, Plaintiff Murphy has been subjected to numerous rounds of chemotherapy, radiation treatment, lymph node removal surgery, kidney damage, and a reoccurrence of her cancer. Plaintiff Murphy's claims for personal injury against Johnson & Johnson, et al., are currently pending in the United States District Court for the District of New Jersey (MDL 2738, 3:18-cv-01498) and were subject to stays imposed as a result of Defendants' fraudulent, malicious, intentional and otherwise wrongful conduct alleged herein.

275.     Plaintiff, Dr. Rebecca Love, D.D.S, is a Utah resident who was diagnosed with Stage IV-B high-grade serous ovarian cancer in July 2018 (at the age of 64). Plaintiff Love used Johnson's talcum powder products as part of her feminine hygiene routine for approximately 43 years, applying the powder to her genital area on a regular basis. Since the date of her ovarian cancer diagnosis, Plaintiff Love has undergone seven chemotherapy treatments, debulking surgery, hospitalization for an infected central chemotherapy line, and a drug trial for maintenance therapy for advanced ovarian cancer. Additionally, Plaintiff Love has been diagnosed with hypothyroidism, osteoporosis, and painful skin lesions – all as a consequence of her ovarian cancer treatments. Plaintiff Love's claims for personal injury against Johnson & Johnson, et al., are currently pending in the United States District Court for the District of New Jersey (MDL 2738,

3:20-cv-3156) and were subject to stays imposed as a result of Defendants' fraudulent, malicious, intentional and otherwise wrongful conduct alleged herein.

276.    Plaintiff, William A. Henry is a Florida resident and the spouse and personal representative of Debra Sue Henry, who died on October 22, 2020 (at the age of 66), as a result of high-grade serous Stage IV ovarian cancer. Debra Sue Henry used Johnson's talcum powder products as part of her infant and feminine hygiene routine from approximately 1953 until approximately 2019 when she was diagnosed with Stage 3 high grade serous carcinoma of the peritoneum, ovaries, and fallopian tubes. Plaintiff Henry's claims for wrongful death and loss of consortium against Johnson & Johnson, et al., are currently pending in the United States District Court for the District of New Jersey (MDL 2738, 3:21-cv-5616) and were subject to stays imposed as a result of Defendants' fraudulent, malicious, intentional, and otherwise wrongful conduct alleged herein.

277.    Plaintiff, Alishia Gayle (Landrum) Davis, is a South Carolina resident who was diagnosed with Stage III-C ovarian cancer in June 2011. Plaintiff Davis used Johnson's talcum powder products as part of her feminine hygiene routine for approximately 25-years, applying the powder to her genital area on a regular basis. Since the date of her ovarian cancer diagnosis, Plaintiff Davis has undergone extensive chemotherapy and debulking surgery. Plaintiff Davis experienced a recurrence of her ovarian cancer in 2023 and is currently undergoing chemotherapy and other medical treatment. Plaintiff Davis's claims for personal injury against Johnson & Johnson, et al., are currently pending in the Circuit Court of the City of St. Louis, State of Missouri (*Valerie Swann, et al.*; Case No. 1422-CC09326-01) and were subject to stays imposed as a result of Defendants' fraudulent, malicious, intentional and otherwise wrongful conduct alleged herein.

278.    Plaintiff, Brandi Carl, is a Pennsylvania resident who was first diagnosed with serous borderline ovarian cancer in November 2012 at the age of 36. Plaintiff Carl was a regular user of Johnson's talcum powder products from approximately 1988 (age 12) through 2014, and regularly applied the powder to her genital area during that time-period. Since the date of her ovarian cancer diagnosis, Plaintiff Carl has undergone a full hysterectomy, depriving her of the ability to have children. Additionally, Plaintiff Carl has been forced to undergo a number of surgeries directly related to her use of Defendants' talc product and ovarian cancer. Plaintiff Carl's claims for personal injury against Johnson & Johnson, et al., are currently pending in the Superior Court of New Jersey Law Division: Atlantic County (Docket No. ATL-L-6546-14) and were subject to stays imposed as a result of Defendants' fraudulent, malicious, intentional and otherwise wrongful conduct alleged herein.

## CLASS ACTION ALLEGATIONS

279.    Plaintiffs bring this action under Rules 23(b)(2) and (3) of the Federal Rules of Civil Procedure on behalf of the following proposed class:

> All persons who, as of August 11, 2023, either had a pending lawsuit alleging an ovarian cancer or mesothelioma personal injury claim caused by asbestos or other constituents in Johnson & Johnson talcum powder products or had executed a retainer agreement with a lawyer or law firm to pursue such a claim (hereinafter the "Class").

280.    Plaintiffs expressly reserve the right to amend this class definition as warranted by discovery, legal rulings, and other considerations, including the maximization of efficiency and fairness to all parties.

281.    Excluded from the class are Defendants; any entities in which they have a controlling interest; their agents and employees; and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

282.    The identity of all class members is sufficiently definite and easily ascertainable through objective criteria.

283.    **Numerosity — Rule 23(a)(1).** Numerosity is satisfied because there are at least 40,000 class members, and individual joinder of these class members is impracticable.

