## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| REBECCA LOVE, D.D.S.; SHARON MURPHY; WILLIAM A. HENRY; ALISHIA LANDRUM; and BRANDI CARL, individually and on behalf of a proposed class,<br><br>    Plaintiffs,<br><br>    v.<br><br>RED RIVER TALC, LLC; JOHNSON & JOHNSON; JOHNSON & JOHNSON HOLDCO (NA), INC.; JANSSEN PHARMACEUTICALS, INC.; and KENVUE, INC.,<br><br>    Defendants. | Hon. Michael A. Shipp<br><br>Civ. Action<br>No. 24-6320 (MAS) (RLS)<br><br>Motion Day: July 21, 2025 |

## PLAINTIFFS' BRIEF IN OPPOSITION TO THE
## <u>MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT</u>

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS...................................................................................... i

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 4

LEGAL STANDARDS ....................................................................................... 9

    A.  Standing.................................................................................................. 9

    B.  Failure to State a Claim...................................................................... 10

ARGUMENT ...................................................................................................... 11

  I.  Plaintiffs Adequately Allege Injury from the Challenged Transactions ..................................................................................... 11

    A.  Plaintiffs Establish Standing and State a Claim.................................. 13

    B.  Plaintiffs Are Not Estopped from Alleging Injury ............................ 22

      1.  Issue Preclusion ............................................................................. 24

      2.  Judicial Estoppel............................................................................. 26

    C.  External Delays in Tort Litigation Constitute a Cognizable Injury .................................................................................................. 27

  II.  Plaintiffs Do Not Challenge Bankruptcy Filings.................................... 30

    A.  Plaintiffs Do Not—And Need Not—Collaterally Attack Bankruptcy Filings about Defendants' Improper Use of the Bankruptcy Code................................................................................ 30

    B.  Defendants' Claimed Good Intentions for Use of the Bankruptcy Code Do Not Inoculate Them from Fraudulent Transfers............................................................................................. 34

III.     Defendants Did Just What They Told This Court They Would
         Not Do, Maliciously Abusing Process ..................................................36

CONCLUSION ......................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
   390 B.R. 80 (S.D.N.Y. 2008) ...............................................................................18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................10

*Ballentine v. United States*,
   486 F.3d 806 (3d Cir. 2007) ....................................................................................9

*Bd. of Trs. of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc.*,
   296 F.3d 164 (3d Cir. 2002) ..................................................................................11

*Bd. of Trs. of Trucking Emps. of N.J. Welfare Fund, Inc. v. Caliber
   Auto Transfer, Inc.*,
   No. 09-6447, 2010 WL 2521091 (D.N.J. June 11, 2010) ....................................9

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................10

*BFP v. Resolution Trust Corp.*,
   511 U.S. 531 (1994)................................................................................................16

*United States ex rel. Bibby v. Mortgage Investors Corp.*,
   No. 12-cv-4020-AT, 2016 WL 11268258 (N.D. Ga. Aug. 12,
   2016) ................................................................................................................18, 19

*Burkhardt v. Genworth Fin., Inc.*,
   250 A.3d 842 (Del. Ch. 2020). ........................................................................17, 18

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ................................................................................10

*Cent. Me. Power Co. v. Foster Wheeler Corp.*,
   684 F. Supp. 724 (D. Me. 1988).............................................................................22

*Chemtex, LLC v. St. Anthony Enters, Inc.*,
   490 F. Supp. 2d 536 (S.D.N.Y. 2007) ....................................................................18

*Component Hardware Group v. Trine Rolled Moulding Corp.*,
No. 05-891(MLC), 2007 WL 2177667 (D.N.J. July 27, 2007)..........................39

*Connelly v. Lane Const. Corp.*,
809 F.3d 780 (3d Cir. 2016) ...............................................................................10

*Const. Party of Pa. v. Aichele*,
757 F.3d 347 (3d Cir. 2014) .................................................................................9

*Crow v. Beardsley*,
68 Mo. 435 (1878) .............................................................................................15

*Edmondson v. Lilliston Ford Inc.*,
No. 23-2938, 2024 WL 5155557 (3d Cir. Dec. 18, 2024) .................................28

*Firmani v. Firmani*,
752 A.2d 854 (N.J. Super. Ct. App. Div. 2000) .................................................20

*G-I Holdings, Inc. v. Reliance Ins. Co.*,
586 F.3d 247 (3d Cir. 2009) ...............................................................................26

*In re Giannini*,
56 A.3d 866 (N.J. 2012) .....................................................................................39

*Gilchinsky v. Nat'l Westminster Bank*,
732 A.2d 482 (N.J. 1999) ...................................................................................13

*Gross v. Pa. Mortgage & Loan Co.*,
137 A. 89 (N.J. Ch. 1927).....................................................................................16

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
607 F.3d 453 (7th Cir. 2010) ..............................................................................20

*Harrington v. Purdue Pharma L.P.*,
603 U.S. 204 (2014)............................................................................................33

*Hawkins v. Harris*,
661 A.2d 284 (N.J. 1995) ...................................................................................39

*Hoffman v. Asseenontv.Com, Inc.*,
962 A.2d 532 (N.J. Super. Ct. App. Div. 2009) .............................................3, 37

*John Deere Shared Servs., Inc. v. Success Apparel LLC*,
    No. 15-CV-1146, 2015 WL 6656932 (S.D.N.Y. Oct. 30, 2015) ................18, 19

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
    337 F.3d 314 (3d Cir. 2003) ....................................................................26

*Laforge v. Consol. Rail Corp.*,
    CIV. A. No. 87-6314, 1988 WL 38321 (E.D. Pa. Apr. 22, 1988)......................28

*Loigman v. Twp. Cmte. of Twp. of Middletown*,
    889 A.2d 426 (N.J. 2006) ......................................................................39

*In re LTL Mgmt., LLC*,
    64 F.4th 84 (3d Cir. 2023) *("LTL I")* ...........................................*passim*

*In re LTL Mgmt., LLC*,
    652 B.R. 433 (2023) *("LTL II")* ........................................6, 23, 30, 31

*Meng v. Du*,
    Civ. Action No. 19-18118 (FLW), 2020 WL 4593273
    (D.N.J. Aug. 11, 2020)..........................................................................36

*MSKP Oak Grove, LLC v. Venuto*,
    875 F. Supp. 2d 426 (D.N.J. 2012) ......................................................10

*MSPA Claims 1, LLC v. Tenet Fla., Inc.*,
    918 F.3d 1312 (11th Cir. 2019) .......................................................20, 21

*Phillips v. Cnty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008) ...................................................................9

*Plastronics Socket Partners, Ltd. v. Hwang*,
    Nos. 2020-1739 & 2020-1781, 2022 WL 108948 (Fed. Cir. Jan.
    12, 2022) ...........................................................................................33

*In re Press*,
    No. 11-86 (MAS), 2015 WL 12911714 (D.N.J. Feb. 4, 2015) .........................28

*In re Red River Talc LLC*,
    No. 24-90505, 2025 WL 1029302 (Bankr. S.D. Tex. Mar. 31,
    2025) ...........................................................................................*passim*

*Robins v. Spokeo, Inc.*,
867 F.3d 1108 (9th Cir. 2017) ............................................................................16

*Shapiro v. Wilgus*,
287 U.S. 348 (1932)..................................................................................13, 21

*Spokeo, Inc. v. Robins*
578 U.S. 330 (2016)..............................................................................*passim*

*Tedards v. Auty*,
557 A.2d 1030 (N.J. App. Div. 1989) ..........................................................37, 39

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*,
No. 1:20-cv-613-SB, 2025 WL 1488015 (D. Del. May 23, 2025)......................28

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)..................................................................................12, 17

*Van v. LLR, Inc.*,
962 F.3d 1160 (9th Cir. 2020) ............................................................................20

*Vita v. Vita*,
No. 21-11060 (SRC), 2022 WL 376764 (D.N.J. Feb. 8, 2022) .........................19

*Williams v. BASF Catalysts LLC*,
765 F.3d 306 (3d Cir. 2014) ..............................................................................39

*Zebrowski v. Wells Fargo Bank, N.A.*,
657 F. Supp. 2d 511 (D.N.J. 2009) ....................................................................37

**Rules**

Fed. R. Civ. P. 1 .......................................................................................................28

Fed. R. Civ. P. 9(b) ...........................................................................................10, 11

Fed. R. Civ. P. 12(b)(1).............................................................................................9

Fed. R. Civ. P. 12(b)(6)........................................................................................9, 10

## Statutes

2 Rich. II, stat. 2, c 3 (1379) ...................................................................16

3 Hen. VII, c 4 (1487) ............................................................................16

11 U.S.C. § 105(a) .................................................................................32

11 U.S.C. § 362 ......................................................................................40

11 U.S.C. § 524(g) ...................................................................................4

11 U.S.C. § 1112(b) ...........................................................................30, 31

13 Eliz., c 5 (151) ..................................................................................16

50 Edw. III, c 6 (1376) ...........................................................................16

N.J. Stat. § 25:2-21 ................................................................................18

N.J. Stat. § 25:2-25(a)(1) ................................................................2, 14, 19