284.    **Commonality — Rule 23(a)(2).** There are questions of law and fact common to all class members, including but not limited to:

a.      Did Defendant companies make the transfers involved in the outlined fraudulent schemes with actual intent to hinder, delay, or defraud creditors?

b.      Did the Individual Defendants make the transfers involved in the outlined fraudulent schemes with actual intent to hinder, delay, or defraud creditors?

c.      Did the Defendant companies' actions constitute malicious abuse and/or malicious use of process?

d.      Did the Individual Defendants actions constitute malicious abuse and/or malicious use of process?

285.    **Typicality — Rule 23(a)(3).** Plaintiffs' claims are typical of the claims of putative class members. All Plaintiffs and putative class members have claims under the same fraudulent transfer statutes. All alleged physical injuries caused by exposure to Defendants' talcum powder products in pending lawsuits. All were subject to stays imposed because of Defendants' fraudulent transfers and conduct alleged here.

286.    **Adequacy — Rule 23(a)(4).** Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the other Class members, they will fairly and adequately protect the interests of the Class members, and they are represented by counsel skilled and experienced in class actions.

287.  **Predominance — Rule 23(b)(3).** Common questions of law and fact predominate over any questions affecting only individual members. In fact, beyond the objective determination of whether each class member had a pending lawsuit alleging injury caused by asbestos and other contaminants in Johnson & Johnson talcum powder products, there are no significant individual questions. Plaintiffs' fraudulent transfer allegations are focused squarely on the Defendants' own corporate dealings, and not on any conduct of any Plaintiff or class member. Further:

(a)     Class members have little if any interest in individually controlling the prosecution or defense of separate actions regarding fraudulent transfer actions. Any class member who would individually bring a fraudulent transfer action would bring that action seeking the same relief, and at expense that would greatly exceed any individual recovery;

(b)     Plaintiffs are aware of no litigation concerning this controversy already begun by class members; and

(c)     There are no significant difficulties in managing this action. The class is objectively defined and capable of identification through official court records and executed retainer agreements, and the case presents broad issues of alleged fraudulent transfer focusing on the Defendants' conduct and knowledge surrounding the transactions at issue.

288.  **Superiority — Rule 23(b)(3).** Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and economically, without the duplication of effort and expense that numerous individual actions would entail.

289.     **Declaratory and Injunctive relief — Rule 23(b)(2).** To the extent Plaintiffs plead claims for declaratory and injunctive relief for all class members, certification under Rule 23(b)(2) is appropriate because:

(a)     Separate actions by class members seeking the same relief in different actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendants; and

(b)     In making the fraudulent transfers to avoid liability to class members, the Defendants acted on grounds that apply generally to all class members, justifying final injunctive and declaratory relief appropriate respecting the class as a whole.

<u>COUNT I</u>[20]
**STATE LAW ACTUAL FRAUDULENT TRANSFER—TERMINATION OF
2021 FUNDING AGREEMENT
(Applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act)
(Against J&J, New JJCI, and LTL)**

290.     The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

291.     The Uniform Voidable Transactions Act is codified in North Carolina[21] and New Jersey.[22] The Uniform Fraudulent Transfer Act is codified in Texas.[23]

292.     The 2021 Funding Agreement obligated J&J and New JJCI to pay for the costs associated with LTL's talc liability up to the full value of New JJCI. The value of the payment right under the 2021 Funding Agreement could not drop below a floor estimated by LTL to be at least $61.5 billion and was subject to increase as the value of JJCI increased.

---

[20] As used in the Counts and Prayer for Relief portion of this Class Action Complaint, J&J refers solely to Johnson & Johnson.

[21]     *See* N.C. Gen. Stat. Ann. §§ 39-23.1 – 39-23.12

[22]     *See* N.J. Stat. Ann. § 25:2-20 – 25:2-33.

[23]     *See* Tex. Bus. & Com. Code § 24.

293. The 2021 Funding Agreement, both by its express terms and as represented by LTL and J&J, applies with equal force outside bankruptcy. LTL's interest in the 2021 Funding Agreement was LTL's most valuable asset.

294. LTL entered into the Termination and Substitution Agreement as of April 4, 2023, with the intention of concocting financial distress sufficient to support a new Chapter 11 bankruptcy case. LTL terminated its interest in its most valuable asset by entering into the Termination and Substitution Agreement.

295. LTL's intentional termination of the 2021 Funding Agreement was done with the actual intent to hinder, delay, and/or defraud all talc claimants to whom the LTL was indebted on April 4, 2023, and in fact did hinder, delay, or defraud such claimants.

296. The termination of the Funding Agreement bears several of the badges of fraud enumerated under the UFTA and/or UVTA. First, the termination was a transfer of an asset—the right to funding—from LTL to its insiders—J&J and New JJCI. Second, the transfer was made after LTL had been threatened with suit given the talc claims against it. Third, the transfer was substantially all of LTL's assets; beyond the 2021 Funding Agreement, LTL had scant assets. Fourth, LTL received nothing close to equivalent consideration for the termination of the Funding Agreement. And fifth, the transfer was concocted during LTL's first bankruptcy yet it was concealed from the Bankruptcy Court and LTL's creditors at the time it was conceived and executed; it was not disclosed until LTL filed its second bankruptcy a mere 131 minutes after the first was dismissed.