Tex. Bus. & Com. Code § 24.001 .............................................................18

Tex. Bus. Orgs. Code § 1.002(55) ................................................32, 33, 38

U.S. Const. art III ...............................................................17, 20, 21, 35

## Other Authorities

A. Gluck et al., *Against Bankruptcy: Public Litigation Values Versus the Endless Quest for Global Peace in Mass Litigation*, 133 YALE L.J. FORUM 525 (2024) ..........................................................................35

Andrew D. Bradt et al., *Dissonance and Distress in Bankruptcy and Mass Torts*, 91 FORDHAM L. REV. 309 (2022) .......................................34

Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881 (1983) ..........................12

BLACK'S LAW DICTIONARY (12th ed. 2024) .......................................14, 15

C. Wright et al., FED. PRACTICE & PROCEDURE  (3d ed. 1998) ...............22

Chancellor Leo E. Strine, Jr., *Our Continuing Struggle with the Idea that For-Profit Corporations Seek Profit*, 47 WAKE FOREST L. REV. 135 (2012) ............................................................................. 5

Charles Dickens, *Bleak House*, *in* 1 WORKS OF CHARLES DICKENS(1891) .......................................................................... 3

COLLIER ON BANKRUPTCY (16th ed. 2016) ............................................. 34

Curtis W. Huff, *The New Texas Business Corporation Act Merger Provisions*, 21 ST. MARY'S L.J. 109 (1989) .......................................... 33

Dan Levine & Mike Spector, *How a Bankruptcy 'Innovation' Halted Thousands of Lawsuits from Sick Plaintiffs*, REUTERS (June 23, 2022) ..................................................................................... 31

DIANE REHM: ON MY MIND PODCAST: *Uncovering the dark secrets of Johnson & Johnson* (Apr. 3, 2025) ........................................... 6

F. Harper et al., HARPER, JAMES AND GRAY ON TORTS (3d ed. 2024) ..................... 37

Frederick S. Wait, A TREATISE ON FRAUDULENT CONVEYANCES AND CREDITORS' BILLS § 11 (Fred B. Rothman & Co. 1998) (1884) ................. 15, 16

Garrard Glenn, I FRAUDULENT CONVEYANCES AND PREFERENCES (rev. ed. 1940) ................................................................................. 16

Joseph Story, I COMMENTARIES ON EQUITY JURISPRUDENCE (Boston: Little Brown & Co., 12th ed. 1877) .............................................. 16

Lindsey D. Simon, *Bankruptcy Grifters*, 131 YALE. L.J. 1154 (2022) ................... 32

Max Radin, *Fraudulent Conveyances at Roman Law*, 18 VA. L. REV. 109 (1931) ................................................................................. 16

MERRIAM-WEBSTER ..................................................................... 14

Michael A. Francus, *Texas Two-Stepping Out of Bankruptcy*, 120 MICH. L. REV. ONLINE 38 (2022) .................................................. 1

Peter A. Alces, LAW OF FRAUDULENT TRANSACTIONS (updated Feb. 2025) ................................................................. 14, 17

Orlando F. Bump, FRAUDULENT CONVEYANCES 19 (Baltimore:
    Cushings & Bailey, 3d ed. 1882)....................................................14, 15

Restatement (Second) of Torts.................................................................39

Uniform Fraudulent Conveyance Act....................................................16

## <u>INTRODUCTION</u>

Plaintiffs were harmed—all grievously and some terminally—by trusting Defendants and routinely using their carcinogenic talc-based products.[1] Seeking damages, the principal recompense available for their injuries, Plaintiffs prepared and brought individual tort actions against Defendants in various state and federal courts. In 2016, all such federal cases were consolidated for pretrial purposes into a Multidistrict Litigation ("MDL") still pending before this Court. *See* MDL No. 2738.

Meanwhile, Defendants, faced with resulting litigation liabilities, engaged in a four-year frolic of corporate shell games—featuring a legal engineering product monikered the "Texas Two-Step"—to hinder, delay, and/or defraud Plaintiffs from recovery on their claims. When, after three years of such shenanigans, Plaintiffs sought injunctive relief from this Court to halt them, Defendants brazenly misrepresented to this Court, in this very case, what they would and would not do, thereby compounding the harm to Plaintiffs.

---

[1] "Defendants" are Red River Talc LLC ("Red River"); Johnson & Johnson ("J&J"); Johnson & Johnson HoldCo (NA), Inc.; Janssen Pharmaceuticals, Inc.; and Kenvue, Inc. ("Kenvue") (Am. Compl. ¶¶ 30-34.) Defendants incorrectly state that the Amended Complaint dropped LLT Management LLC as a defendant in this case. (Mov. Br. at 15.) Instead, Red River was substituted for LLT Management LLC f/ka LTL Management LLC by stipulated order (ECF No. 68) because, pursuant to the transactions described in the stipulation and in the Amended Complaint, LLT/LTL had ceased to exist and was succeeded for relevant purposes by Red River. It is not surprising that even Defendants apparently find it difficult to keep up with their own successive fraudulent transfers using the "Texas Two-Step." *Cf.* Michael A. Francus, *Texas Two-Stepping Out of Bankruptcy*, 120 MICH. L. REV. ONLINE 38, 43 (2022) ("If the Texas Two-Step sounds like a fraudulent transfer, that's because it fits the definition of one.").

- 1 -

Yet, Defendants premise their Motion to Dismiss on the ridiculous notion that Plaintiffs were unharmed by Defendants' conduct, or that the harms are non-cognizable in this forum. Plaintiffs, of course, developed cancers from using Defendants' products. And their access to the courthouse to file or proceed in litigation, including in the MDL, was delayed for years—not by the ordinary twists and turns of litigation itself, but by the fraudulent conveyances challenged in this action.

Still, the Defendants submit that "[d]elay, by itself, is not a legally cognizable injury." (Mov. Br. at 18.) That is a particularly bold claim—and an incorrect one—in a statutory action regarding transfers "[w]ith actual intent to *hinder*, *delay*, or defraud." NJ Stat. § 25:2-25(a)(1) (emphasis added). Defendants nevertheless contend that Plaintiffs are uninjured by delay. This is plainly wrong.

By the time value of money, Defendants have shorted Plaintiffs of their ultimate recoveries in order to hoard Defendants' corporate free cash flow. And as the Bankruptcy Court in Texas noted in kicking Defendants out of the bankruptcy system for the third time: "unfortunately some women fighting ovarian and other gynecological cancers died during this case." *In re Red River Talc LLC*, No. 24-90505, 2025 WL 1029302, at *2 (Bankr. S.D. Tex. Mar. 31, 2025) ("*In re Red River*"). A defendant's right to due process cannot be confused with an expansive

strategy to dilatorily transform litigation into *Jarndyce v. Jarndyce*. *See* Charles Dickens, *Bleak House*, *in* 1 WORKS OF CHARLES DICKENS 4–5 (1891).

Defendants next suggest that Plaintiffs are somehow seeking to relitigate three different bankruptcy filings by Defendant Red River and its predecessors. Plaintiffs do not seek to re-litigate the bankruptcy cases; courts already have decided them, defeating Defendants' repeat attempts at bankruptcy. In any event, Plaintiffs' claims in this action challenge Step One of the Texas Two-Step (Texas divisive mergers and related reorganizations) and other non-bankruptcy corporate acts; they are not preempted by Defendants' failed bankruptcies interstitial to those transactions. As the Amended Complaint describes in detail, Plaintiffs seek to avoid Defendants' fraudulent transfers made for the purpose of hindrance, delay, and/or defrauding.

Finally, Defendants seek to defeat the count for Malicious Abuse of Process by claiming they lacked ulterior motive in making important representations to this Court that their actions exposed as false just weeks later. It is an unusual count, indeed—but perhaps only because this type of act, which represents "the perversion or abuse of the legitimate purposes" of process, is unusual, too. *See Hoffman v. Asseenontv.Com, Inc.*, 962 A.2d 532, 541 (N.J. Super. Ct. App. Div. 2009).

This Court should deny Defendants' Motion to Dismiss in its entirety.

## BACKGROUND

The underlying tort actions concern ovarian cancers caused by Defendants' talc-based products including "Johnson's Baby Powder" and "Shower to Shower." (Am. Compl. ¶¶ 4–14.) For nearly four years, from October 2021 through March 2025, Defendants engaged in a scheme of various fraudulent transfers to hinder, delay, and/or defraud Plaintiffs' recovery on their tort claims. They are:

(1) The Divisive Merger Fraud, by which talc liabilities were separated from certain Defendants' operating assets using the "Texas Two-Step" (Am. Compl. ¶¶ 55–69);

(2) The Asset Stripping Fraud, by which Defendants' consumer health business assets were spun off into an independent publicly traded company in the form of Defendant Kenvue (*id*. ¶¶ 70–80);

(3) The Bait-and-Switch Fraud, by which an agreement guaranteeing access to $61.5 billion as needed for talc liabilities was traded out for an agreement guaranteeing less than $30 billion to be available in bankruptcy only (*id*. ¶¶ 81–93);

(4) The Potemkin Democracy Fraud, by which Defendants ran a defective vote solicitation process under 11 U.S.C. § 524(g) and proceeded with their planned reorganizations despite failing to meet the announced

vote threshold and contrary to representations made to this Court (*id.* ¶¶ 94–111); and

(5) The Integrated Fraud, by which the first four frauds constituted a single scheme to hinder, delay, and/or defraud Plaintiffs in pursuit of their tort claims (*id.* ¶¶ 112–114).