297. The transfer was made for the benefit of J&J and New JJCI. It surrendered $31.6 billion in value for a fraudulent purpose.

298. The transfer is avoidable under applicable law by LTL's talc creditors.

299.     Therefore, the entry into the Termination and Support Agreement was a fraudulent transfer that may be avoided and LTL's interest in the 2021 Funding Agreement should be recovered under the Uniform Fraudulent Transfer Act and/or Uniform Fraudulent Transactions Act, thus fully reinstating 2021 Funding Agreement and LTL's rights thereunder.

300.     Alternatively, under the Uniform Fraudulent Transfer Act and/or the Uniform Fraudulent Transactions Act, damages must be awarded to Plaintiffs and members of the Class.

301.     Moreover, and/or alternatively, the Court should grant a final or permanent injunction under the applicable Uniform Fraudulent Transfer Act(s) and/or the Uniform Fraudulent Transactions Act(s), each of which allow for an injunction as a form of relief. UFTA/UVTA § 7(a)(3)(a). In this case, an injunction would not be inimical to the public at large, or to third parties who are not involved in the litigation. The hardships favor the Plaintiffs as do the ends of justice. Thus, the 2021 Funding Agreement should be reinstated in full for the benefit of LTL/LLT and its creditors.

## COUNT II
### AIDING AND ABETTING FRAUDULENT TRANSFER—TERMINATION OF 2021 FUNDING AGREEMENT
#### (Pursuant to New Jersey Law or other Applicable State Law)
#### (Against LTL, J&J, New JJCI, and the Aider and Abettor Defendants Identified as Involved in the Termination of the 2021 Funding Agreement)

302.     The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

303.     As alleged *supra*, the termination of the 2021 Funding Agreement constituted an actual fraudulent transfer.

304.     Certain parties knowingly assisted in effectuating those transactions, including but not limited to LTL, J&J, New JJCI, and the Aider and Abettor Defendants identified above as involved in the termination of the 2021 Funding Agreement.

305.     Under New Jersey law and other applicable state laws, these parties are liable for conspiring to commit and/or aiding and abetting the fraudulent transfer.

306.     Furthermore, under New Jersey law or other applicable state law, these culpable parties bear joint and several liability for the outcome of the fraudulent transfer.

## COUNT III
## DECLARATORY JUDGMENT—2021 FUNDING AGREEMENT WAS NOT VOID OR VOIDABLE
### (Pursuant to the Declaratory Judgment Act and New Jersey or North Carolina Law or other Applicable State Law)
### (Against LTL, New JJCI, and J&J)

307.     The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

308.     Following the Third Circuit's ruling to dismiss LTL 1.0 as having been filed in bad faith due to an absence of financial distress, LTL and J&J determined to manufacture financial distress to skirt the Third Circuit's ruling. In that effort, LTL and J&J terminated the 2021 Funding Agreement, thereby eliminating what was by far LTL's biggest asset (at least $61.5 billion) and replacing it with a much less valuable asset—*i.e.,* the 2023 Funding Agreement.

309.     To justify such an incredible decision to relinquish valuable estate assets, LTL and J&J have offered the facially absurd justification that there was a material risk that the 2021 Funding Agreement had been rendered "void or voidable"—a representation for which neither LTL, nor J&J, has provided any support or basis for so concluding.

310.     Notwithstanding its representation that the 2021 Funding Agreement was rendered void or voidable following the Third Circuit's ruling, the 2021 Funding Agreement applied with equal force inside and outside of bankruptcy according to both its plain terms and representations made by LTL.

311.    LTL purported to "settle" claims that the 2021 Funding Agreement was void or voidable without having made any effort to litigate them or defend them with J&J. In terminating the 2021 Funding Agreement, LTL gave up the J&J guarantee, compromising its access to funds that were supposed to pay claims against LTL, and access to the consumer products division J&J had spun off from New JJCI. LTL thus intentionally sought to create financial distress by stripping itself of access to cash, and its ability to pay talc claims as they matured. Its access to tens of billions of equity value now at Holdco was put beyond LTL's reach.

312.    In its first bankruptcy case, LTL did not raise its alleged concern that the 2021 Funding Agreement might be void or voidable because of the Third Circuit's opinion. In late March 2023, LTL filed a monthly operating report, signed by LTL's CFO and its counsel, which indicated the 2021 Funding Agreement remained in place.

313.    Notwithstanding the foregoing, LTL implausibly asserted that there was a material risk that the 2021 Funding Agreement was not enforceable against J&J and New JJCI and that the 2021 Funding Agreement had become "void or voidable" because the Third Circuit's ruling dismissing LTL's first bankruptcy as a bad faith filing frustrated the alleged purpose of the 2021 Funding Agreement. This assertion was made despite the specific language of the Funding Agreement. The Plaintiffs assert that there was no risk that the 2021 Funding Agreement was "void or voidable" because of the Third Circuit's ruling dismissing LTL's first bankruptcy as a bad faith filing and that LTL's assertion on this issue is entirely pretextual. The Third Circuit's ruling could not have frustrated the purpose of the 2021 Funding Agreement because that agreement expressly provided for funding outside of bankruptcy. Moreover, LTL admitted that dismissal was reasonably foreseeable, precluding any claim that the 2021 Funding Agreement could not be enforced because of frustration of purpose.