Defendants use more than a quarter of their brief to present a preferred version of the facts alleged in the Amended Complaint. (Mov. Br. at 4–16.) They do not (and cannot) suggest the allegations are unfounded. Instead, they try to spin their most recent failed bankruptcy petition, filed by Defendant Red River in September 2024, in the Southern District of Texas ("Red River Bankruptcy") following the Potemkin Democracy Fraud, as an act of charity. (*Id.* at 14–15.) It was not. As all of the Defendants are for-profit corporations, this Court may reasonably assume that their actions were taken in furtherance of profit motives rather than for any generous purpose. *See* Chancellor Leo E. Strine, Jr., *Our Continuing Struggle with the Idea that For-Profit Corporations Seek Profit*, 47 WAKE FOREST L. REV. 135, 135–36 (2012) ("Instead of recognizing that for-profit corporations will seek profit for their stockholders using all legal means available, we [naively and mistakenly] imbue these corporations with a personality and assume they are moral beings capable of being 'better' in the long-run than the lowest common denominator.").

Plaintiffs do not ask this Court to relitigate the Red River Bankruptcy or its two predecessors (three total bankruptcy petitions, filed in three different jurisdictions). There is no need: It is a matter of public record and final judgment that each of the three bankruptcies failed. *See In re Red River*, 2025 WL 1029302, at \*44 (dismissing the third bankruptcy); *In re LTL Mgmt., LLC*, 652 B.R. 433, 436 (2023) ("*LTL II*") (dismissing the second bankruptcy "as having been filed in bad faith"), *aff'd* Nos. 23-2971 & 23-2972, 2024 WL 3540467 (3d Cir. 2024); *In re LTL Mgmt., LLC*, 64 F.4th 84, 111 (3d Cir. 2023) ("*LTL I*") (directing dismissal of the first bankruptcy because debtor was not in "financial distress"). In each bankruptcy, Defendants attempted a global resolution that sought to play tort victims off each other by illusory enticements to "pay claimants soon" at a discount, all the while dangling global hindrance and delay on talc claims as both a threat and an alternative desired outcome. Plaintiffs need not, and do not, attempt to disprove Defendants' natural economic motivation for the designer strategy to hinder, delay, and/or defraud Plaintiffs by their actions.[2] Instead, Plaintiffs have adequately—that is,

---

[2] It is also rich for one of the wealthiest and most litigious corporations in America to complain about some Plaintiffs' choice of counsel. Defendants gripe irrelevantly about Plaintiffs' lawyers who have advocated zealously for their clients, (Mov. Br. at 4), even as J&J has been called a "law firm with a drug subsidiary and a device subsidiary attached to it." DIANE REHM: ON MY MIND PODCAST: *Uncovering the dark secrets of Johnson & Johnson* 2:16–2:24 (Apr. 3, 2025), available at dianerehm.org/audio/#/shows/2025-04-03/uncovering-the-dark-secrets-of-johnson-and-johnson/117419/@2:16. "They've spent $35 billion on lawyers since 2011, which is roughly 15 percent of what every major corporation in the country has spent over that period of time. I mean, they've spent more on lawyers by far than any other company, and no one else is close." *Id.* 2:28–2:49.

plausibly and with requisite specificity—alleged that Defendants were pleased all along to have the alternative of failed bankruptcy petitions and the unearned benefit to them of litigation delays. Defendants improperly disrupted Plaintiffs' "chance to prove to a jury of their peers injuries claimed to be caused by a consumer product," as the Third Circuit held in *LTL I*. 64 F.4th at 111.

Defendants used the fraudulent conveyances alleged in this case to build and maintain for four years a 'Heads-I-Win, Tails-You-Lose' litigation ecosystem that had the intended result of hindrance, delay, and/or defrauding of Plaintiffs. They concede as much in their brief, quoting the first LTL bankruptcy court's finding that they "did not undertake the corporate restructuring and bankruptcy filing as litigation tactics designed *solely* to gain a litigation advantage or hinder a plaintiff in any of the thousands of pending tort actions." (Mov Br. at 34 (quoting *In re LTL Mgmt., LLC*, 637 B.R. 396, 426 (Bankr. D.N.J. 2022) (emphasis added), *rev'd LTL I*, 64 F.4th at 92)). Plaintiffs have never said hindrance and delay of their tort claims were the *sole* purposes of the challenged transactions, only that hindrance and delay were intended by the Defendants—as is well pleaded and indisputable.

Moreover, the Defendants make no attempt to address the false representations they made to this Court and the U.S. Court of Appeals for the Third Circuit regarding their commitment to corporate reorganization preceding the Red River Bankruptcy. Defendants contended in filings that they would undertake the

- 7 -

announced reorganization only if 75% of claimants had voted by July 26, 2024, in support of the prepackaged plan. (Am. Compl. ¶ 103 (citing ECF No. 16 at 11, 15, 16, 24, 26).) This Court relied on that representation in its Opinion. (ECF No. 31 at 9–10.) Defendants made the same representation to the Court of Appeals. (Am. Compl. ¶ 104.) Yet when Defendants did not have the requisite votes on July 26, 2024, they proceeded full steam ahead with their reorganization scheme, in contravention of their own disclosures used to solicit votes in favor of the proposed plan of reorganization.[3] And that voting defect made the whole Red River Bankruptcy a fool's errand—except as to Defendants' gains of hindrance and delay.

Defendants' Motion to Dismiss at its core asks this Court to assume that Defendants, in their collective corporate heart of hearts, always acted with good will toward Plaintiffs. Apart from the metaphysical dubiousness of corporate feeling, that goodwill invocation is belied by the history detailed in the Amended Complaint and certainly is not something this Court may presume on the Motion to Dismiss. Instead, the bottom-line allegation is that J&J's four years of corporate reorganization malfeasance and shenanigans caused hindrance, delay, and/or defrauding of Plaintiffs on their claims as tort victims.

---

[3] Plaintiffs cast no professional aspersions on the lawyers in this case by way of suggesting knowing misrepresentation in those submissions. But Defendants are surely responsible for them.

## LEGAL STANDARDS

Defendants have moved to dismiss for lack of standing, *see* Fed. R. Civ. P. 12(b)(1), and for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6).

### A.    Standing

"Pursuant to Rule 12(b)(1), the Court must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the moving party." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). In deciding a Rule 12(b)(1) motion, a court must first determine whether the movant presents a facial or factual attack because the distinction determines how the pleading is reviewed. *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). When a party moves to dismiss prior to answering the complaint, as here, the motion is generally considered a facial attack. *Id.* In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). Thus, "the Court must consider the allegations of the complaint as true," much like a Rule 12(b)(6) motion to dismiss. *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Caliber Auto Transfer, Inc.*, No. 09-6447, 2010 WL 2521091, at *8 (D.N.J. June 11, 2010) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006)).

### B.    Failure to State a Claim

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff merely needs to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face when the factual content is sufficient to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, plaintiffs must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [their] claims." *Id.* at 789.

Fraudulent transfer claims are subject to the heightened pleading standard required by Rule 9(b) of the Federal Rules of Civil Procedure. *See MSKP Oak Grove, LLC v. Venuto*, 875 F. Supp. 2d 426, 434 (D.N.J. 2012). But "courts should be conscious of the fact that application of these more stringent pleading standards may allow 'sophisticated defrauders' to 'successfully conceal the details of their fraud.'" *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)). Thus, nothing more than "precise allegations of date, place, or time" or other "means of injecting precision and some measure of substantiation" into fraud

allegation is required. *Bd. of Trs. of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 172 n.10 (3d Cir. 2002) (internal quotation marks omitted). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## **ARGUMENT**

### I.    **Plaintiffs Adequately Allege Injury from the Challenged Transactions**

Having once persuaded this Court that Plaintiffs lacked standing, for the relief sought against then-future conduct in the June 2024 injunction proceeding, the Defendants now assert that Plaintiffs lack standing on the claims in the Amended Complaint. Of course, the Court's June 2024 decision expressly relied on representations by Defendants about contingent events outside their control, in the form of the 75% solicited vote on the prepackaged bankruptcy—representations that proved to be *false* when Defendants proceeded in their corporate reorganization despite indisputably failing to have reached the 75% threshold when voting closed and they undertook the transactions. (Am. Compl. ¶¶ 105–07.) The Amended Complaint alleges a fourth fraudulent transfer—the Potemkin Democracy Fraud—that is now fully in the rear-view mirror. What Defendants previously obscured is now plainly visible in hindsight: the Potemkin Democracy Fraud was, in fact, already bound to occur in June 2024 despite what Defendants told this Court at that time.