314.    The requested declaratory relief would definitively resolve the issue giving rise to the controversy—*i.e.,* whether the 2021 Funding Agreement was "void or voidable."

315.    For the sake of clarity, the Plaintiffs' position is that if the 2021 Funding Agreement was "void or voidable" such that J&J or New JJCI could have refused to comply with their payment obligations thereunder, then the divisive merger must be avoided as an actual fraudulent transfer as set forth herein.

316.    Removing the uncertainty of whether the Third Circuit's Opinion somehow created a way that J&J or LTL could void the 2021 Funding Agreement is of paramount public interest because it bears directly on whether the termination of the 2021 Funding Agreement and its alleged replacement with the 2023 Funding Agreement was fraudulent and whether the divisive merger was fraudulent as to talc creditors.

317.    No other remedies will be as effective, efficient, or readily available as a declaratory judgment from this Court.

318.    Therefore, the Plaintiffs are entitled to a declaratory judgment that the 2021 Funding Agreement was not rendered void or voidable by the Third Circuit's Opinion or otherwise.

<u>COUNT IV</u>
**STATE LAW ACTUAL FRAUDULENT TRANSFER—DIVISIVE MERGER
AND MERGER SUPPORT AGREEMENT**
**(Applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act)**
**(J&J, New JJCI, and LTL)**

319.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

320.    If the Court does not find and declare that the termination of the 2021 Funding Agreement was a fraudulent transfer, Plaintiffs ask that in the alternative, it find and declare that

the divisive merger and the Merger Support Agreement were actual fraudulent transfers made with the intent to hinder, defraud, or delay talc creditors.

321.    The Uniform Voidable Transactions Act is codified in North Carolina[24] and New Jersey.[25] The Uniform Fraudulent Transfer Act is codified in Texas.[26]

322.    Through the divisive merger, LTL incurred all the outstanding talc liability of JJCI (including J&J liabilities transferred on the books to Old JJCI).

323.    The obligations which LTL assumed under the divisive merger were from insiders of LTL, namely its corporate parent and affiliates.

324.    In exchange for incurring all the talc liabilities of Old JJCI, LTL received rights under the 2021 Funding Agreement and minimal other assets.

325.    If there was a material risk that the 2021 Funding Agreement was "void or voidable" such that J&J or New JJCI would have refused to comply with their payment obligations thereunder, then J&J's and New JJCI's funding obligations under the 2021 Funding Agreement were essentially illusory; the divisive merger was a fraud; and J&J and Old JJCI effectuated the divisive merger, saddling LTL with its present and future talc liability and removing access to its most substantial assets, with actual intent to hinder, delay, and defraud talc creditors.

326.    The incurrence of the talc liabilities by LTL as part of the divisive merger was the incurrence of an obligation that bears several of the badges of fraud enumerated under the UFTA and/or UVTA. First, the transfer was concealed; J&J did not publicly announce the transfer prior to its pleadings in the LTL bankruptcy filing. Second, the obligation was incurred for the benefit of an insider (*i.e.*, J&J). Third, the obligation was incurred after Old JJCI had been sued and

---

[24]    *See* N.C. Gen. Stat. Ann. §§ 39-23.1 – 39-23.12.

[25]    *See* N.J. Stat. Ann. § 25:2-20 – 25:2-33.

[26]    *See* Tex. Bus. & Com. Code § 24.

threatened with suit for the talc liabilities. Fourth, Old JJCI removed assets by allocating them to New JJCI. And fifth, the talc obligations were foisted upon LTL the minute it was formed, while the vast majority of the valuable assets were given to New JJCI.

327.    In the divisive merger, all of Old JJCI's valuable operating assets were allocated to New JJCI. Notwithstanding Tex. Bus. Org. Code § 10.008(a)(2)(C) deeming the allocation of assets as part of a divisive merger not to be a transfer or assignment, the UFTA/UVTA contains a specific definition of transfer that supersedes it, as the definition "as used in this [Act]". UFTA/UVTA § 1. Accordingly, the allocation of Old JJCI's valuable operating assets to New JJCI was a transfer for the purposes of the UFTA/UVTA.

328.    That transfer of Old JJCI's operating assets to New JJCI bears several of the badges of fraud enumerated under the UFTA and/or UVTA. First, the transfer was concealed; J&J did not publicly announce the transfer prior to its pleadings in the LTL bankruptcy filing. Second, the transfer was from the assets of an insider (*i.e.*, Old JJCI). Third, the transfer was of substantially all of Old JJCI's assets. And fourth, the transfer was made after Old JJCI had been sued and threatened with suit for the talc liabilities.