- 11 -

Plaintiffs, on behalf of the putative Class, have brought this suit to challenge a scheme of "keep away," a real-world version of the schoolyard game perpetrated by Defendants whereby they took private litigation rights—and the prospect of assets available to satisfy judgments—away from the talc victims and then tossed them around bullyingly using a series of fraudulent transfers while the talc victims tried to vindicate their litigation rights. Plaintiffs seek to avoid the challenged transactions because they are directly causing Plaintiffs' harm. Defendants perpetrated the alleged transactions to limit the amount they ultimately will pay all present and future talc claimants; and they were also fully cognizant of the harm their scheme would cause to Plaintiffs and the putative Class in the form of hindrance and delay. (Am. Compl. ¶ 22.) The relief requested—avoidance of the challenged transactions, class-wide declaration of prejudgment interest, etc.—would redress Plaintiffs' class-wide injuries presented in this case.

As then-Judge Scalia wrote many years ago, standing is about "the very first question that is sometimes rudely asked when one person complains of another's actions: 'What's it to you?'" Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881, 882 (1983); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting same). Plaintiffs have had individual products liability actions against Defendants pending for years, consolidated in a Multidistrict Litigation proceeding that has

been repeatedly interrupted by automatic stays from bad-faith Chapter 11 bankruptcy filings. In this case, Plaintiffs seek redress under state law for fraudulent transfers made for the purpose of "hindering, delaying, or defrauding creditors' ability to collect on a claim." (Am. Compl. ¶ 17.) "The purpose of the Fraudulent Transfer Act [of New Jersey] is to prevent a debtor from placing his or her property beyond a creditor's reach." *Gilchinsky v. Nat'l Westminster Bank*, 732 A.2d 482, 488 (N.J. 1999); *see also Sargeant v. Al Saleh*, 512 S.W.3d 399, 412 (Tex. App. 2016) ("[The Texas Uniform Fraudulent Transfer Act] provides a comprehensive statutory scheme through which a creditor may seek recourse for a fraudulent transfer of assets or property."). Defendants' scheme has worked just to that effect. "Underlying the act is the notion that a debtor cannot deliberately cheat a creditor by removing his property from the jaws of execution." *Gilchinsky*, 732 A.2d at 488 (internal quotation marks omitted).  A debtor may not bring a corporate bankruptcy vehicle into existence "with the hindrance and delay of suitors the very aim of its existence." *Shapiro v. Wilgus*, 287 U.S. 348, 356 (1932).

Plaintiffs have alleged injury as to their claims and have standing to pursue redress in this action.

### A.    Plaintiffs Establish Standing and State a Claim

In *Spokeo, Inc. v. Robins*, the Supreme Court emphasized that the injury-in-fact requirement of standing requires a harm that must be both "concrete *and*

- 13 -

particularized." 578 U.S. 330, 334 (2016). Defendants improperly attempt to stretch *Spokeo* to contend that an ultimate material risk of total nonpayment is an essential allegation. (Mov. Br. at 23.) That would rewrite both the statute and the law of standing.

First, the statute: The Uniform Fraudulent Transfer Act protects against fraudulent transfers "[w]ith actual intent to *hinder*, *delay*, or defraud." NJ Stat. § 25:2-25(a)(1) (emphasis added). Presumably, Defendants read "defraud" to mean creation of a material risk of nonpayment—and Plaintiffs agree, at least, that nonpayment would fall within the definition of defraud. But "delay" surely means delay. *See Delay*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("The act of postponing or slowing <the continuance was sought for no purpose other than delay>."); *Delay*, MERRIAM-WEBSTER (last visited July 7, 2025) ("the act of postponing, hindering, or causing something to occur more slowly than normal"). And the statute is plainly disjunctive. In the words of a 19th century commentator, the "language implies that the intent to defraud is something distinct from the mere intent to delay or hinder, and that the latter alone will vitiate a transfer." Orlando F. Bump, FRAUDULENT CONVEYANCES 19 (Baltimore: Cushings & Bailey, 3d ed. 1882); *accord* Peter A. Alces, LAW OF FRAUDULENT TRANSACTIONS § 5:35 n.1 (updated Feb. 2025) ("As the requisite intent is set forth in the disjunctive, it is sufficient to find that the intent involved was to hinder and delay creditors and not

- 14 -

necessarily to defraud creditors."); Frederick S. Wait, A TREATISE ON FRAUDULENT CONVEYANCES AND CREDITORS' BILLS § 11 (Fred B. Rothman & Co. 1998) (1884) ("The statute is in the disjunctive and attaches a separate meaning to each of the words which it employs"); *see also Crow v. Beardsley*, 68 Mo. 435, 439 (1878) ("A conveyance may be made to hinder or delay without an intent to defraud.").  By pleading hindrance and delay, among other bases, Plaintiffs have a well-pleaded statutory right of action under the fraudulent transfer law.[4]

And so Defendants turn to standing, arguing (incorrectly) that this case resembles *Spokeo*, where a plaintiff complained that inaccurate content from the case namesake's "people search engine" violated the Fair Credit Reporting Act. The Supreme Court determined that the court of appeals had not addressed whether the privacy harm in the complaint was sufficiently "concrete." Providing new guidance on that analysis, it noted that "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo,* 578 U.S.

---

[4] Authorities divide as to whether "hinder" and "delay" have distinct meanings. *Compare* F. Wait, A TREATISE ON FRAUDULENT CONVEYANCES AND CREDITORS' BILLS § 11 (taking disjunctive view, that debtors "might dispose of their property in such manner as to interpose obstacles to legal process, with intent to hinder creditors in the collection of their demands" or "delay payment to some future period.") *with* O. Bump, FRAUDULENT CONVEYANCES 20 (stating that use of "hinder and delay" is an old English pleonasm); *see also Hinder*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("(Of action) to impede, delay, or prevent.").

at 341. And it held simply that something more is required than a "bare procedural violation." *Id.*[5]

Applying the tradition test to this case, the historical practice is manifest. The Statute of 13 Elizabeth chapter 5 (that is, the law of the 13th year of the reign of Queen Elizabeth I) was enacted in 1571 by the British Parliament, prohibiting transactions that would "delay, hinder or defraud creditors." The statute was received into colonial common law at the time of Independence in 1776. *See* Joseph Story, I COMMENTARIES ON EQUITY JURISPRUDENCE § 353 (Boston: Little Brown & Co., 12th ed. 1877) ("13 Elizabeth, ch. 5 . . . has been universally adopted in America, as the basis of our jurisprudence on the same subject."). And it was widely codified following the promulgation of the Uniform Fraudulent Conveyance Act in 1918, including in New Jersey in 1919.[6] Four hundred and fifty years is a solid historical foundation.[7] *See generally BFP v. Resolution Trust Corp.*, 511 U.S. 531,

---

[5] On remand, the Ninth Circuit found that the informational harms in *Spokeo* itself met the test. *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1118 (9th Cir. 2017).

[6] *See Gross v. Pa. Mortgage & Loan Co.*, 137 A. 89, 90 (N.J. Ch. 1927) ("I am unable to discern in the Act of 1919 (P. L. 1919, p. 500), any substantial change in the law as theretofore recognized and administered in this court in aid of creditors as against acts of debtors designed to hinder, delay, or defraud them, except by the removal of the rule recognized in this jurisdiction prior to the enactment of that act which limited such remedies to judgment and attaching creditors.").

[7] Commentators have observed that even earlier acts of Parliament contain antecedents to the Statute of 13 Elizabeth, including 3 Hen. VII, c. 4 (1487), 2 Rich. II, stat. 2, c. 3 (1379), and 50 Edw. III, c. 6 (1376). *See* F. Wait, A TREATISE ON FRAUDULENT CONVEYANCES AND CREDITORS' BILLS § 18. And some trace the origins back yet further. *See, e.g.,* Garrard Glenn, I FRAUDULENT CONVEYANCES AND PREFERENCES § 60 (rev. ed. 1940) (noting that Roman law "fully recognized" the fraudulent conveyance); M. Radin, *Fraudulent Conveyances at Roman Law*, 18

540–41 (1994) (tracing history of modern U.S. law of fraudulent transfers to Statue of 13 Elizabeth); P. Alces, LAW OF FRAUDULENT TRANSACTIONS § 1:13 ("The Statute of 13 Elizabeth, enacted in 1571, is the source of fraudulent disposition law in this country.").

In *TransUnion*, the Supreme Court further parsed the "concrete" analysis of *Spokeo*, noting that "physical harms and monetary harms "readily qualify as concrete injuries under Article III." 594 U.S. at 425. *TransUnion* said: "If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *Id*. The named plaintiff and others similarly situated who could show a practical harm from an informational injury—i.e., the named plaintiff who had been denied credit to buy a car based on inaccurate suggestion of terrorist affiliation disseminated by the credit bureau—had standing. But other would-be plaintiffs who had been inaccurately "matched" with a name on a terrorist watch list in TransUnion's databases—but for which there had been no dissemination of that match or further practical consequences—lacked standing.