329.    The transfer of assets to New JJCI and incurrence of obligations by LTL were both made for the benefit of J&J and New JJCI.

330.    Therefore, the transfers of assets and incurrence of obligations that occurred as part of the divisive merger were actual fraudulent transfers that may be avoided for the benefit of Plaintiffs and members of the Class under the Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act.

## COUNT V
## AIDING AND ABETTING FRAUDULENT TRANSFER—DIVISIVE MERGER AND MERGER SUPPORT AGREEMENT
### (Pursuant to New Jersey Law or other Applicable State Law)
### (Against J&J, New JJCI, J&J Services, and the Aider and Abettor Defendants Identified as Involved in the Divisive Merger Fraud)

331.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

332.    As alleged *supra*, if the Court does not find that the termination of the 2021 Funding Agreement was a fraudulent transfer, then the divisive merger and Merger Support Agreement transactions certainly constituted an actual fraudulent transfer.

333.    Certain parties knowingly assisted in effectuating those transactions, including but not limited to J&J, New JJCI, J&J Services, and the individuals identified above as involved in the Divisive Merger Fraud.

334.    Under New Jersey law and other applicable state laws, these parties are liable for aiding and abetting the fraudulent transfer.

335.    Furthermore under New Jersey law and other applicable state laws, these culpable parties bear joint and several liability for the outcome of the fraudulent transfer.

## COUNT VI
## STATE LAW ACTUAL FRAUDULENT TRANSFER—ASSET STRIPPING FRAUD INVOLVING CONSUMER BUSINESS
### (Applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act)
### (Against New JJCI, J&J, Janssen, and Kenvue)

336.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

337.    The Uniform Fraudulent Transfer Act and/or the Uniform Voidable Transactions Act are codified in Texas, North Carolina, and New Jersey.

338.     Through the Asset Stripping Fraud, the consumer health business assets of New JJCI's (known at the time as Johnson & Johnson Holdco (NA) Inc.) were fraudulently transferred away from the reach of LTL and New JJCI's creditors, first to Janssen and ultimately to Kenvue. Janssen and Kenvue, respectively, are the initial and subsequent transferees of the Asset Stripping Fraud.

339.     The assets of the consumer health business were previously available to pay talc claims against LTL pursuant to the 2021 Funding Agreement as well as talc claims against New JJCI.

340.     Because New JJCI transferred the consumer health division to Janssen as part of the Asset Stripping Fraud, New JJCI is unable to meet the same obligations Old JJCI could meet. In the event the divisive merger was unwound and the LTL liabilities were placed back with New JJCI, then New JJCI would have less ability to meet those liabilities than Old JJCI – all on account of the Asset Stripping Fraud.

341.     New JJCI transferred the consumer health business assets to Janssen at J&J's instruction with actual intent to hinder, delay, or defraud its creditors, including LTL and talc claimants.

342.     The transfer for the consumer health business bears several of the badges of fraud enumerated under the UFTA and/or UVTA. First, the termination was a transfer of value by New JJCI to an insider—Janssen, its corporate parent. Second, the transfer was made after New JJCI had been threatened with litigation over the talc claims against it. Third, New JJCI received no consideration for the transfer of the consumer health business assets. Fourth, the transfer occurred shortly after a substantial debt was incurred, namely the 2021 Funding Agreement.

343.    The transfer of the consumer health business from New JJCI to Janssen was made for the benefit of J&J and Janssen and is avoidable under applicable law by New JJCI's talc creditors (*i.e.*, talc claimants).

344.    The Aider and Abettor Defendants identified as involved in the Asset Stripping Fraud helped to effectuate the Asset Stripping Fraud transactions.

345.    Therefore, the transfers made as part of the spinoff of the consumer health business were fraudulent transfers that may be avoided and recovered for the benefit of Plaintiffs and members of the Class under the Uniform Fraudulent Transfer Act and/or Uniform Fraudulent Transactions Act – the result of which would be the return of the consumer health business or its value to New JJCI.

## COUNT VII
## AIDING AND ABETTING FRAUDULENT TRANSFER—ASSET STRIPPING FRAUD INVOLVING CONSUMER BUSINESS
### (Pursuant to New Jersey Law or other Applicable State Law)
### (Against J&J, Janssen, New JJCI, J&J Services, Kenvue, and the Aider and Abettor Defendants Identified as Involved in the Asset Stripping Fraud)

346.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

347.    As alleged *supra*, both the transfer of the consumer business from New JJCI to Janssen and its subsequent spinoff in January 2023 to Kenvue were actual fraudulent transfers.

348.    Certain parties knowingly assisted in effectuating those transactions, including but not limited to J&J, Janssen, New JJCI, J&J Services, Kenvue, and the Aider and Abettor Defendants identified above as involved in the Asset Stripping Fraud.

349.    Under New Jersey law and other applicable state laws, these parties are liable for conspiring to commit and/or aiding and abetting the fraudulent transfers.

350.     Furthermore under New Jersey law and other applicable state laws, these culpable parties bear joint and several liability for the outcome of the fraudulent transfers.