*This* case is about monetary harms (and, of course, the underlying tort cases are about physical harms)—nothing like the claimed informational injuries from non-disseminated information in *TransUnion*. In *Burkhardt v. Genworth Financial,*

---

VA. L. REV. 109, 129 (1931) (showing role of hindrance in fraudulent conveyance law as early as 213 A.D. under Emperor Antonius Augustus (Caracalla)).

*Inc.*, a Delaware court reasoned that although a technical violation of state fraudulent transfer law "is not enough, *ipso facto* or *ipso jure* to confer standing," a claim by creditors in the fraudulent transfer context is "nothing like the inconsequential harm discussed in *Spokeo*." 250 A.3d 842, 853–54 (Del. Ch. 2020). *Burkhardt* assessed that the legislature's judgment about harms as reflected in the fraudulent transfer statute is entitled to deference. *See id*. at 853. And unmatured claims—like those of Plaintiffs in the mass tort litigation—are certainly sufficient to give rise to standing for challenge of conveyances. *See id*. at 856; *see also* N.J. Stat. Ann. § 25:2-21 (defining "Claim" to include "right to payment whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured"); Tex. Bus. & Com. Code § 24.001 (same).[8]

---

[8] Defendants cite various cases for their point that a plaintiff who "fails to sufficiently allege harm from the fraudulent transfer lacks standing to pursue a fraudulent transfer claim." (Mov. Br. at 19.) None helps Defendants' argument.

In *Chemtex, LLC v. St. Anthony Enterprises, Inc.*, the court allowed that a junior creditor of a garment business would have to show that assets conveyed by the garment business to a senior, secured creditor were "in excess of the amounts owed" to that senior creditor in order to demonstrate a fraudulent conveyance claim. 490 F. Supp. 2d 536, 542 (S.D.N.Y. 2007). Recognizing that the standing analysis merges into the merits of fraudulent conveyance allegation, it assumed standing arguendo. *Id.*; *see also See Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 80, 97 (S.D.N.Y. 2008) (holding that there was no injury where "creditors have been paid *in full with interest*") (emphasis added); *John Deere Shared Servs., Inc. v. Success Apparel LLC*, No. 15-CV-1146, 2015 WL 6656932, at *4 (S.D.N.Y. Oct. 30, 2015) (citing *Chemtex* to dismiss fraudulent transfer claim because plaintiff junior creditor failed to allege that defendant's assets "exceeded the value of its secured debt to [senior creditor] Wells Fargo"). There is no senior creditor at issue in this case that would give Defendants any argument that Plaintiffs lack interest in the transferred assets.

*United States ex rel. Bibby v. Mortgage Investors Corp.* has even less to do with the facts

Defendants ask this Court to presume they still have enough, even after the challenged transactions, to satisfy Plaintiffs' claims. But the fraudulent conveyance here is not simply about putting some assets beyond the reach of talc victim-creditors (which Defendants have plainly done by means of the alleged frauds). It is about moving around nearly all the assets that Defendants have, stripping them from purpose-built entities that were assigned liabilities for Plaintiff's injuries. This leaves Plaintiffs with mere representations by Defendant that there will—maybe, someday—be sufficient assets available to satisfy judgments, despite the impediments to date in satisfaction of Plaintiffs' claims in any amount.[9]

---

of this case. Plaintiff Bibby brought a qui tam action against a mortgage lender alleging "a scheme to defraud the United States." No. 12-cv-4020-AT, 2016 WL 11268258, at *1 (N.D. Ga. Aug. 12, 2016). Bibby then added fraudulent transfer claims alleging "shareholder distributions and other payments in an attempt to evade a potential judgment." *Id.* Although the Court dismissed the claim for lack of standing, it did so based on quirks of qui tam cases (that have no bearing here) "that a relators' financial stake in a *qui tam* suit is not an 'injury in fact.'" *See id.* at 13 (citing *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772 (2000)). The court expressly noted that this was a quirk of "the Supreme Court's characterization of the Relators' prejudgment financial interest in the suit as equivalent to a 'wager on the outcome' of the case." *Bibby*, 2016 WL 11268258, at *2 n.1 (quoting *Vt. Agency of Nat. Res.*, 529 U.S. at 772). That does not apply here to override the express statutory inclusion of unliquidated claims as subject to fraudulent transfer protection.

[9] Defendants rely on *Vita v. Vita*, No. 21-11060 (SRC), 2022 WL 376764 (D.N.J. Feb. 8, 2022), for their specious argument that the Amended Complaint does not plead particularized facts. (Mov. Br. at 22.) *Vita* involved a "financial dispute between family members." 2022 WL 376764, at *1. The *Vita* plaintiff alleged that she wired $500,000 to her brother for a business investment and that he absconded with the money. *Id.* The first count was a breach of contract claim. *Id.* The court granted the motion to dismiss on count seven, for violation of the NJ UFTA, because no transfer had been pleaded—the transfer from plaintiff to defendants was "inconsequential to the NJ UFTA claim because the statute only addresses transfers made by debtors (Defendants here) rather than creditors (Plaintiff)." *Id.* at *6. In this case, the fraudulent transfers made by the debtors (Defendants) are at the core of the amended complaint and are pleaded with specificity. (Am. Compl. ¶¶ 41–114.)

Further, courts faced with this issue in the context of fraudulent transfers have indeed found that hindrance and delay caused by debtors moving assets away from creditors cause real harm. In *Firmani v. Firmani*, the Appellate Division affirmed avoidance of a fraudulent conveyance because the conveyance at issue served to "greatly hinder and delay plaintiff's ability to collect the debt [owed to] her." 752 A.2d 854, 858 (N.J. Super. Ct. App. Div. 2000). Notably, that court rejected the defendant's argument that the transfer did not deprive the plaintiff of reachable assets sufficient to satisfy her judgment. *Id.* The court was instead persuaded by the fact that it would have taken years for the plaintiff to collect, even if she secured a charge against the defendant's partnership interest.

As multiple courts of appeals have recognized, "[t]he inability to have and use money to which a party is entitled is a concrete injury." *Van v. LLR, Inc.*, 962 F.3d 1160, 1161 (9th Cir. 2020) (holding that temporary deprivation of money gives rise to an injury in fact for purpose of Article III standing); *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019) ("The inability to have and use money to which a party is entitled is a concrete injury."); *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 457 (7th Cir. 2010) ("Every day that a sum of money is wrongfully withheld, its rightful owner loses the time value of the money.").

Following dismissal of the Red River Bankruptcy, Plaintiffs finally may begin trying their cases to juries across the country. Yet, they have endured waits up to

- 20 -

four years to get to this point because of Defendants' fraudulent transfers and maneuvers to shield assets and place them out of reach. Defendants never directly address the Integrated Fraud in their Motion to Dismiss, perhaps because the total delay caused of nearly four years is such evident harm. Plaintiffs' economic injury "is the epitome of 'concrete.'" *See MSPA Claims 1, LLC*, 918 F.3d at 1318. At a minimum, Plaintiffs have lost the time value of any money that could have been paid as a judgment and, therefore, have Article III standing on their claims.

Moreover, the Supreme Court has observed that "[a] conveyance is illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and delay them." *Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932) (holding that a receivership was voidable when it was commenced to obstruct creditors). A debtor may not "build up obstructions that will hold his creditors at bay," even if he holds the genuine belief that suits can be staved off for a time while a financial storm passes. *Id.* So too here. Delay and obstruction of creditors is illegal, and Plaintiffs have standing to bring their claims because they have been delayed and hindered in their pursuit of damages. It does not make sense that Plaintiffs would lack standing to pursue money that has been shuttled away for the purpose of slow walking any recovery because their economic injuries are based, at least in part, on the delay itself.

Plaintiffs have established standing and stated valid claims.

**B.    Plaintiffs Are Not Estopped from Alleging Injury**

In essentially additional bites at their "standing" argument apple, Defendants assert various theories of estoppel to argue that, because each of the two LTL bankruptcies was dismissed for having been filed in bad faith, based on assets exceeding liabilities, Plaintiffs should be precluded from complaining about impairment of their prospects for recovery in the products liability action here. (Mov. Br. at 23–29.) But the estimated liabilities determination in the bankruptcy context is so inextricably bound up in the context of the Chapter 11 bad faith determination that it is not really the same issue as here. *See* 18 C. Wright et al., FED. PRACTICE & PROCEDURE § 4423 (3d ed. 1998) (observing that "substantial differences in the nature of the proceedings" informs preclusion determination); *see also Cent. Me. Power Co. v. Foster Wheeler Corp.*, 684 F. Supp. 724, 735 n.4 (D. Me. 1988) ("The substantial difference in the nature of the proceedings leads the Court to the conclusion that although some of the same words were used that might be used in discussing negligence in this Court, the issue was neither litigated nor decided in the same terms as it has been in this Court.").

The "good faith" threshold for Chapter 11 bankruptcy put the parties into through-the-looking-glass litigating positions, with Plaintiffs arguing that funds potentially available were too many and Defendants arguing that they were too few.

*See LTL I*, 64 F.4th at 110 (stating that the court does "not duck an apparent irony" in the arguments about access to the bankruptcy system).