### COUNT VIII
### DECLARATORY JUDGMENT—TERMINATION OF FUNDING AGREEMENT, AND ASSET STRIPPING FRAUD CONCERNING CONSUMER BUSINESS, COLLECTIVELY, ARE ACTUAL FRAUDS
**(Pursuant to the Declaratory Judgment Act and New Jersey or North Carolina or other Applicable State Law)**
**(Against LTL, New JJCI, J&J, J&J Services, Janssen, and Kenvue)**

351.     The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

352.     Count I of this Complaint sets forth that the termination of the 2021 Funding Agreement is an actual fraudulent transfer; Count IV of this Complaint sets forth that the divisive merger is an actual fraudulent transfer; and Count VI of this Complaint sets forth that the transfer of the consumer business out of New JJCI is likewise an actual fraudulent transfer. Collectively, these transactions constitute an actual fraud (the "Collective Actual Fraud").

353.     The requested declaratory relief would definitively resolve the issue giving rise to the controversy—*i.e.*, whether these transactions constituting the Collective Actual Fraud were intended to hinder, delay, or defraud LTL's talc creditors and are an actual fraud under applicable state law.

354.     No other remedies will be as effective, efficient, or readily available as a declaratory judgment from this Court.

355.     Therefore, the Plaintiffs and members of the Class are entitled to a declaratory judgment that one or more of the Individual Actual Frauds and/or the Collective Actual Fraud were intended to delay, hinder, or defraud LTL's talc creditors and were frauds under applicable state law.

<u>**COUNT IX**</u>
**MALICIOUS USE OF PROCESS**
**(Pursuant to New Jersey Law or other Applicable State Law)**
**(Against LTL and the Aider and Abettor Defendants Who Participated in These Actions)**

356.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

357.    In January 2023, the Third Circuit ordered the first LTL bankruptcy case (LTL 1.0) to be dismissed as having been filed in bad faith in substantial part due to the absence of the requisite financial distress required of an entity seeking protection under the bankruptcy laws. *In re LTL Mgmt. LLC*, 64 F.4th 84, 102 (3d Cir. 2023). The Bankruptcy Court for the District of New Jersey entered the order dismissing the case on April 4, 2023. *See In re: LTL Management LLC,* No. 21-30589, Dkt. No. 3938 (1:49 pm).

358.    Yet, within 131 minutes of the dismissal of the LTL's first bankruptcy case (LTL 1.0), LTL filed its second bankruptcy case (LTL 2.0), which was premised on the Divisive Merger and Merger Support Agreement; the stripping of the consumer health care business assets from New JJCI, thereby diminishing the value of the 2021 Funding Agreement; and the Termination and Substitution Agreement entered into as of April 4, 2023, terminating the 2021 Funding Agreement along with the substitution of a new funding agreement for the 2021 Funding Agreement. *See In re: LTL Management LLC*, No. 23-12825, Dkt. No. 1 (4:00 pm).

359.    On August 11, 2023, the Bankruptcy Court for the District of New Jersey dismissed LTL's second bankruptcy filing as being in bad faith. *See In re: LTL Management LLC,* No. 23-12825, Dkt. No. 1211.

360.    LTL, through its malicious and bad faith filing of LTL 2.0, made an improper, illegal, and perverse use of legal process and procedure.

361.     Moreover, LTL's malicious use of the legal process through the filing of LTL 2.0 was done with the actual intent to hinder, delay, and/or defraud Plaintiffs, members of the Class, and other of LTL's talc creditors to whom LTL is liable, and did in fact hinder, delay, defraud and damage such creditors.

362.     As a proximate result of this malicious use of the legal process, Plaintiffs and the members of the Class suffered damages and losses as set forth below.

363.     LTL's use of the legal process as described herein was done deliberately, with malice and without justification and for an improper purpose, warranting compensatory along with punitive and/or exemplary damages.

364.     Certain parties knowingly assisted in effectuating LTL's malicious and bad faith filing of LTL 2.0, and its improper, illegal, and perverse use of legal process and procedure, including, but not limited to, the Aider and Abettor Defendants identified above as participating in these actions.

365.     Under New Jersey law and other applicable state laws, these Aider and Abettor Defendants are liable for aiding and abetting LTL's malicious use of process.

366.     Furthermore, under New Jersey law and other applicable state laws, these Aider and Abettor Defendants bear joint and several liability for LTL's malicious use of process justifying the imposition of compensatory along with punitive and/or exemplary damages.

### COUNT X
### MALICIOUS ABUSE OF PROCESS
#### (Pursuant to New Jersey Law or other Applicable State Law)
#### (Against LTL and the Aider and Abettor Defendants Who Participated in These Actions)

367.     The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

368.    In January 2023, the first LTL bankruptcy case (LTL 1.0) was dismissed as having been filed in bad faith in substantial part due to the absence of the requisite financial distress required of an entity seeking protection under the bankruptcy laws. *In re LTL Mgmt. LLC*, 64 F.4th 84, 102 (3d Cir. 2023). The Bankruptcy Court for the District of New Jersey entered the order dismissing the case on April 4, 2023. *See In re: LTL Management LLC,* No. 21-30589, Dkt. No. 3938 (1:49 pm).