By Defendants' reasoning, *they* should be estopped from arguing that the reduced assets in the bankruptcies were sufficient to pay claims. But as the Third Circuit found in the first bankruptcy, that threshold dispute was ultimately about whether Defendants were making use of the Bankruptcy Code consistent with its purposes. *Id.* at 93 ("What counts to access the Bankruptcy Code's safe harbor is to meet its intended purposes."). The Third Circuit held that Defendants were not doing so, *id.*, and the bankruptcy court applied the precedent to likewise dismiss the second filing. *LTL II*, 652 B.R. at 448–49 ("[T]he emphasis on certainty and immediacy of financial distress closes the door of chapter 11 to LTL at this juncture."). The relevant holdings to which the parties are bound are the "bad faith" of Defendants in the first two Chapter 11 filings.

More importantly, focusing narrowly on the amounts available in the bankruptcies misreads Plaintiffs' allegations in this case about the overall scheme. Over several years, Defendants succeeded in hindering and delaying Plaintiffs' tort claims and those of the putative Class. Named Plaintiffs' individual circumstances are described in the Amended Complaint, and each references an MDL or state case "subject to stays imposed as a result of Defendants' fraudulent, malicious, intentional

and otherwise wrongful conduct alleged herein." (Am. Compl. ¶¶ 115–19.)[10] Plaintiffs have never taken any inconsistent position on that critical contention, and so there can be no estoppel of any kind on them asserting it here.

### 1.    Issue Preclusion

Issue preclusion from the bankruptcy proceedings works against Defendants, who cannot relitigate that the first two bankruptcies were filed in bad faith. More generally, Plaintiffs are not asking this Court to adjudicate the validity of the bankruptcy claims by Red River and its predecessors, and they need not do so. Plaintiffs defeated the first bankruptcy partly on the basis that a 2021 funding agreement valued at $61.5 billion was available to Red River's predecessor and exceeded the relevant talc-related liabilities valued at that time. *LTL I*, 64 F.4th at 95. The Third Circuit called this "an ATM disguised as a contract, that it can draw on to pay liabilities without any disruption to its business or threat to its financial viability." *Id.* at 109. Defendants argue that Plaintiffs are now estopped from arguing otherwise. But Plaintiffs are not seeking to argue otherwise. Plaintiffs do not argue here that $61.5 billion (plus prejudgment interest) would be insufficient to pay all class claims; rather, they maintain that the bankruptcy system was never properly

---

[10] A debtor's representation of sufficient assets does not, in any event, preclude creditors' claims for hindrance and delay.

available to a highly solvent corporate family that made improper use of corporate restructurings.

The count in the Amended Complaint concerning the Integrated Fraud alleges "a fraudulent transfer by which Defendants: (a) reduced assets available to satisfy tort claims from at least the full value of Old JJCI [i.e., the $61.5 billion recognized in the first bankruptcy] to whatever assets remain with Red River following dismissal of its bankruptcy in 2025" and in the alternative forced a nearly four-year delay on all talc claim litigation. (Am. Compl. ¶ 175.)

Nor do Plaintiffs need to argue that $29.9 billion (plus prejudgment interest) would not suffice to pay all class claims. Instead, Plaintiffs argue that Defendants fraudulently dwindled the assets available to LTL by the first funding agreement and ensured that these assets would be available only in bankruptcy. (*Id.* ¶ 84 (quoting sworn testimony of LTL's chief legal officer, John Kim, that cancellation of the 2021 funding agreement was based on a "feeling").) Further, Plaintiffs allege that Defendants, via the fraudulent transfers, limited and restricted what would have been a panoply of restructuring options in the bankruptcy cases. (*Id.* ¶ 175.)

Plaintiffs have not taken an inconsistent position on their claim that Defendants manufactured their supposed "financial distress" by surrendering their interest in LTL's most valuable asset through the Termination and Substitution Agreement. (*Id.*) Focusing on the amounts available in the bankruptcies misses the

point: Defendants hindered and delayed Plaintiffs' tort claims and those of the putative Class by engaging in corporate reorganizations that constituted improper obstacles to resolution of Plaintiffs' claims. That issue has never been litigated before *any* court.

### 2.    Judicial Estoppel

Defendants also seek to invoke judicial estoppel, citing *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp*., 337 F.3d 314 (3d Cir. 2003). (Mov. Br. at 28–29.) Once again, they are off the mark: The purpose of judicial estoppel is "to prevent a litigant from 'playing fast and loose with the courts.'" *Krystal Cadillac*, 337 F.3d at 319 (quoting *Scarano v. Central R. Co. of N.J.*, 203 F.2d 510, 513 (3d Cir. 1953)). The Third Circuit has "consistently stated that the doctrine should only be applied to avoid a miscarriage of justice." *Id*. And it is "not intended to eliminate all inconsistencies." *Id.*

Judicial estoppel requires three factors: "there must be (1) irreconcilably inconsistent positions; (2) adopted in bad faith; and (3) a showing that estoppel addresses the harm and no lesser sanction is sufficient." *G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262) (3d Cir. 2009) (citation modified). None of these factors are present here.

First, Plaintiffs take no inconsistent position—let alone an irreconcilable one. The Divisive Merger Fraud (leading to LTL's first bankruptcy) is described in detail

in the Amended Complaint. (Am. Compl. ¶¶ 55–69.) "Of course, LTL was not in financial distress, as the Third Circuit subsequently held in [*LTL I*], and the divisive merger was undertaken to seek to control a subsequent bad faith bankruptcy filing such that its purpose was to hinder, delay, and/or defraud the Plaintiffs and current and future talc victims." (*Id.* ¶ 69.) That is the same position on financial distress that Plaintiffs advanced in the *LTL I* bankruptcy, and it is what the Court ultimately found. *See LTL I*, 64 F.4th at 110 (holding that "LTL was not in financial distress").

Second, the only relevant "bad faith" was on the part of the Defendants, by claiming financial distress for LTL when it did not exist. *See id.* at 103 ("financial distress is vital to good faith").

Third, judicial estoppel is unavailable because no harm follows from the first two factors, and certainly not anything Plaintiffs have done to cause the kind of miscarriage of justice that could warrant judicial estoppel where no lesser sanction is sufficient. Indeed, this would be an absurd context to apply judicial estoppel, where individual Plaintiffs who developed serious cancers from use of Defendants' products simply seek ordinary judicial process, without extraordinary and extraneous delays, on their tort claims.

## C.    External Delays in Tort Litigation Constitute a Cognizable Injury

Without a single citation, Defendants contend that litigation delays are unactionable. That is incorrect: "That the adage 'justice delayed is justice denied'

may by now be trite, that makes it no less true." *Laforge v. Consol. Rail Corp.*, CIV. A. No. 87-6314, 1988 WL 38321, at *1 (E.D. Pa. Apr. 22, 1988).

Within a case, a presiding judicial officer ensures efficient process. *See* Fed. R. Civ. P. 1 (stating duty "to secure the just, speedy, and inexpensive determination of every action and proceeding").[11] Courts are perfectly capable of doing that. *See, e.g., Edmondson v. Lilliston Ford Inc.*, No. 23-2938, 2024 WL 5155557, at *3 (3d Cir. Dec. 18, 2024) (approving district court's invocation of "the adage '[j]ustice delayed is justice denied"); *Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, No. 1:20-cv-613-SB, 2025 WL 1488015 (D. Del. May 23, 2025) (Bibas, J.) ("[J]ustice delayed is justice denied.").

But entitlement to due process should not make a party unaccountable for extraneous delays. A litigant who pulls the fire alarm to evacuate a courthouse in which a trial is taking place surely cannot cloak such an act within the protections of due process. *See In re Press*, No. 11-86 (MAS), 2015 WL 12911714, at *8 (D.N.J. Feb. 4, 2015) ("[Attorney's] false allegations regarding his missing briefcase fell one step short of pulling the fire alarm in the courthouse."). All the more so for a litigant who pulls the proverbial fire alarm repeatedly. Plaintiffs are not, as Defendants contend, attempting "to use fraudulent-transfer law to challenge *any* delay in

---

[11] Following the 2015 amendments, Rule 1 expressly provides that "the parties share the responsibility . . . to discourage over-use, misuse, and abuse of procedural tools that increase cost and result in delay." Fed. R. Civ. P. 1; *see id.* cmt. (2015).

litigating contingent claims." (Mov. Br. at 31.) Plaintiffs are challenging repeated actual fraudulent transfers *designed* to cause external delays in the talc litigation.

Defendants will likely contend that the corporate machination detailed in the Amended Complaint was for Plaintiffs' benefit. They have already pointed to the finding in the Red River Bankruptcy that there was "good faith in pursuing a Chapter 11 plan to settle the talc claims in bankruptcy." (Mov. Br. at 38.) This is plainly aspirational dicta designed to encourage agreed dispositions of talc claims, and recognizing the difficulties of addressing future claimants. If it was a finding, it would have to be read with the opinion's holdings about vote defects and other structural failures of the prepackaged bankruptcy scheme. And it says nothing about the corporate reorganizations challenged in this case. [12] Moreover, to the extent Defendants are now saying it was good faith incompetence rather than malice that led to the relevant litigation delays, that cannot be an escape from liability for fraudulent transfers.