369.    Yet, within 131 minutes of the dismissal of the LTL's first bankruptcy case (LTL 1.0), LTL filed its second bankruptcy case (LTL 2.0), which was premised on the Divisive Merger and Merger Support Agreement; the stripping of the consumer health care business assets from New JJCI, thereby diminishing the value of the 2021 Funding Agreement; and the Termination and Substitution Agreement entered into as of April 4, 2023, terminating the 2021 Funding Agreement along with the substitution of a new funding agreement for the 2021 Funding Agreement. *See In re: LTL Management LLC*, No. 23-12825, Dkt. No. 1 (4:00 pm).

370.    After commencing the second bankruptcy case in bad faith, LTL filed hundreds of pleadings in the bankruptcy to advance its improper, illegal, and perverse use of legal process and procedure.

371.    LTL's abuse of the legal process through the filing of numerous pleadings in LTL 2.0 was done with the actual intent to hinder, delay, and/or defraud Plaintiffs, members of the Class, and other of LTL's talc creditors to whom LTL is liable, and did in fact hinder, delay, defraud and damage such creditors.

372.    As a proximate result of this malicious abuse of process, Plaintiffs and the members of the Class suffered damages and losses as set forth below.

373.    LTL's abuse of legal process was done deliberately, with malice and without justification and for an improper purpose, warranting compensatory along with punitive and/or exemplary damages.

374.    On August 11, 2023, the Bankruptcy Court for the District of New Jersey dismissed LTL's second bankruptcy filing as being in bad faith. *See In re: LTL Management LLC,* No. 23-12825, Dkt. No. 1211.

375.    Certain parties knowingly assisted in effectuating LTL's malicious and bad faith filing of LTL 2.0 and its improper, illegal, and perverse use of legal process and procedure, through subsequent pleadings, including, but not limited to, the Aider and Abettor Defendants identified above as participating in these actions.

376.    Under New Jersey law and other applicable state laws, these Aider and Abettor Defendants are liable for aiding and abetting LTL's malicious abuse of process.

377.    Furthermore, under New Jersey law and other applicable state laws, these Aider and Abettor Defendants bear joint and several liability for LTL's malicious abuse of process justifying the imposition of compensatory along with punitive and/or exemplary damages.

## ATTORNEYS' FEES AND COSTS

378.    To the extent allowable by applicable law, the Plaintiffs request that the Court award reasonable attorney's fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, the Plaintiffs respectfully request that the Court certify the Class and thereafter permit a jury trial on all issues so triable. Additionally, the Plaintiffs, on behalf of themselves and the members of the Class seek the following legal and equitable relief:

**On Count I**:

a.      Entering a judgment against J&J, New JJCI, and LTL finding that the transfer concerning the termination of the 2021 Funding Agreement constitutes an actual fraudulent transfer under the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

b.      Avoiding the transfer concerning the termination of the 2021 Funding Agreement under the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

c.      Implementing remedies, including the full restoration and/or reinstatement of the 2021 Funding Agreement (or the value thereof) for the benefit of the Plaintiffs and the members of the Class, pursuant to the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act.

**On Count II**:

a.      Entering a judgment against LTL, J&J, New JJCI, and the Aider and Abettor Defendants, finding that such entities and individuals aided and abetted the actual fraudulent transfer embodied in the termination of the 2021 Funding Agreement and awarding damages to Plaintiffs and members of the Class jointly and severally against LTL, J&J, New JJCI, J&J Services, and the Aider and Abettor Defendants.

**On Count III**:

a.      Entering a declaratory judgment against LTL, New JJCI, and J&J that the 2021 Funding Agreement was not "void or voidable" by virtue of the Third Circuit's ruling to dismiss the bankruptcy case referred to as LTL 1.0.

**On Count IV**:

a.       Entering a judgment against J&J, New JJCI, and LTL finding that the divisive merger constitutes an actual fraudulent transfer pursuant to the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

b.       Avoiding the divisive merger pursuant to the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act; and,

c.       Implementing remedies, including the unwinding of the divisive merger for the benefit of the Plaintiffs and the members of the Class, pursuant to the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act.

**On Count V**:

a.       Entering a judgment against J&J, New JJCI, J&J Services and the Aider and Abetting Defendants, finding that such entities and individuals aided and abetted the fraudulent transfer embodied in the divisive merger and Merger Support Agreement and awarding damages to Plaintiffs and members of the Class jointly and severally against J&J, New JJCI, J&J Services, and the Aider and Abettor Defendants.

**On Count VI**:

a.       Entering a judgment against J&J, New JJCI, Janssen, and Kenvue, finding that the transfer of the consumer health business from New JJCI to Janssen and its subsequent spinoff constitutes an actual fraudulent transfer pursuant to the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

b.       Finding that J&J is liable to the Plaintiffs and the Class for the full value of the fraudulent transfer and in an amount not less than $61.5 billion; and,

c.      Implementing remedies, including voiding the transfer of the consumer health business from New JJCI to Janssen and its subsequent spinoff (or restoring its equivalent value) for the benefit of the Plaintiffs and the members of the Class, pursuant to the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act.