The relief sought for prejudgment interest on the talc claims beginning October 2021, on the date of the first divisive merger, (Am. Compl. ¶ 187), illuminates the common sense of the hindrance and delay issues. Whatever the

---

[12] The relevant language in the *In re Red River* opinion reads: "Red River and its professionals have also acted in good faith *during this case*." 2025 WL 1029302, at *42. By its own terms—and because of the bankruptcy court's limited jurisdiction—the comment at most addresses conduct within the Red River bankruptcy case and could not reach the other actions challenged here.

alternative motivations for the transfers, Defendants should not be able to use them to hinder, delay, and/or defraud Plaintiffs of recoveries on their talc claims.

## II.    Plaintiffs Do Not Challenge Bankruptcy Filings

Defendants incorrectly contend that the Plaintiffs' claims are directed at the failed, defective bankruptcy filings rather than Defendants' fraudulent transfers that enveloped each filing. Defendants say that "Plaintiffs' bankruptcy-related allegations lack merit." (Mov. Br. at 32). But Plaintiffs do not make any bankruptcy conduct allegations. Instead, the court holdings dismissing the bankruptcy filings for bad faith and defective vote failures do all their own work. *See In re Red River*, 2025 WL 1029302, at *44 (dismissing the third bankruptcy); *LTL II*, 652 B.R. at 436 (dismissing the second bankruptcy "as having been filed in bad faith"); *LTL I*, 64 F.4th at 111 (directing dismissal of the first bankruptcy because debtor was not in "financial distress").

### A.    Plaintiffs Do Not—And Need Not—Collaterally Attack Bankruptcy Filings about Defendants' Improper Use of the Bankruptcy Code

Plaintiffs do not collaterally attack the three failed bankruptcy petitions that are relevant to this Amended Complaint. There would be no need to do so given that, in each case, the courts dismissed the petition pursuant to law. As Defendants point out (Mov. Br. at 33 n. 21), 11 U.S.C. § 1112(b) is available to challenge a bankruptcy from inside a bankruptcy proceeding, and it was used successfully against all three

bankruptcies. *See In re Red River*, 2025 WL 1029302, at *41 (citing § 1112(b) as basis for dismissal); *LTL II*, 652 B.R. at 445 (holding that second bankruptcy "fell on the wrong side of the line" of § 1112(b)); *LTL I*, 64 F.4th at 110 ("Because LTL was not in financial distress, it cannot show its petition served a valid bankruptcy purpose and was filed in good faith under Code § 1112(b).").

The Amended Complaint is specific about the individual challenged actions: the Divisive Merger Fraud, the Asset Stripping Fraud, the Bait-and-Switch Fraud, and the Potemkin Democracy Fraud. (Am. Compl. ¶ 12.) It also describes how they were part of an Integrated Fraud (*id.*) and, thus, were connected with Defendants' bankruptcy *plans* for LTL and later Red River. It was integral to each of the three attempts to place an improperly purpose-built entity into bankruptcy. But that is just the point: Plaintiffs challenge the structuring exercises and transfers by which Defendants custom-manufactured and tailored LTL and then Red River, the corporate entities that filed the petitions for bankruptcy. Divisional mergers under Texas law and Chapter 11 bankruptcy are tools of, respectively, state and federal statute. It is the combination of them that defense bar attorney marketers called "the greatest innovation in the history of bankruptcy."[13] And it is the further combination of those two steps with other aspects of the frauds detailed in the Amended

---

[13] *See* Dan Levine & Mike Spector, *How a Bankruptcy 'Innovation' Halted Thousands of Lawsuits from Sick Plaintiffs*, REUTERS (June 23, 2022), https://www.reuters.com/investigates/special-report/bankruptcy-tactics-two-step/.

Complaint that Plaintiffs challenge on the basis of hindrance and delay as to their claims.

As Defendants point out, the Bankruptcy Code provides authority for a court acting under it to prevent abuse of process internal to the filing. *See* 11 U.S.C. § 105(a). But the Third Circuit expressly noted the narrow lens permitted in a bankruptcy proceeding that precluded "license to look past . . . the creation of a new entity with a unique set of assets and liabilities." *LTL I*, 64 F.4th at 105. Looking at the other side of the coin, the actions challenged here by Plaintiffs could have given rise to the Amended Complaint even without the bankruptcy filings having taken place (although, of course, there was no other purpose for them). The transfers themselves represent a shell game designed to hinder and delay Plaintiffs in their MDL actions. The challenge is not to Red River (and its predecessor LTL) filing for bankruptcies; the challenge is to the structuring undertaken by well-capitalized Defendants other than Red River—including Johnson & Johnson itself—that made them, in the well-chosen phrase of one scholar, "bankruptcy grifters." *See* Lindsey D. Simon, *Bankruptcy Grifters*, 131 YALE. L.J. 1154, 1158 (2022) (stating that "bankruptcy grifters seek to join the debtor in resolving mass-tort litigation through Chapter 11's procedures without filing for bankruptcy themselves").

In 1989, Texas authorized its corporations to effect a "divisive merger." *See* Tex. Bus. Orgs. Code ("TBOC") § 1.002(55). The law expressly provides that a

divisive merger may not "abridge any right or rights of any creditor under existing laws." *Id.* § 10.901; *see also Plastronics Socket Partners, Ltd. v. Hwang*, Nos. 2020-1739 & 2020-1781, 2022 WL 108948, at *4 (Fed. Cir. Jan. 12, 2022) ("[T]he Texas divisive merger statute did not relieve companies of [preexisting] obligations"). As one of the authors of the divisive merger provision observed contemporaneously with its enactment:

> While the provisions permitting multiple surviving entities in a merger were intended to provide corporations with greater flexibility in structuring acquisition and restructuring transactions, they were not intended to have any material effect on the existing rights of creditors of the parties to a merger.

Curtis W. Huff, *The New Texas Business Corporation Act Merger Provisions*, 21 St. Mary's L.J. 109, 122 (1989). The drafter's comments are not affirmative evidence of legislative intent, but they provide persuasive confirmation that the plain text of the statute contains no inoculation for its misuse to limit the options of a bankruptcy court in managing reorganization of assets. *Cf. Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 209 (2014) (stating that beneath the complexity of the bankruptcy code "lies a simple bargain: A debtor can win a discharge of its debts if it proceeds with honesty and places virtually all its assets on the table for its creditors"). The various frauds described in the Amended Complaint were orchestrated to prepare a push into the bankruptcy courts while preemptively limiting the options of those tribunals, and of Plaintiffs and other creditors of the

putative bankruptcy vehicle, to fairly guide reorganizations. *Cf.* 1 COLLIER ON BANKRUPTCY § 1.07[3] (16th ed. 2016) ("Reorganization is a negotiating process, and chapter 11 provides the milieu for such negotiation.").

In this lawsuit, Plaintiffs are not seeking sanctions for the three filings of bankruptcies judicially determined to be fatally defective under the Code. Instead, Plaintiffs are claiming injury for the corporate activities around those filings, and the Amended Complaint plausibly alleges that the purpose of the activities—individually and collectively—was, among other things, to improperly hinder and delay the claims of Plaintiffs and the putative Class.

**B.    Defendants' Claimed Good Intentions for Use of the Bankruptcy Code Do Not Inoculate Them from Fraudulent Transfers**

Defendants tell this Court that the schemes alleged in the Amended Complaint were somehow for the benefit of Plaintiffs. (Mov. Br. at 34–36.) Not so. Fundamentally, the Parties have been in disagreement about a non-bankruptcy issue: Who decides how much compensation injured talc plaintiffs will get, individually and in the aggregate? Defendants—a family of companies under a publicly traded parent with a market capitalization of more than $350 billion—would very much like to make that decision for claimants and courts, capping compensation at a fraction of their assets (less, even, than J&J's annual shareholder dividend). *See* Andrew D. Bradt et al., *Dissonance and Distress in Bankruptcy and Mass Torts*, 91 FORDHAM L. REV. 309, 317 (2022) ("While the closure that bankruptcy offers may

sometimes increase the size of the pie, converting tort victims from plaintiffs to creditors can significantly reduce their leverage to demand their share."). Plaintiffs maintain it is their individual prerogative—and indeed a highly personal decision given the nature of the mass tort injuries—to settle or to litigate. The significant sums at stake cannot distract from the fact that Defendants sought to artificially limit and control the sources of potential recovery for the tens of thousands of people they harmed, including Plaintiffs, by marketing and selling consumer products they knew were carcinogenic.

In their aggressive pursuit of the 75% minimum consent required by the Red River bankruptcy plan, Defendants sought to play injured claimants off against each other while attempting to cloak their plan in the language of democratic values. But no bankruptcy was ever required for Defendants to settle with any or all talc plaintiffs. Indeed, the Red River plan was surely not an exercise in charity; it sought to impose a capped settlement on willing and unwilling claimants alike and to extinguish individual claimants' rights to vindication at trial or to settle on their own terms. And, at the same time, Defendants sought to undermine the Article III courts, the statutory MDL system, and the particular MDL for these torts. *See* A. Gluck et al., *Against Bankruptcy: Public Litigation Values Versus the Endless Quest for Global Peace in Mass Litigation*, 133 YALE L.J. FORUM 525, 544 (2024) (describing how the Texas Two-Step "not only shift[s] power and leverage to defendants, but []

also threaten[s] to shut off the traditional tort process—and with it, the public benefits of litigating mass-harm cases—entirely").