**On Count VII**:

a.      Entering a judgment against J&J, Janssen, New JJCI, J&J Services, Kenvue, and the Aiding and Abetting Defendants finding that such entities and individuals aided and abetted the fraudulent transfer embodied in the transfer of the consumer health business from New JJCI to Janssen and its subsequent spinoff and awarding damages to Plaintiffs and members of the Class jointly and severally against J&J, Janssen, New JJCI, J&J Services, Kenvue, and the Aider and Abettor Defendants.

**On Count VIII**:

a.      Entering a declaratory judgment against J&J, New JJCI, J&J Services, Janssen, Kenvue, and LTL declaring that one or more of the fraudulent transfers outlined in this Complaint were intended to hinder, delay, and/or defraud Plaintiffs and the members of the Class and are frauds under applicable state law.

**On Count IX**:

a.      Entering a liability judgment and a finding against LTL and the participating Aider and Abettor Defendants that their actions constitute Malicious Use of Process and/or aiding and abetting Malicious Use of Process under applicable New Jersey or North Carolina law or other applicable law.

b.      Entering a judgment and award of compensatory and punitive damages in favor of Plaintiffs and the members of the Class jointly and severally and against LTL and the participating

- 97 -

Aider and Abettor Defendants for their Malicious Use of Process and/or aiding and abetting Malicious Use of Process under applicable New Jersey or North Carolina law or other applicable law.

**On Count X:**

a.      Entering a liability judgment and a finding against LTL and the participating Aider and Abettor Defendants that their actions constitute Malicious Abuse of Process and/or aiding and abetting Malicious Abuse of Process under applicable New Jersey or North Carolina law or other applicable law.

b.      Entering a judgment and award of compensatory and punitive damages in favor of Plaintiffs and the members of the Class jointly and severally and against LTL and the participating Aider and Abettor Defendants for their Malicious Abuse of Process and/or aiding and abetting Malicious Abuse of Process under applicable New Jersey or North Carolina law or other applicable law.

**On All Counts Except Counts III and VIII**:

a.      Awarding compensatory damages to the Plaintiffs and members of the Class, and against the Defendants jointly and severally, in such amounts as determined at trial;

b.      Awarding economic damages against the Defendants including but not limited to interest on the compensatory damages awarded at trial;

c.      Awarding punitive damages for the wanton, willful, fraudulent, reckless, and malicious acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public, Plaintiffs, and members of the Class, in an amount sufficient to punish Defendants and deter future similar conduct;

d.      Pre- and post-judgment interest;

e.     Reasonable attorneys' fees and costs; and

f.     Such other relief as allowed by law or as the Court otherwise deems just and proper.


Dated: <u>May 21, 2024</u>               Respectfully submitted,

<u>/s/ Richard Golomb</u>
Richard Golomb
GOLOMB LEGAL
1835 Market Street, Suite 2900
Philadelphia, PA 19103
Tel: 215-278-4449
rgolomb@golomblegal.com


<u>/s/ Christopher Tisi</u>
Christopher Tisi *(pro hac pending)*
Mike Papantonio *pro hac pending)*
LEVIN, PAPANTONIO, RAFFERTY, PROCTOR,
BUCHANAN, O'BRIEN,
BARR, MOUGEY, P.A.
316 S. Baylen Street
Pensacola, FL 32502
Tel: 850-435-7000
ctisi@levinlaw.com
mpapantonia@levinlaw.com


<u>/s/ Brian A. Glasser</u>
Brian A. Glasser (*pro hac pending*)
David Selby (*pro hac pending*)
Thomas Bennett (*pro hac pending*)
Todd Mathews (*pro hac pending*)
BAILEY GLASSER, LLP
1055 Thomas Jefferson Street NW
Suite 540
Washington, D.C.  20007
Tel: 202-463-2101
bglasser@baileyglasser.com
dselby@baileyglasser.com
tbennett@baileyglasser.com
tmathews@baileyglasser.com

*/s/ P. Leigh O'Dell*
P. Leigh O'Dell (*pro hac pending*)
Andy Birchfield, Jr. (*pro hac pending*)
Ted G. Meadows (*pro hac pending*)
David B. Byrne, III (*pro hac pending*)
BEASLEY, ALLEN, CROW, METHVIN PORTIS
& MILES, P.C.
218 Commerce St.
Montgomery, AL 36104
Tel: 334-269-2343
leigh.odell@beasleyallen.com
andy.birchfield@beasleyallen.com
ted.meadows@beasleyallen.com
david.byrne@beasleyallen.com


*/s/ Michelle A. Parfitt*
Michelle A. Parfitt (*pro hac pending*)
ASHCRAFT & GEREL, LLP
1825 K Street, NW, Suite 700
Washington, DC 20006
Tel: 202-335-2600
mparfitt@ashcraftlaw.com


*/s/ Warren Burns*
Warren Burns (*pro hac pending*)
Amanda Klevorn (*pro hac pending*)
Natalie Earles (*pro hac pending*)
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
phone: (469) 904-4550
wburns@burnscharest.com
aklevorn@burnscharest.com
nearles@burnscharest.com