Even setting all that aside, the voting on the prepackaged plan itself turned out to be a fraud. (Am. Compl. ¶¶ 102 – 07.) Defendants cannot cloak themselves within the protections of the bankruptcy system—that courts found three times over they were not entitled to access in the first instance—as inoculation for their conduct outside the bankruptcy proceedings.

## III.  Defendants Did Just What They Told This Court They Would Not Do, Maliciously Abusing Process

Defendants' actions speak louder than their words: After representing to this Court that they would not pursue bankruptcy without 75% support from claimants, the Defendants did just that. The myriad voting irregularities and Defendants' ham-fisted attempts to stuff the ballot box constituted a principal reason the third bankruptcy attempt was denied outright. Defendants misrepresented their intentions to this Court and thereby, as alleged in the Amended Complaint, perpetrated a malicious abuse of process.

"To state a claim for the tort of abuse of process, a party must allege both (1) an ulterior motive; and (2) a further act after the issuance of process that represents a perversion of the legitimate use of process." *Meng v. Du*, Civ. Action No. 19-18118 (FLW), 2020 WL 4593273, at *6 (D.N.J. Aug. 11, 2020) (citing *Zebrowski v. Wells Fargo Bank, N.A.*, 657 F. Supp. 2d 511, 517 (D.N.J. 2009)). This

"perversion" of the legitimate use of process "exists where the process is used to 'coerce or oppress' [a party] or the process is used in a manner not contemplated by law." *Zebrowski*, 657 F. Supp. 2d at 517. Malicious abuse of process lies for misusing or misapplying process after it is issued. *Hoffman*, 962 A.2d 532. Process is abused if, "after its issuance[,] the defendant reveals an ulterior purpose he had in securing it by committing 'further acts' whereby he demonstrably uses the process as a mean to coerce or oppress the plaintiff." *Tedards v. Auty*, 557 A.2d 1030, 1035 (N.J. App. Div. 1989) (citing *Gambocz v. Apel, et al.*, 245 A.2d 507 (N.J. App. Div. 1968)). Where there is a genuine issue as to whether a defendant's "further acts" were maliciously intended as an abuse of process, the plaintiff may demonstrate that the defendant secured issuance of process without reason "as evidence that his ultimate intent was to use it for a purpose ulterior to the one for which it was designed." *Tedards*, 557 A.2d at 1035 (citing *Soos v. Soos*, 185 A. 386 (N.J. Ch. 1936) (considering defendant's alleged acts of cruelty in a proceeding for divorce even though the acts occurred within the statutory "cooling-off" period before a complaint was filed)); *see also* F. Harper et al., Harper, James and Gray on Torts § 4.9 (3d ed. 2024) ("All courts would recognize the tort if the process was properly procured and if afterwards the procurer engaged in an improper act concerning the process, outside the normal course of law.").

- 37 -

Here, Defendants declared before this Court in June 2024 and the U.S. Court of Appeals for the Third Circuit in July 2024 that they would not proceed with their plan of reorganization unless they received "the requisite 75% vote in favor" by July 26, 2024. (Am. Compl. ¶ 179.) Those representations were false and constituted abuse of the legal process "because they were intended to make improper, illegal, and perverted use of the legal process with the ulterior motive to hinder, delay, and/or defraud Plaintiffs and members of the Class, and did in fact hinder, delay, and/or defraud and damage such creditors." (Am. Compl. ¶ 180.) Defendants' Initial Plan and Disclosure Statement was published on June 3, 2024. *In re Red River*, 2025 WL 1029302, at *8. "The Disclosure Statement explicitly stated several times that J&J would not undertake another divisional merger or start a third chapter 11 case unless the Initial Plan was approved by 75% of the voting holders of Talc Personal Injury Claims." *Id.* Voting began on June 6, 2024 and yet, July 26 came and went without 75% claimant approval. *Id.* On August 9, 2024, Defendants' voting agent reported that only 70% of claimants had voted to approve the Initial Plan. *Id.* at *9. But on August 19, 2024, "LLT started a series of corporate restructurings using the TBOC divisional merger statutes that eventually led to the end of LLT and the creation of Red River." *Id.*

Defendants, as their last hope, invoke the specter of common law litigation privilege as conveying some magic immunity on the breached commitments made

to this Court in this proceeding. (Mov. Br. at 39–40.) "The litigation privilege generally protects *an attorney* from civil liability arising from words he has uttered in the course of judicial proceedings." *Loigman v. Twp. Cmte. of Twp. of Middletown*, 889 A.2d 426, 433 (N.J. 2006) (emphasis added); *Hawkins v. Harris*, 661 A.2d 284, 292 (N.J. 1995) ("[L]itigation immunity, of fourteenth century origin, protects lawyers, judges, witnesses, parties, and jurors."). It is generally treated as the privilege against allegations of defamation from statements in a court proceeding. *See* Restatement (Second) of Torts § 586. This is workable in part because "the privilege does not cloak attorneys from 'the discipline of the courts, the bar association, and the state.'" *In re Giannini*, 56 A.3d 866, 869 (N.J. 2012).

But the privilege in New Jersey does not "immunize systematic fraud, let alone fraud calculated to thwart the judicial process." *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 318 (3d Cir. 2014). "[W]hen, as here, defendants have uttered words that prevent a fair proceeding, the litigation privilege provides no relief.'" *Id.*[14]

---

[14] Defendants rely for their position on *Component Hardware Group v. Trine Rolled Moulding Corp.*, No. 05-891(MLC), 2007 WL 2177667 (D.N.J. July 27, 2007). But *Trine* addressed whether the misrepresentation within the proceeding could itself constitute a further act, *id.* at *5. The *Trine* court's "litigation privilege" analysis was mere dicta in circling back to the conclusion that "the alleged lies that Component continued to tell the Court do not constitute further acts." *Id.* Indeed, it contrasted *Tedards*, where (as here) the misrepresentations had collateral consequences to the party alleging malicious abuse of process. *See id.*

Plaintiffs' allegations (and the timeline of voting issues as found by the Bankruptcy Court for the Southern District of Texas) satisfy the elements of a claim for malicious abuse of process. Defendants had an ulterior motive to interfere (further, again) with talc litigation, including in the MDL, by the further act of forcing through their plan of reorganization.[15]

Plaintiffs have adequately stated a claim for malicious abuse of process under New Jersey law.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully ask the Court to deny Defendants' Motion to Dismiss.

---

[15] An additional word on stays: Following the improper override of the election they (mis)managed, the non-debtor Defendants pursued and obtained third-party litigation stays for which there is no provision in the bankruptcy code. After dismissal of the Red River Bankruptcy, an appeal beneficially representing certain Plaintiffs in this case remained pending from the related adversary action challenging purported extensions of the Automatic Stay to non-debtors as contrary to the plain text of 11 U.S.C. § 362. *See* Nos. 24-cv-4450 & 24-cv-5074 (S.D. Tex. notice of appeal filed Nov. 7, 2024). In response to appellant's proposed stipulation of dismissal on the condition that Defendants would agree not to seek or benefit from further non-debtor stays on these claims, Defendants declined. All of which is to say that ongoing threats to Plaintiffs remain present.

Dated: July 7, 2025                    Respectfully submitted,


                                       */s/ Patricia M. Kipnis*
                                       BAILEY & GLASSER, LLP
                                       Patricia M. Kipnis (NJ Bar #016962003)
                                       923 Haddonfield Rd., Suite 300
                                       Cherry Hill, NJ 08002
                                       Tel: 215-274-9420
                                       pkipnis@baileyglasser.com

                                       GOLOMB LEGAL, P.C.
                                       Richard M. Golomb (NJ Bar #013181984)
                                       Kevin W. Fay (NJ Bar #005692010)
                                       130 N. 18th Street, 16th Fl.
                                       Philadelphia, PA 19103
                                       Tel: 215-985-9177
                                       golomb@golomblegal.com
                                       fay@golomblegal.com

                                       BAILEY & GLASSER, LLP
                                       Brian A. Glasser (admitted *pro hac vice*)
                                       David L. Selby II (admitted *pro hac vice*)
                                       Thomas B. Bennett (admitted *pro hac vice*)
                                       D. Todd Mathews (admitted *pro hac vice*)
                                       Michael L. Shenkman (admitted *pro hac vice*)
                                       1055 Thomas Jefferson St., NW, Suite 540
                                       Washington, DC 20007
                                       Tel: 202-463-2101
                                       bglasser@baileyglasser.com
                                       dselby@baileyglasser.com
                                       tbennett@baileyglasser.com
                                       tmathews@baileyglasser.com
                                       mshenkman@baileyglasser.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 7, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this case.


*/s/ Patricia M. Kipnis*
Patricia M. Kipnis